LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
The Chrysler Building, 405 Lexington Avenue, 64th Floor
New York, NY 10174
(212) 826-7001

FINER WINN
2850 East Rockhurst Lane, Suite 356
Spokane, WA 99223
(509) 981-8960

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

-----------------------------------------------------------X

ZAYN AL-ABIDIN MUHAMMAD HUSAYN
also known as ABU ZUBAYDAH

     Plaintiff,

                                       Case No. _____

     vs.

JAMES MITCHELL and
JOHN "BRUCE" JESSEN           **COMPLAINT AND**
                                **DEMAND FOR JURY**
                                **TRIAL**

     Defendants.
-----------------------------------------------------------X

I firmly believe that all people, even captured enemies, possess basic human rights which are protected by international standards often set by America's past leaders. Our enemies act without conscience. We must not.

                  Senator McCain, 161 Cong. Rec. S4181
                             (daily ed. Jun. 16, 2015)

1    Plaintiff Zayn al-Abidin Muhammad Husayn ("Abu Zubaydah"), by and

2  through his undersigned counsel, respectfully alleges his complaint for

3  compensatory and punitive damages pursuant to Title 28, United States Code,

4  Section 1350, against Defendants James Mitchell and John "Bruce" Jessen as

5  follows:

6                        **<u>NATURE OF THE ACTION</u>**

7    1.    This case concerns an experimental torture program designed,

8  implemented, and personally administered by Defendants Mitchell and Jessen in

9  their roles as contractors for the U.S. Central Intelligence Agency ("CIA"). The

10  program, misleadingly referred to as "enhanced interrogation," rested on the flawed

11  premise that systematic and prolonged abuse, including uncontrollable pain and

12  mental suffering, would yield actionable intelligence. In proposing the program to

13  the U.S. government, Mitchell and Jessen misled officials regarding the scope and

14  severity of the tactics that they would ultimately use on Abu Zubaydah. In practice,

15  Mitchell and Jessen used torture and cruel and inhuman treatment to force Abu

16  Zubaydah and other subjects into a state of "learned helplessness," a pseudo-

17  scientific phrase for complete submission to the interrogator that, their theory went,

18  would render the subject unable to resist the interrogator's demand for information.

19    2.    Neither Mitchell nor Jessen was remotely qualified to design a proper

20  interrogation program for suspected Al Qaeda affiliates, and this was evident in their

COMPLAINT AND DEMAND FOR JURY TRIAL

results. During the first weeks following his capture on March 28, 2002, Abu Zubaydah was interrogated by agents from the U.S. Federal Bureau of Investigation ("FBI"). In this brief period, he provided virtually all the actionable, reliable information he possessed. By contrast, when Mitchell and Jessen inserted themselves into the process in April of 2002, they were unable to obtain additional information from Abu Zubaydah. Faced with this failure, they claimed that Abu Zubaydah was withholding information, refused to accept that he had already disclosed all his relevant information, and argued that this purported withholding justified increasingly brutal tactics. The escalation of brutality did not produce actionable intelligence, but this did not deter Mitchell and Jessen, as they were no longer actually seeking information. Rather, they were using Abu Zubaydah as a guinea pig for untested interrogation methods, laying the groundwork for what provided them a hugely lucrative contracting business to provide detention and interrogation personnel to the CIA and the U.S. Defense Department ("DOD"). Mitchell and Jessen ultimately earned revenues in excess of $80 million from this scheme.

3.      Prior to developing their torture program, neither Mitchell nor Jessen had ever conducted an interrogation, and neither had knowledge of Al Qaeda, a background in terrorism, or relevant cultural or linguistic expertise. Mitchell and Jessen instead drew on their experience in the U.S. Air Force Survival, Evasion,

1   Resistance and Escape ("SERE") training program, where they had overseen mock

2   interrogations in a controlled setting. However, the program they devised—the

3   proactive use of coercive techniques for actual intelligence gathering—had never

4   been researched or proven effective. In other words, the mock torture techniques

5   employed in the SERE program served as a foil for defensive resistance training,

6   and there was no empirical basis to believe that they could be productive techniques

7   for U.S. forces to acquire information. Nor had Mitchell or Jessen ever implemented

8   these SERE-derived techniques outside the controlled training context with its many

9   safeguards that expressly prevented severe or prolonged physical or mental injury.

10  Notwithstanding the tremendous differences between the SERE program and what

11  would be done to Abu Zubaydah, Mitchell and Jessen repeatedly referenced SERE

12  in justifying their plan to the CIA and the Department of Justice ("DOJ"). This was

13  misdirection. The SERE resistance training was just that—training. It did not involve

14  genuine coercion, and was not a model for effective interrogation.

15        4.    In early 2002, the CIA was desperate to regain footing after the

16  intelligence failures apparent in the wake of the September 11 attacks, and eager to

17  embrace "all means at its disposal" to meet its new mandate to detain and interrogate

18  terror suspects. In particular, the CIA's Counter-Terrorism Center (the "CTC"),

19  under immense pressure to produce actionable intelligence, was receptive to

20  Mitchell and Jessen's proposals, and either ignored or failed to appreciate that the

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 4

proposed techniques had no proven track record and were built on the shaky, pseudo-scientific foundation of learned helplessness. Seeking to lead the government's intelligence gathering efforts and win valuable government contracts in the process, Mitchell and Jessen had no incentive to draw on the copious institutional resources already developed by the FBI and others with decades of interrogation experience that had proven the effectiveness of non-coercive techniques. Instead, they advocated the false promises of brutality, and convinced the CTC and others at the CIA to support their approach and pay them to devise, implement, supervise, and evaluate the program. While Mitchell and Jessen convinced the government's legal team that they would implement the program without crossing legal limits, they ultimately went fully rogue and exceeded long-standing boundaries in torturing Abu Zubaydah. Given their potentially huge financial interest in future government contracts, Mitchell and Jessen sought to become the go-to interrogation experts for the CIA and DOD, and reported successes that were dubious at best.

5.     Abu Zubaydah was the first victim subjected to Mitchell and Jessen's program of torture. Captured in March 2002, he was erroneously believed to be the number three leader in Al-Qaeda and was transported to a black site in Thailand. What Mitchell and Jessen did to him there was a radical departure from the mock interrogation program at SERE. Long gone were any safeguards; for months, Abu Zubaydah endured solitary confinement; constant, intense light, cold, and noise;

1    painful stress positions; prolonged sleep deprivation; starvation; confinement in

2    small coffin-like boxes; proximity to dangerous insects; and water torture/mock-

3    execution—often in combination, and all in longer durations, harsher conditions, and

4    crueler applications than SERE would have allowed. This was Mitchell and Jessen's

5    first opportunity to test their hypothesis that these techniques would yield

6    intelligence, and they were eager to prove themselves right. Having applied and

7    refined these techniques over the course of months torturing Abu Zubaydah,

8    Mitchell and Jessen capitalized on their experience and won contracts to oversee the

9    coercive interrogation and torture of scores of other suspects, including some who

10    have successfully pursued claims similar to those alleged here. *See* Complaint, *Salim*

11    *v. Mitchell*, Case No. 2:15-CV-286 (E.D. Wa. 2015), ECF No. 1.

12    6.    Mitchell and Jessen's conduct caused significant harm to important

13    national interests. Having unqualified and inexperienced people implementing

14    torture on terror suspects left the U.S. intelligence network at a significant

15    disadvantage in the crucial period following the September 11 attacks. Had anyone

16    checked, they would have found evidence-based assessments that coercive

17    techniques "do not produce intelligence," "will probably result in false answers,"

18    and have historically proven to be ineffective. Mitchell and Jessen opted to simply

19    ignore these assessments. Moreover, the torture of individuals in U.S. custody sent

20    shock waves of negative publicity around the world, supporting a widely held view

that the U.S. government tortured people in violation of prevailing international norms. This eroded the mutual deterrence that existed before September 11, and greatly increased the risk of torture for U.S. servicemen and women, as well as civilian intelligence officers, diplomatic personnel, reporters, aid workers, and others. These harms are in addition to and wholly separate from the also significant harm that Mitchell and Jessen caused individual prisoners and the government personnel forced to witness and support Defendants' conduct (many of whom— government personnel as well as prisoners—bear psychological scars from their participation in torture).

7.     Abu Zubaydah, in particular, bears lasting psychological and physical injuries from the torture he endured at the hands of Mitchell and Jessen. He struggles with basic bodily functions and lost the use of his left eye which, injured by shrapnel during his capture, atrophied and shriveled as a result of a lack of adequate medical attention. Due to other injuries sustained during his capture, and exacerbated by Defendants' instructions to withhold medical treatment, among other things he lost much of his intestine, causing severe constipation, and suffered interference with his reproductive system including the loss of a testicle. As a result of blunt force trauma to his head caused by Mitchell and Jessen, he also suffers from blinding headaches, seizures, permanent brain damage, and memory loss. The latter is particularly painful for him, given that he has been held nearly incommunicado for over two

decades, and still cannot see or speak with his family; it grieves him that he is rapidly forgetting the faces of his loved ones.

8.      Abu Zubaydah brings this action against Mitchell and Jessen, whose design, implementation, and administration of the torture program blatantly violated customary international law, laws and treaties of the United States, and the basic parameters of human decency.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over the causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a), and 28 U.S.C. § 1350.

10.      Title 28, United States Code, Section 1350 provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

11.      This is a civil action by an alien for torts committed in violation of the law of nations, also referred to as customary international law, including without limitation as reflected in the following international agreements and declarations:

a.   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20 (1988) reprinted in 23 I.L.M. 1027 (1984) (ratified by the United States on October 21, 1994);

b. Geneva Convention Relative to the Treatment of Prisoners of War, Common Article 3, Aug. 12, 1949, 6 U.S.T. 3316; 75 U.N.T.S. 135 (ratified by the United States on February 8, 1955);

c. International Covenant on Civil and Political Rights, Article 7, adopted Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976) (ratified by the United States on June 8, 1992);

d. The Charter of the International Military Tribunal, Nuremberg, of 8 August 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946) (signed by the United States on August 8, 1945);

e. Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, at 71 (1948);

f. United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. GAOR, 24th Sess., Annex, U.N. Doc. A/CONF/611, Annex I, (1957), approved July 31, 1957, E.S.C. Res. 663(c), 24 U.N. ESCOR, 24th Sess., Supp. No. 1, at 11, U.N. Doc. E/3048 (1957), amended E.S.C. Res. 2076, 62 U.N. ESCOR, 64th Sess., Supp. No. 1, at 35, U.N. Doc. E/5988 (1977);

g. The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N, GAOR, Supp. No. 18, at 40, U.N. Doc. A/7218 (1968);

h. Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452 (XXX), U.N. GAOR, 30th Sess., Supp. No. 34, at 91, U.N. Doc. A/10034 (1975); and

i. Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), Article 5(2)(e), June 8, 1977, 1125 U.N.T.S. 609; 26 I.L.M. 568 (1987); S. Treaty Doc. No. 100-2 (1987) (signed by the United States on December 12, 1977).

12. Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2)-(3).

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 9

13.    This Court may exercise personal jurisdiction over Jessen because he is, and at all relevant times was, domiciled in Spokane, Washington.

14.    This Court may exercise personal jurisdiction over Mitchell and Jessen because they purposefully availed themselves of the privilege of conducting activities in the State of Washington, and the causes of action alleged in this Complaint arise out of or relate to the Defendants' numerous contacts and residence in the State of Washington.

## PARTIES

### A. Plaintiff Abu Zubaydah

15.    Abu Zubaydah, a current Guantanamo inmate, was the first so-called "high value detainee" subjected to Mitchell and Jessen's torture program. Born in 1971 in Saudi Arabia, Abu Zubaydah spent his early years travelling around the Middle East before finally planting roots in Mysore, India, where he married a British citizen and began studying computer science. In 1991, looking for purpose, he travelled to Afghanistan and fought there in the wake of the Soviet withdrawal. After sustaining various injuries, he went on to hold various non-combat administrative roles with the mujahideen, concerned generally with internal and local conflicts. The majority of this time—from 1993 to 2000—he was a fundraiser and recruiter for Khalden Training Camp, one of the largest and longest-operating training camps in Afghanistan. Khalden was independent, not controlled by any

terrorist group, and closed in 2000 due to ideological differences with the ascendant Al Qaeda, including a rejection of Al Qaeda's policy of targeting civilians.

16.    On March 28, 2002, Abu Zubaydah was wounded and captured in Faisalabad, Pakistan by a joint U.S.-Pakistani force and flown to Thailand. Mistakenly believed to be Al Qaeda's third in command, he was briefly interrogated by a highly qualified, Arabic-speaking FBI agent. In response, Abu Zubaydah provided substantial information, including the identity of Khalid Sheik Mohammad, the primary planner of the September 11 attacks. Thereafter, under the supervision of Mitchell and Jessen, he was subjected to an increasingly severe application of interrogation techniques, including isolation, waterboarding on at least 83 occasions, stress positions, cramped confinement, walling, extreme cold, and sleep deprivation, for at least five months. The CIA transferred Abu Zubaydah through a number of different clandestine facilities, and in September 2006 to the U.S. Government detention facility in Guantanamo Bay Naval Base. To date, Abu Zubaydah has never been charged with a crime.

**B. Defendant Mitchell**

17.    James Elmer Mitchell was the principal architect of the CIA's torture program who, at times relevant to this complaint, resided within the Eastern District of Washington. A U.S. citizen, Mitchell was a psychologist at the U.S. Air Force SERE training program at Fairchild Air Force Base in Spokane, Washington. Prior

COMPLAINT AND DEMAND FOR JURY TRIAL

to becoming an independent contractor for the CIA, Mitchell had spent most of his career inside this program, where he developed and supervised a course involving mock torture in a pretend prisoner-of-war camp in a made-up country called "Spokanistan." The goal was to prepare U.S. forces for the possibility of being held and tortured by enemies.

18.    In 2001, Mitchell became an independent contractor for the CIA and, with the help of his partner, Jessen, reverse-engineered the mock-torture techniques used in survival school and deployed them offensively against U.S. detainees, albeit under circumstances far more severe than anything done at survival school or authorized by the U.S. government. He continued working under contract with the CIA from 2005 to 2009 through Mitchell, Jessen and Associates, LLC ("MJA"), the company he co-founded with Defendant Jessen headquartered in downtown Spokane, Washington. MJA eventually was paid more than $80 million for the torture consulting services Mitchell and Jessen provided to the CIA.

**C. Defendant Jessen**

19.    Defendant John "Bruce" Jessen is a U.S. citizen and a psychologist residing now and at all times relevant to this complaint within the Eastern District of Washington. Jessen was the chief psychologist for the Department of Defense Joint Personnel Recovery Agency, which oversees all four of the SERE training programs, serving there until 2002. From 2002 to 2005, Jessen worked alongside

Mitchell as an independent contractor for the CIA, developing and deploying a program of torture for the purpose of interrogating U.S. captives. From 2005 to 2009, Defendant Jessen continued this work as the President of MJA, with corporate headquarters and offices in Spokane, Washington, reaping considerable personal wealth through contracts with the CIA.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

**A. Defendants Pervert the SERE Program to Develop Their Business Plan Around Physical and Psychological Torture**

20.    With predecessor programs originating in World War II, the modern Joint Services SERE Agency was formally established by the Department of Defense in 1991 to teach United States enlisted servicemen and women necessary survival skills and resistance to interrogation. Among other things, the program teaches students methods to resist disclosing confidential information if captured by hostile enemy combatants who do not adhere to the Geneva Conventions.

21.    From 1989 to 1996, Mitchell worked as the chief psychologist at the SERE training school at Fairchild Air Force Base in Spokane, Washington. Jessen helped establish the SERE program and served as the senior SERE psychologist at Fairchild through 2002. Mitchell and Jessen would later seek to justify their proposed interrogation program, giving it a veneer of legality through comparison to the SERE techniques.  This was a fraud.  First, SERE was designed to *simulate* torture, to a degree, and teach U.S. forces how to withstand it. Second, at SERE the

COMPLAINT AND DEMAND FOR JURY TRIAL

techniques were implemented under careful controls, and by other U.S. forces expected not to go too far against one of their own. Under Mitchell and Jessen, by contrast, the techniques were implemented against Abu Zubaydah at a pace, for a duration, and with relentless repetition that passed far beyond anything practiced at SERE.

22.    At "Spokanistan," the made-up country at the SERE location within Fairchild, Mitchell and Jessen supervised the mock torture of students in pretend prisoner-of-war camps. Based on coercive methods used by communist regimes to produce "debility, dependence, and dread" in U.S. prisoners of war, the purpose of SERE training was to build resistance to the extreme stresses of capture, interrogation, and detention by exposing students to simulated scenarios in a controlled and constructive manner.

23.    To prepare U.S. forces to withstand possible torture, SERE training techniques included slapping, shaking, stress positions, isolation, forced nudity, body cavity searches, sleep deprivation, exposure to extreme heat or cold, confinement in cramped spaces, dietary manipulation, and waterboarding. It was well known in the SERE community that these techniques present serious psychological and physical risks, and those risks were monitored and controlled. Even so, there were multiple accounts of students who tried to commit suicide, had nervous breakdowns, or died during or soon after attending the school.

COMPLAINT AND DEMAND FOR JURY TRIAL

24.     As SERE was a mock program in a controlled environment, certain safeguards were implemented to mitigate these risks. SERE school instructors were "let loose" on candidates only after being trained, qualified, and certified to use these techniques by licensed psychologists. The instructors were always supervised by and subordinate to psychologists, who monitored for signs of "abusive drift" during role-play to make sure that instructors did not relish the power of playing torturer.

25.     In addition to training instructors, SERE psychologists observed the training, watching for signals that a student was developing "learned helplessness," a state of total submission. Psychologists at SERE intervened to prevent students from reaching that state and counseled any cadets who got "too close to the edge." Indeed, the 2002 SERE manual directed instructors to mitigate this serious psychological risk:

> Maximum effort will be made to ensure that students do not develop a sense of 'learned helplessness' during the pre-academic laboratory . . . . The goal is not to push the student beyond his means to resist or learn (to prevent 'Learned Helplessness'). The interrogator must recognize when a student is overly frustrated and doing a poor job resisting. At this point the interrogator must temporarily back off, and will coordinate with and ensure that the student is monitored by a controller or coordinator.

26.     Physical torture was likewise strictly regulated. For example, waterboarding of SERE students was limited in duration—no more than two applications, each lasting 20 to 30 *seconds*—and carefully implemented to assure

COMPLAINT AND DEMAND FOR JURY TRIAL

that water would be dribbled onto the upper lip and little if any water would pass through the cloth into the mouth. As set forth below, it was not so for Abu Zubaydah.

27.     Mitchell and Jessen's experience with these practices in "Spokanistan" provided the foundation for the interrogation program that they proposed to the CIA and tested on Abu Zubaydah. Mitchell and Jessen repurposed the program as "a weapon against our enemies." The techniques, however, had never been used for interrogation by U.S. forces, nor had learned helplessness ever been qualified as a means for intelligence collection. The contention that such techniques could be effective for intelligence gathering was entirely supposition unmoored to any research or data, as SERE tactics had only been used defensively on volunteers, where the purpose of the exercise was to withstand them, not measure whether they offered any advantage in gaining information. Mitchell and Jessen's baseless hypothesis, of course, was the basis for their business plan. Purportedly proving this thesis through the torture of their first subject, Abu Zubaydah, would lead to valuable government contracts for the detention and interrogation of the many terror suspects then being rounded up by U.S. forces and others.

28.     Mitchell and Jessen's torture-based interrogation program, while based in SERE, perverted the core defensive purpose and many safeguards of SERE training. The goal of Mitchell and Jessen's new program was to induce, not avoid, a state of learned helplessness in their subjects. Execution of the program—intensified

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 16

to go past the point of mental and physical endurance—was devoid of the controls, safety measures, and oversight mechanisms critical to SERE. Indeed, Abu Zubaydah was subjected to at least 83 applications of waterboarding, during which Mitchell would keep a saturated cloth on Abu Zubaydah's face for the full duration of each pour, sometimes after, and occasionally put the cloth in his mouth. Abu Zubaydah often swallowed copious amounts of water. He was, at the time of his torture, the only known person to have ever been subject to multiple applications of waterboarding. On one occasion, he ceased breathing and had to be resuscitated.

29.    While SERE students were "taken to the edge of the cliff" but never pushed over, Mitchell and Jessen took Abu Zubaydah far beyond the boundaries of the law and into a netherworld of prolonged and extreme psychological and physical abuse.

**B. The CIA Scrambles to Create a Detention and Interrogation Function After September 11**

30.    Following the September 11 attacks, the United States invaded Afghanistan and Iraq, and took other actions collectively described as a War on Terror, which sought to identify, capture, and punish the terrorists responsible for prior attacks and ongoing threats to Western democracy. Reeling from perceived failures to detect and prevent the September 11 attacks, the CIA was keenly focused on its new mandate: to hold and interrogate people suspected of terrorist associations in order to gather intelligence and help avoid a "second wave" of attacks. To meet

COMPLAINT AND DEMAND FOR JURY TRIAL

those goals, Vice President Dick Cheney urged the CIA to use "any means at our disposal."

31.    Torture, of course, was never on the table as a lawful option. While some, including Mitchell and Jessen, may have wished otherwise, the prohibition on torture was and remains absolute. Indeed, in November 2001, CIA lawyers produced a twenty-eight page summary of federal and international law prohibiting the practice. After the September 11 attacks, there was some debate about the moral and practical case for the use of torture "to prevent imminent, significant, physical harm to persons, where there is no other available means." *Report of the Senate Select Committee on Intelligence Study of the Central Intelligence Agency's Detention and Interrogation Program*, S. Rep. No. 113-288 (Dec. 9, 2014) ("SSCI Report") at 19. The U.S. itself has long rejected such arguments in a number of contexts, on the grounds that torture is illegal, ineffective as an interrogation method, politically counterproductive, immoral, and harmful to U.S. servicemembers and foreign policy interests. As Senator John McCain explained in a May 12, 2011 statement on the Senate floor, "if America uses torture, it could someday result in the torture of American combatants. . . . [W]e must bear in mind the likelihood that someday we will be involved in a more conventional war against a state and not a terrorist movement or insurgency and be careful that we do not set a standard that another country could use to justify their mistreatment of our prisoners." The U.S. Army

Field Manual has long reflected these points, including during the period relevant to this Complaint:

> Revelation of use of torture by US personnel will bring discredit upon the US and its armed forces while undermining domestic and international support for the war effort. It also may place US and allied personnel in enemy hands at a greater risk of abuse by their captors. Conversely, knowing the enemy has abused US and allied PSs does not justify using methods of interrogation specifically prohibited by the [Geneva Conventions] and US policy.

*U.S. Army Field Manual 34-52 "Intelligence Interrogation"* (effective 1992 to 2006) at 1-9. And as ends do not justify means, torture has continued to be strictly—and without exception—against the law.

32.     Further affirming the long-standing prohibition on torture, after Abu Zubaydah was captured, and in anticipation of his interrogation, the CIA asked DOJ attorneys for a "get out of jail free card"—legal memoranda preemptively declining to prosecute counter-terrorism personnel for committing torture. No such cover was provided (though, as discussed below, certain DOJ memos did conclude, in circular fashion, that if a number of techniques were applied in such a way so as to not be torture, they would not be prohibited by anti-torture criminal laws).

33.     At the time, the CIA lacked any recent institutional experience with custody and interrogation practices. Rather than turn to the many U.S. government components that had such experience, however, CIA officials accepted Mitchell and Jessen's bid to design a new program, and never received full disclosure concerning

COMPLAINT AND DEMAND FOR JURY TRIAL

the untested, extreme, and illegal methods Defendants planned to use as part of that program. A later investigation confirmed that in the six months before Abu Zubaydah's capture, the CIA did not confer with U.S. military or law enforcement interrogators to research and develop traditional, non-coercive interrogation practices, nor did it rely on its own past practices or the lessons learned from them. Had it done so, the CIA would have seen evidence that coercive techniques "do not produce intelligence," "will probably result in false answers," and have historically proven to be ineffective. SSCI Report at 18. In addition, the CIA would have known that, following World War II, U.S. allies executed Japanese officers for waterboarding prisoners of war.

34.    The only documented analysis supporting Mitchell and Jessen's torture-based interrogation program was a December 2001 assessment of the "Manchester Manual" prepared by Mitchell and Jessen, which as described below would ultimately play a critical role in the torture program tested on Abu Zubaydah. SSCI Report at 17.

**C. Defendants are Retained for Analysis and Instead Implement a Torture Program**

35.    In or around December, 2001, Mitchell pitched himself and Jessen for the job of analyzing the "Manchester Manual," an Al Qaeda-generated document that included purported strategies to resist interrogation that British anti-terrorism police recovered in a May 2000 raid on a suspected Al Qaeda safe house in

COMPLAINT AND DEMAND FOR JURY TRIAL

Manchester, England. Neither Mitchell nor Jessen had ever met an Islamist or a terrorist at that time, and neither possessed any "specialized knowledge of Al-Qaeda, a background in terrorism, or any relevant regional, cultural, or linguistic expertise." SSCI Report at 21. Mitchell's perception was colored by *The Arab Mind*, a 1973 book that has been heavily criticized as simplistic, stereotyping, and Islamophobic. Notwithstanding his lack of experience, Mitchell confidently told CIA officials that they "could do with having someone like [him] go through" the Manchester Manual to inform the CIA "what the terrorists who wrote it would look like and behave like."

36.    In December 2001, despite having no field experience with interrogation nor any relevant background knowledge, Mitchell and Jessen signed a contract with the CIA's Office of Technical Service to review the Manchester Manual. For their services, each was paid $16,000.

37.    After a few days at CIA headquarters in Langley, Virginia, Mitchell and Jessen drafted their report, titled *Recognizing and Developing Countermeasures to Al-Qa'ida Resistance to Interrogation Techniques: A Resistance Training Perspective*. They concluded that "[a] sophisticated level of resistance training is available to high risk Al Qaeda operatives," and proposed countermeasures to defeat that resistance. *Senate Committee on Armed Services Inquiry into the Treatment of Detainees in U.S. Custody*, Nov. 20, 2008, at 7.

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 21

38.     The "Mitchell Paper" (as the assessment came to be known) proposed countermeasures that, per Mitchell, were based on the psychological and physical techniques he had used to train U.S. forces at the SERE school in Spokane, Washington, where Jessen was still the chief psychologist. Among the practices recommended to overcome resistance training, Defendants proposed "walling," slaps to the face and abdomen, putting a detainee in stress positions, and "watering," which involved multiple uses of water as a psychological torture weapon.

39.     Defendants' theory was that these countermeasures would induce a state of "learned helplessness" wherein detainees became passive, compliant, and unable to resist their interrogators' demands for information. The theory of "learned helplessness" was originally conceptualized in 1967 following experimentation on dogs who had received random and frequent electric shocks. It was predicated on the test subject's inability to control or impact their own situation. Dogs that had been subjected to uncontrollable pain and deprived of any control or influence over their suffering "learned" to become helpless and, collapsing into a complete state of passivity, abandoned any attempt to escape their confinement or future pain. As applied to humans, the assumption was that a person who recognized that no actions or words would alter or ameliorate the negative stimuli inflicted on them would, like the dogs in the experiment, be induced into a state of learned helplessness. Of course, dogs were never interrogation subjects, and the proposed link between learned

helplessness in dogs and successful interrogation was, to say the least, irrational and obscene.

40.    Nevertheless, Mitchell and Jessen's thesis, that the infliction of uncontrollable physical and mental pain would "break" interrogation subjects and ultimately lead to valuable intelligence, would become the cornerstone of the program they tested on Abu Zubaydah and implemented on others. As the CIA later explained in a December 30, 2004 memorandum, "[t]he goal of interrogation is to create a sense of learned helplessness and dependence conducive to the collection of intelligence in a predictable, reliable, and sustainable manner…."

41.    Mitchell's theory was flawed and dangerous from its inception. Inducing learned helplessness to produce quality intelligence is illogical, as individuals in a state of learned helplessness—who are psychologically incapable of taking action to improve their situation—would not be "motivated" or "encouraged" to talk to end their torture, much less cooperate with interrogators in the manner hypothesized by Mitchell and Jessen. They would, if anything, lie in a corner like tortured dogs. The CIA understood this; in reviews conducted prior to September 11, it had concluded that "inhumane physical or psychological techniques are counterproductive" and consistently yield unreliable and false answers. SSCI Report at 19. But desperate to make up for past failures and avert future attacks, individuals

1    at the CTC were too eager to accept the confident bluster of Mitchell and Jessen

2    when they promised results from their proposed hardline approach.

3    **D. Joint Forces Capture Abu Zubaydah and He Cooperates with the FBI**

4    42.    On March 28, 2002, a joint force of U.S. and Pakistani agents captured

5    Abu Zubaydah in a raid on a compound in Faisalabad Province, Pakistan. He was

6    severely wounded during the raid by near-fatal bullet wounds. He was stabilized and

7    flown to a safe house in an undisclosed location, presumed to be Thailand, where he

8    would be provided with medical treatment and, more importantly, interrogated.

9    43.    Abu Zubaydah's capture was publicly lauded as "a very serious blow

10   to al-Qaeda" and, as he was then (incorrectly) believed to be part of "Osama bin

11   Laden's inner circle," he was presented as a valuable source of intelligence and the

12   key to avoiding a second wave of attacks on the United States.

13   44.    Abu Zubaydah's value as an information source was overstated. U.S.

14   intelligence believed he had connections to high-profile jihadists, including within

15   Al Qaeda. The CIA came to believe—based on 2001 testimony that would later be

16   recanted—that Abu Zubaydah was the "number three" man in Al Qaeda and that he

17   had authored the Manchester Manual. This was not the case, and the CIA has since

18   learned and conceded the truth: Abu Zubaydah did not plan the September 11 attacks

19   or have any participation in them; he was not a member of Al Qaeda, nor did he hate

20   America; and he was not the author of the Manchester Manual. SSCI Report at 21.

1   In fact, as known by the FBI prior to his capture, Abu Zubaydah had only limited

2   and tangential interactions with certain low-level Al Qaeda members. He had no

3   interaction with bin Ladin.

4       45.    On or about April 1, 2002, Abu Zubaydah's rendition flight landed in

5   Thailand. An FBI team was on site, led by an agent who spoke Arabic and had

6   experience interrogating members of Al Qaeda. The team immediately began

7   interrogating Abu Zubaydah, using photographs and other tools to elicit intelligence

8   on various topics. SSCI Report at 25. Their strategy was immediately successful.

9   Despite his wounds, Abu Zubaydah confirmed his identity, expressed a desire to

10  cooperate, and provided background information on his activities. *Id.* Within the first

11  hour of questioning, he provided valuable information regarding a planned attack,

12  and details such as "the sources he had received money from, where the money was

13  going, the individuals involved, and logistical and operational details, along with

14  other valuable intelligence." *Id.* Upon receipt of the information, the CIA confirmed

15  it was reliable intelligence, and that the planned attack was successfully thwarted.

16      46.    Within hours, Abu Zubaydah's medical condition deteriorated, and he

17  was secretly transferred to a local hospital. Abu Zubaydah required a breathing tube,

18  rendering him unable to speak, but he still continued to respond to the agents'

19  questions to the degree he was able.

COMPLAINT AND DEMAND FOR JURY TRIAL

47.     On April 10, two days after he was extubated, Abu Zubaydah reviewed photographs of suspects provided by the FBI and voluntarily provided vital intelligence that had never been previously confirmed: he identified Khalid Shaykh Mohammad as "Mokhtar," the mastermind behind the September 11 attacks. SSCI Report at 25, 53-54.

48.     Abu Zubaydah's cooperation was a deliberate decision on his part— and a far cry from the resistance Mitchell had predicted. Speaking to a CIA psychologist in February 2003, Abu Zubaydah expressed that prior to his capture he did not believe it possible to withhold information from interrogators. In fact, when he worked at the Khalden Training Camp, Abu Zubaydah advised recruits that such cooperation was expected and should be accounted for, stating that "brothers should be able to expect that the organization will make adjustments to protect people and plans when someone with knowledge is captured." SSCI Report at 48.

### E. Mitchell Obtains Another Contract to Consult on Interrogations of Abu Zubaydah

49.     On April 1, 2002, the CIA contacted Mitchell with a request that he "provide real-time recommendations to overcome Abu Zubaydah's resistance to interrogation." SSCI Report at 26. This was despite the fact Abu Zubaydah was not resisting the FBI's investigation. Quite the opposite: he was cooperating and had provided valuable intelligence. At this time, Abu Zubaydah was viewed, however improbably, as a "high value" detainee with significant ties to Al Qaeda and Osama

COMPLAINT AND DEMAND FOR JURY TRIAL

bin Ladin, already known to be the architect of the September 11 attacks. The CIA, facing what it believed to be a life-threatening "short fuse" situation, was assembling an interrogation team. Even though he had never interrogated a person outside of mock interrogations at the SERE program, Mitchell was the only candidate considered. He was already a contractor with the CIA and, while some had denigrated his past experience as "playacting" and called him a "schoolhouse psychologist," he had been a psychologist at "Spokanistan," had analyzed the Manchester Manual, and had developed countermeasures to resistance training. He was therefore thought to be knowledgeable despite the total absence of any real-world experience.

50.    Around April 3, 2002, Mitchell negotiated the terms of a new independent contract with the CIA to provide "psychological consultation to CTC in debriefing and interrogation operations for Quick Response Tasking." His contract promised him $1,000 per day for work done in the United States and $1,800 per day for work done abroad, four times the rate of a standard interrogator. He also received $17,000 for travel expenses. Now that he had a long-term contract, he could use his position to encourage the CIA to adopt the practices he had developed with Jessen in December to induce learned helplessness in detainees.

51.    Days after negotiating his contract for "applied research" with the CTC in April 2002, Mitchell left for Thailand to interrogate Abu Zubaydah. Mitchell's

COMPLAINT AND DEMAND FOR JURY TRIAL

goal was not just to get intelligence from Abu Zubaydah; he sought to test and refine the methods he had proposed in the Mitchell Paper in December, determine how far he could go, and ultimately gain a contract that went beyond Abu Zubaydah and made him the central authority on interrogating all suspects in the War on Terror— an incredibly broad mandate that would, and ultimately did, come with massive financial benefits. Before leaving, Mitchell and Jessen travelled to Philadelphia to meet with a psychologist in the field of learned helplessness, Martin Seligman, and other government psychologists to discuss the applicability of the theory. Mitchell and Jessen used the information gained in these meetings and conferences to further develop their hypothesis that learned helplessness could be used as an offensive information gathering technique, a hypothesis they were about to test on their first, unwilling subject.

## F. Jessen Develops Coercive Techniques in Parallel and Ultimately Joins Mitchell

52.     Meanwhile, in the United States, Jessen had been promoting SERE practices as a tool to combat the War on Terror. In March 2002, he had prepared slide presentations for future Guantanamo interrogators. His presentation, entitled "Al Qaeda Resistance Contingency Training Based on Recently Obtained Al Qaeda Documents," encouraged the same practices Jessen and Mitchell had proposed in connection with their December paper on the Manchester Manual: the usefulness of "exploitation" interrogation, isolation and degradation, and how to exert control over

COMPLAINT AND DEMAND FOR JURY TRIAL

a detainee with methods that were not within the protections of the Geneva Conventions. Jessen's presentations were transformed into a curriculum for interrogators.

53.     In or around April 2002, Jessen, together with the Joint Personnel Recovery Agency ("JPRA") (which was tasked with supervision of all the U.S. military survival schools, including the Personnel Recovery Academy in Spokane), prepared a proposal to develop a coercive interrogation plan. A draft of the plan recommended techniques specifically designed to shame and humiliate Muslims, including the use of dogs, female interrogators, debased sanitary conditions, and nudity. Jessen wrote himself into the plan, recommending that such interrogations be held at an offsite "exploitation facility" under the direction of the "JPRA Senior SERE Psychologist." When questioned about his credentials to lead such a program, Jessen touted his experience *observing* numerous "interrogations" at SERE school.

54.     However, Jessen wanted to work for the CIA, too. While working for the Pentagon and not yet read-in to the CIA program, Jessen maintained contact with Mitchell at the black site. When Mitchell called Jessen to consult on re-creating a SERE school interrogation bunker, for example, Jessen helped without hesitation. In or around May 2002, Jessen signed his own independent contract with the CIA, specifying that he would perform "applied research," among other things.

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 29

55.    Jessen dove into his new position from Spokane, Washington. With Mitchell, he began developing the curriculum to train future interrogators. The curriculum was practically identical to the slide presentation Jessen had prepared for Guantanamo-bound interrogators earlier that year. At this point, Jessen had yet to conduct a non-SERE confined interrogation and Mitchell's first and only real interrogation experience was torturing Abu Zubaydah, which yielded nothing.

**G. Defendants Torture Plaintiff as Part of their Experimental Program**

*Abu Zubaydah is "Conditioned" under Mitchell's Direction*

56.    Despite the FBI's success, Mitchell somehow convinced the CIA that Abu Zubaydah was still withholding valuable information, and coercive techniques were called for to overcome his purported resistance. For Mitchell, this was a critical tryout of his ambitious and lucrative proposal. If he could get new information from Abu Zubaydah using coercive techniques, that would validate his learned helplessness theory and the aggressive methods that he had proposed, opening the door to greater control and lucrative contracts for the oversight of other CIA detainees.

57.    On April 13, 2002, a CIA officer entered the hospital room where Abu Zubaydah was recovering and told Abu Zubaydah that he had "a most important secret that [we] needed to know." SSCI Report at 27. This framing, that every person

COMPLAINT AND DEMAND FOR JURY TRIAL

1   had a secret to protect, was part of the script Mitchell had created, and kicked off the

2   CIA's takeover of the Abu Zubaydah interrogation.

3       58.    On April 16, on Mitchell's recommendation, Abu Zubaydah was

4   medically sedated and transferred from his hospital room to a CIA black site in

5   Thailand, where coercive techniques were immediately implemented. The sedation

6   itself was the start of the interrogation: it was intended to make Abu Zubaydah wake

7   up disoriented, with no knowledge of where he was and how he got there. At the site

8   Abu Zubaydah was hooded, with a bag on his head, SERE-style; stripped naked;

9   and, in a perverse twist on SERE training in which students were given a safe word

10  to stop their torture training, told he could stop the mistreatment at any time—but

11  only if he revealed details of a second wave of attacks on the United States.

12      59.    Mitchell had further ideas on how to "condition" Abu Zubaydah. For

13  the first six to eight weeks following his release from the hospital, Mitchell kept Abu

14  Zubaydah in "an all-white room that was lit 24 hours a day," where he "was not …

15  provided any amenities." "[H]is sleep [was] disrupted" by "loud noise [that was]

16  continuously fed into his cell." SSCI Report at 26, 55. The cell was kept extremely

17  cold, and Abu Zubaydah, who was naked, was provided with minimal food. He was

18  shackled to a chair almost continuously, and only unshackled to use the "toilet"—a

19  bucket. He was not allowed to sleep, and despite—or perhaps because of—the cold

20  temperature, he was sprayed with water to wake him whenever he began to fall

COMPLAINT AND DEMAND FOR JURY TRIAL

asleep. *Id.* Additionally, at Mitchell's direction, medical attention was intentionally withheld. Specifically, dressings on Abu Zubaydah's wounds would go unchanged and at times the wounds would reopen because of the physical mistreatment that he suffered.

60.    Mitchell directed proceedings from another room as interrogators repeatedly asked the confused Abu Zubaydah the same Kafkaesque question for hours: to disclose "the secret" he was purportedly hiding. Abu Zubaydah was not presented with specific prompts, but bombarded with open-ended questions that did not target or seek information on a specific event; it was a fishing expedition for a hypothetical second wave of attacks on the United States. In a deliberate echo of Mitchell's approach at SERE, Abu Zubaydah was also told that the treatment of his friends and co-captors depended on his answer and cooperation. *Id.*

61.    The purpose behind these tactics was to disorient and distress Abu Zubaydah to the extent that, according to Mitchell's theory, he would develop a sense of learned helplessness. Mitchell explained the concept to the team in Thailand in terms of the original experiment—"when you apply electric shocks to a caged dog, after a while he's so diminished he can't resist"—and made clear that Abu Zubaydah was to be considered and treated like "a dog in a cage." Here, Mitchell's lack of interrogation experience was apparent in the lack of any logical connection between a caged dog and a human prisoner with potentially valuable intelligence.

COMPLAINT AND DEMAND FOR JURY TRIAL

62.     Even though Abu Zubaydah did not provide any information during the sleep deprivation period, Mitchell justified these extreme techniques, reporting that the approach was successful in weakening Abu Zubaydah's "resistance." But, in an effort to obtain permission to engage in more aggressive tactics, such as his request for extended sleep deprivation, Mitchell also reported that the "extremely resilient" Abu Zubaydah continued to resist interrogation. It was never considered that Abu Zubaydah, rather than resisting interrogation, had already provided all responsive information that he possessed. Mitchell extended Abu Zubaydah's sleep deprivation over the objections from the medical team at the black site. The medical team ultimately intervened at the seventy-six hour mark and allowed Abu Zubaydah to sleep for three hours.

63.     When interrogators returned to Abu Zubaydah's cell, he provided them with information about a planned attack and the identity of "Mokhtar"—the same information that he had already provided to the FBI in the first weeks following his capture.

64.     A little later, with prompts from FBI interrogators, Abu Zubaydah discussed two bumbling jihadist-aspirants who discussed swirling uranium in a bucket in the hopes of constructing a dirty bomb. Jose Padilla, one of the two men described, was later arrested in May 2002 on intelligence from an unrelated source;

COMPLAINT AND DEMAND FOR JURY TRIAL

as the CIA later admitted, he was nowhere near being able to build a dirty bomb. SSCI Report at 264, 266.

65.     Over the following month, Mitchell and Jessen experimented with a variety of interrogation approaches, including rewarding Abu Zubaydah for instances of cooperation, such as providing him with clean clothes and better food in exchange for information on Al Qaeda, which simply duplicated other information he had already provided. Nevertheless, Mitchell continued to push to try more aggressive interrogation methods, claiming that Abu Zubaydah was resisting providing intelligence about a hypothetical second wave of attacks. To that end, Mitchell returned to the United States on May 26, 2002, to recommend a formal list of SERE-style interrogation methods.

### *Defendants Seek Authority for "Corrective" and "Coercive" Measures*

66.     Between late May and early June of 2002, Mitchell worked in the United States to get approval from CIA officials to use even more excessive hardline interrogation measures. He wanted the latitude to explore "corrective" techniques— slaps, grabs, holds, pressing, and yelling—alongside "coercion," considered the most frightening aspect of SERE training.

67.     Mitchell's specific proposals included putting Abu Zubaydah in a room with a cadaver, waterboarding, placing electrical nodes on his tooth to shock and cause pain, and injecting him with a drug that would paralyze his central nervous

system and make him unable to breathe. Jessen joined Mitchell at CIA headquarters in June, marking the first time since Abu Zubaydah's capture that the two architects of his torture were back together in person. It was at these meetings that they whitewashed their proposed methods—the torture-based interrogation program that they intended to test on Abu Zubaydah—with the deliberately innocuous-sounding term "enhanced interrogation techniques." Even though the legality of Mitchell and Jessen's techniques was dubious at best, they gained the support of at least some officials at CTC, who encouraged the two psychologists to think big. However, there had been no approval from CIA legal authorities or the DOJ.

68.    During this time in June 2002, Abu Zubaydah was placed in complete isolation to "disorient" him and keep him off-balance for the next round of interrogation. This treatment was justified by Mitchell and Jessen's false claim that Abu Zubaydah had stopped cooperating with interrogators. In truth, it was an excuse to justify the next phase—the stepped-up torture program. In other words, Abu Zubaydah was punished based on Mitchell and Jessen's lies about his resistance to interrogation solely so they could apply even harsher interrogation techniques.

69.    Around the same time, Mitchell and Jessen began to take turns in role as the "bad guy." Previously criticized at SERE conferences as "unethical" for playing both interrogator *and* psychologist, Jessen did not limit himself to a single

role in torturing Abu Zubaydah. Nor did Mitchell. They were operating with no controls whatsoever.

70.     At a July 8, 2002 meeting at Langley, Mitchell and Jessen proposed a roadmap for their "enhanced interrogation" techniques. Immediately after, they prepared a follow-up memo detailing the proposed techniques that would be tried on Abu Zubaydah. The proposed techniques, couched in misleadingly vague, clinical language, were not described in terms of uncontrollable and prolonged pain and fear of death. Instead, they were purportedly intended to "dislocate the subject's expectation concerning how he is apt to be treated and instill fear and despair." They included:

i)      attention grasp (grasping the subject's collar with both hands and dragging them towards the interrogator);

ii)     walling (bouncing the subject off of a "flexible wall," though initially they used a cement wall);

iii)    facial hold (holding the subject's head immobile with both hands);

iv)     facial slap/insult slap (open-handed slap to the subject's face);

v)      cramped confinement (confining the subject to large box or space that restricts movement for up to 18 hours, or to a smaller confinement box for one hour, though in practice Abu Zubaydah was restrained in the small box for several hours at a time until he lost consciousness);

vi)    wall standing (inducing fatigue by forcing the subject to support his own body weight against a wall using just his fingertips);

vii)   stress positions (forcing the subject to hold his arms above his head or to kneel and lean back at 45-degree angle, and to hold either position for a prolonged period);

viii)  sleep deprivation (implemented with no proposed time limit, but the report noted that the Guinness Book of World Records record for sleep deprivation was 205 hours);

ix)    waterboarding (binding the subject to an inclined bench, placing a cloth over his forehead and eyes, saturating the cloth with water "from a canteen cup or small watering can," and then lowering the cloth over his nose and mouth, at which point the "subject [is] exposed to 20 to 40 seconds of restricted airflow," *i.e.*, drowned, and then permitting a few short breaths before the process is repeated);

x)     diapers (recommended because Abu Zubaydah was considered "fastidious" regarding his personal hygiene, and in practice used primarily during travel);

xi)    insects (threatening to place "stinging insects" into the cramped confinement box with the subject, but only actually placing "harmless

COMPLAINT AND DEMAND FOR JURY TRIAL

insects," with the goal of increasing his "sense of dread"—in practice they put actual scorpions in proximity to Abu Zubaydah); and

xii)  mock burial (placing the subject in a coffin-shaped box with hidden air holes, transporting the box to a mock-burial location, lowering it into the ground, and shoveling dirt on top of it to make the subject believe he is being buried alive, at which point a "rescuer" interrupts the process and then uses the subject's fear of being buried alive again to motivate him to cooperate).

July 8, 2002, Mitchell Memo to CTC re: Description of Physical Pressures.

71.    As Mitchell proposed, he would start with a stern warning to Abu Zubaydah of a worse fate if he did not reveal details of future attacks, after which he would lock him in a coffin for several hours. Jessen would then introduce himself to Abu Zubaydah by slapping him across the face. After, both would conduct "fear and despair rounds," followed by "threat and rescue," which would include a mock burial in the coffin, noting that they would take care when shoveling dirt to avoid coving the airhole and actually burying Abu Zubaydah alive.

72.    After the meeting, despite the continued lack of approval to use the proposed techniques, Mitchell and Jessen signed new, lucrative contracts that specified the experimental, research-oriented aspects of their roles and offered them hundreds of thousands of dollars. These and other contracts referred to Mitchell and

Jessen's "applied research," with descriptions of the work that would be done domestically and abroad: in the United States, they were tasked with developing methodologies and advising the CIA on their application, while the overseas portion involved "conducting specified, time-limited research projects." Mitchell and Jessen were conducting an uncontrolled study in which Abu Zubaydah was their guinea pig, with the goal of applying their findings to other detainees.

73.    On July 24, 2002, the CIA, apparently unwilling to approve Mitchell and Jessen's proposal unilaterally, sent a memo to DOJ attorney John Yoo seeking legal clearance for the proposed techniques. Referencing SERE, the memo carried forward Mitchell and Jessen's misleading statements concerning the precedent of the SERE program and the presumption of recovery:

> [W]hile the interrogation techniques mentioned above (attention grasp, walling, facial hold, facial slap (insult slap), cramped confinement, wall standing, stress positions, sleep deprivation, waterboard, and mock burial) are all administered to students in the U.S. in a harmless way, with no measurable impact on the psyche of the volunteer, we do not believe we can assure the same here for a man forced through these processes and who will be made to believe this is the future course of the remainder of his life. While the CIA will make every effort possible to ensure that the subject is not permanently physically or mentally harmed, some level of risk still exists. The intent of the process is to make the subject very disturbed, but with the presumption that he will recover.

*Department of Justice Office of Professional Responsibility Report, Investigation into the Office of Legal Counsel's Memoranda Concerning Issues Relating to the*

COMPLAINT AND DEMAND FOR JURY TRIAL

1    *Central Intelligence Agency's Use of "Enhanced Interrogation Techniques" on*

2    *Suspected Terrorists* (July 29, 2009), at 54-55.

3    74.    Contrary to this sterilized description, the Defendants in fact planned to

4    implement their proposed interrogation techniques in a manner that would be a stark

5    departure from the controlled environment, and limited application, of SERE

6    training. Ignoring the science—and turning a blind eye to research showing that

7    SERE training can cause serious mental health damage—neither Mitchell nor Jessen

8    disclosed the full severity of their implementation, or explained why or how Abu

9    Zubaydah would recover from more extreme torture than SERE students had ever

10    endured.  To seek approval of the enhanced torture program, Mitchell and Jessen

11    intentionally likened their proposed techniques to those utilized in the SERE

12    program, while withholding from government lawyers that the critical safety

13    protocols present in the SERE program would be abandoned and the techniques

14    employed would go far beyond those employed at SERE.

15    75.    In or around July 2002, Mitchell and Jessen returned to Thailand. Once

16    they arrived, they built the interrogation bunker, including a plywood "walling"

17    board, a box resembling a coffin, and an even smaller box designated the "dog box."

18    76.    On August 1, 2002, the DOJ's Office of Legal Counsel issued a legal

19    memorandum—later dubbed one of the "torture memos"—opining that to be subject

20    to federal criminal prosecution, an interrogator must cause "longer-term mental

harm" or "intense pain or suffering of the kind that is equivalent to the pain that would be associated with serious physical injury so severe that death, organ failure, or permanent damage resulting in a loss of significant body functions will likely result." *Memorandum for White House Counsel Re: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A* (Aug. 1, 2002) at 13.

77.    In a second legal memorandum dated August 1, 2002, and directed to the CIA's general counsel, the DOJ's Office of Legal Counsel opined, based on a number of assurances originating from Mitchell and Jessen, that the techniques did not cause the kind of pain associated with "serious physical injury," and that the techniques would not give rise to criminal liability. *Memorandum for John Rizzo, Acting General Counsel of the Central Intelligence Agency: Interrogation of Al Qaeda Operative* (Aug. 1, 2002) at 10. The memo went on to opine, again accepting assurances originating from Mitchell and Jessen, that the procedures would not lead to "prolonged mental harm," and that they would not violate the federal statute criminalizing torture, Title 18 U.S.C. "Section 2340A." *Id*. at 18. The memo to the CIA specifically referenced Mitchell and Jessen's roles, noting that as part of an "increased pressure phase, Zubaydah will have contact only with a new interrogation specialist, whom he has not met previously [*i.e.*, Jessen], and the [SERE] training psychologist who has been involved with the interrogations since they began [*i.e.*, Mitchell]." *Id*. at 1.

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 41

78.    While these memos engaged in circular logic, relied on Mitchell and Jessen's self-serving (and ultimately false) predictions concerning the limited harm to be caused, and pertained only to criminal prosecution rather than the lower standards applicable to civil matters and international treaty obligations, Mitchell and Jessen disregarded these limitations and perverted SERE training techniques to enhance the brutality of their interrogation methods. Specifically, going forward, Mitchell and Jessen would point to the August 1, 2002 DOJ memo, claiming— contrary to the plain meaning of the memo—that it authorized the following techniques: (1) attention grasp; (2) walling; (3) facial hold; (4) facial or insult slap; (5) cramped confinement; (6) insects; (7) wall standing; (8) stress positions; (9) sleep deprivation; and (10) waterboarding. The conclusion that these techniques would not violate criminal law—whatever its application in the civil context—was premised on factual representations that their use would be limited or constrained in material ways cited in the DOJ memo. For example, Defendants claimed (falsely) that the techniques could cause no permanent harm because they caused no such harm to SERE participants, and they withheld that the critical safety protocols in place at SERE would be cast aside when these techniques were applied to Abu Zubaydah. They also withheld that the techniques would be applied in combinations, for durations, and with an intensity and repetition never used at SERE. Defendants went well beyond the limitations in the DOJ memo, including by applying extended

COMPLAINT AND DEMAND FOR JURY TRIAL

water-board treatment and cramped confinement with such severity that they amounted to mock execution and mock burial.

### *Defendants Take the Severity of their Torture Program to Unauthorized Extremes*

79.    On August 4, 2002, Mitchell and Jessen commenced their new regime with a day of nearly ceaseless torture. First, accompanied by security personnel, they entered Abu Zubaydah's cell where he was (as he was nearly always forced to be) completely naked. Mitchell collared Abu Zubaydah with a rolled towel and slammed him against a concrete wall, rather than the plywood "walling" wall called for in the proposed interrogation plan. SSCI Report at 68-69, 70 n. 83. In his diary, Abu Zubaydah described the banging as so strong that he felt like his "skull was in pieces."

80.    Mitchell then grabbed Abu Zubaydah's face to show him the coffin-like box and demanded additional information on terrorist operations planned against the United States, including the names, phone numbers, email addresses, weapon caches, and safehouses of anyone involved. Every time Abu Zubaydah, who was visibly anxious, denied having additional information, Mitchell slapped him or slammed him against the wall. *Id.* at 69. This continued even after Abu Zubaydah fell to the floor, in what Roger Aldrich, a fellow SERE instructor present at the time, described as "full-blown, full-tilt, bozo wild person role-play mode."

81.     Abu Zubaydah was then shoved into the coffin-like box with a waste bucket, drinking water, and Ensure (a protein shake). After four hours, Jessen opened the coffin, wrapped a towel noose around Abu Zubaydah's neck, and yanked him out, spilling the toilet bucket over Abu Zubaydah's gaping leg wound. Jessen dragged him to the plywood walling wall, which now covered the concrete wall where Mitchell had bashed Abu Zubaydah's head earlier that day. Jessen slammed Abu Zubaydah's head so hard that he fell and momentarily lost his vision. Jessen continued to "wall" Abu Zubaydah until he collapsed, and then Jessen slapped him as he laid on the floor. Jessen became so frustrated that he grabbed Abu Zubaydah's head with his hands and started banging it against the wall.

82.     Around 5 p.m. that same day, Jessen squeezed Abu Zubaydah into a yet smaller box—the "dog box"—measuring 21 inches in one dimension, and 30 inches in the other two. Fitting into the "dog box" forced Abu Zubaydah into a fetal position and reopened his leg wound, causing it to bleed. *Id.* at 71. Hot and sweaty inside the box, Abu Zubaydah felt like "[he] was going to explode." After approximately one hour, guards opened the box. Mitchell and Jessen backed Abu Zubaydah up against the plywood wall and told him that he needed to cooperate to avoid "bring[ing] more misery onto himself." They punched him repeatedly, seemingly trying to compete with the other for the hardest punch. They sought expressions of obedience.

83.    At 6:15 p.m.—still on the same day—ignoring CIA legal advice that "the waterboard constitutes a threat of imminent death," Mitchell and Jessen waterboarded Abu Zubaydah. Despite having requested and received permission only for a controlled application of the technique—the method used on SERE students—Mitchell and Jessen's implementation was, in practice, far more aggressive. They put a black cloth over Abu Zubaydah's face and poured water far exceeding the volume in the SERE training, audibly counting the duration of each pour. Abu Zubaydah swallowed copious amounts of water. They also kept the saturated cloth on Abu Zubaydah's face for the full duration of each pour, sometimes after, and occasionally put the cloth in his mouth.

84.    Receiving multiple cycles, sometimes in quick succession, Abu Zubaydah was, at the time of his torture, the only known person subjected to multiple applications of waterboarding. Mitchell attempted to justify the departure from the SERE program and its safeguards, noting that waterboarding Abu Zubaydah was "for real" and needed to be convincing (presumably meaning that it needed to convince Abu Zubaydah that he was being drowned). Abu Zubaydah was convinced, and lost control of his bladder while being waterboarded.

85.    At the end of this day, Mitchell and Jessen sent CIA Headquarters a clinical, sterilized summary of the day's interrogation, and maintained data and

records concerning the techniques used. The CIA would later refer to the torture inflicted on Abu Zubaydah as "guinea pig research on human beings." *Id.* at 126.

86.    Abu Zubaydah said that he was ready to talk after the first waterboarding attempt. Mitchell and Jessen nonetheless decided to continue the process. *Id.* at 471 n. 2578. They tortured Abu Zubaydah on a twenty-four hour cycle, waterboarding him multiple times a day, along with "walling," slapping, stress-positions, confinement in the "coffin" and "dog box," facial holds, and continuous sleep deprivation. *Id.* at 70.

87.    On at least one occasion, Mitchell and Jessen told Abu Zubaydah that, if he did not give them the information they demanded, he would leave the facility in the coffin-like box. *Id.* at 70-71. Mock execution is not an approved SERE technique, and threats of imminent death are forbidden by U.S. law. Mitchell and Jessen, however, were undeterred. As to mock burial, mock execution, and in other respects, Defendants stepped outside the SERE manual and well beyond the representations and limitations that they had offered when seeking authority to implement their interrogation program.

88.    Abu Zubaydah frequently cried, begged, pleaded, and whimpered for the torture to stop but, in response to the same open-ended demands for information, he continued to deny that he had any additional information on current threats to the United States. *Id.* at 71. He was described as being compliant with requests, but

COMPLAINT AND DEMAND FOR JURY TRIAL

sometimes so hysterical and distressed that he was unable to communicate. *Id.* at 71-72. Defendants took clinical note of the progress, and refined, recalibrated, and adjusted their approach based upon Abu Zubaydah's reactions.

89.    Members of the CIA team were distressed by watching the interrogation, and some were even worried that this approach would kill Abu Zubaydah. *Id.* at 44. By the fifth day of the torture program, members of the CIA team reported being profoundly disturbed and expressed concerns about the limits of what was being done. By the sixth day of the interrogation, the CIA team had come to the collective conclusion that it was "unlikely" that Abu Zubaydah possessed the information that they were seeking. By the seventh day, it was "highly unlikely." *Id.* at 72.

90.    Nevertheless, Mitchell and Jessen continued to "interrogate" Abu Zubaydah for another ten days—in total, seventeen days of continuous torture. The interrogation period ended on August 20, 2002, when Abu Zubaydah, who had by then supposedly been induced into a state of "complete helplessness, compliance and cooperation," began fabricating information and inventing fictional terrorist operations. *Id.* at 11. By that point, Abu Zubaydah had been waterboarded at least 83 times, spent 266 hours in the coffin-like box, and sustained twenty-nine hours in the "dog box." *Id.* at 71.

*The Torture Yielded Grave Harm, but No Actionable Intelligence*

91.    This extended abuse caused prolonged physical pain and injuries which, as described below, persist today. In addition, the psychological impacts on Abu Zubaydah were stunningly profound. He was extremely traumatized: with a raised eyebrow from Mitchell, Abu Zubaydah would immediately be forced to sit on or stand next to the table, or be shackled to bars, awaiting waterboarding. Two snaps of the interrogator's fingers and he would be forced to lay back onto the board for more torture. Abu Zubaydah would routinely be heard "uncontrollably mumbling," whimpering, and occasionally praying—begging—for help.

92.    The ostensible reason for the torture had been to obtain intelligence, allegedly withheld by Abu Zubaydah, regarding forthcoming terrorist events and agents within the United States. After the stepped-up torture period, CIA personnel at the detention site concluded that Abu Zubaydah had been truthful and never possessed the information the torture program was intended to extract. CIA records confirmed that Abu Zubaydah did not provide superior intelligence following his exposure to the torture program. SSCI Report at 73-74.

93.    Despite not obtaining any improved intelligence, let alone the type of intelligence that the torture was intended to produce, Mitchell and Jessen self-declared their experimental program a "success." In lieu of intelligence, they reported that they could "confidently assess that [Abu Zubaydah] does not possess

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 48

undisclosed threat information." *Id.* at 46. Mitchell and Jessen recommended that the "aggressive phase" of Abu Zubaydah's interrogation be used as a "template" for future interrogations, and their independent contracts with the CIA were extended and compensation increased to perform this new task. They were later flown back to the United States to implement their plans.

94.     With Mitchell and Jessen away seeking contracts to interrogate other detainees, Abu Zubaydah's interrogators took a more traditional, non-coercive approach. One officer, who arrived after the "aggressive phase" had been completed, was able to use a compliance-reward approach, mixed with photographs to jog Abu Zubaydah's memory, to elicit intelligence on three British Al-Qaeda suspects—more than two months after Mitchell and Jessen had claimed success and departed.

**H. Abu Zubaydah Continues to Suffer Egregious Harm as a Result of Being Tortured**

95.     Abu Zubaydah was transferred between various black sites over the next four years. These transfers involved further humiliations taken straight from Mitchell and Jessen's playbook, including hooding, forced diapering, and body cavity searches.

96.     Even though Abu Zubaydah was no longer a target for interrogation, Mitchell and Jessen remained involved in his detention and transfers throughout this period. They provided "maintenance" due to their familiarity with Abu Zubaydah,

despite warnings from staff that their history of torturing him made Mitchell and Jessen inappropriate for the role.

97.     In September 2006, Abu Zubaydah was transferred to the U.S. base in Guantanamo Bay, where he remains confined as of the date of this filing. There are currently no plans for his release, and opportunities for release are severely limited given the notoriety imputed to Abu Zubaydah by Mitchell, Jessen, and others.

98.     While Abu Zubaydah would have been detained regardless, his ongoing, interminable detention without charge is intentional and due, in significant part, to Mitchell and Jessen. In a July 2002 cable, the interrogation team supervised by Mitchell and Jessen specifically requested this outcome, writing that "in light of the planned psychological pressure techniques to be implemented, we need to get reasonable assurances that Abu Zubaydah will remain in isolation and incommunicado for the remainder of his life." SSCI Report at 35. Accordingly, consistent with Mitchell and Jessen's clear intent and request, Abu Zubaydah's chances to be charged, tried, and/or released at any time during his life are limited to nonexistent. To date, over twenty years after his capture, the U.S. Government has not charged Abu Zubaydah with any crimes.

99.     Though no longer confined in the cold, noisy, and brightly lit cell in Thailand, Abu Zubaydah carries the emotional and physical scars of the torture he endured. Many details of his physical and psychological injuries are presumed

classified, but limited public information provides a window into the egregious injuries that continue to plague Abu Zubaydah's daily life.

100.   Abu Zubaydah has developed cognitive deficits and is aware that his mind is slipping away. Although only 52, he suffers from partial amnesia and cannot picture his mother's face or recall his father's name. For Abu Zubaydah, who has not seen his family in over 20 years, this difficulty remembering his family is a unique and ongoing torture. He has experienced an excruciating sensitivity to sound, hearing what others do not, and is driven to near insanity by even the slightest noise.

101.   Abu Zubaydah experienced seizures—more than 300 between 2008 and 2011—and blinding headaches. He also lost consciousness 324 times between 2007 and 2015 (for which there are records). For periods, he would lose control of his bladder when he was under stress and, as a result of the renditions from one black site to another, during which he was not permitted to use a bathroom for sustained periods, together with the lack of medical care following the injuries sustained during his capture, he suffers from chronic and severe constipation.

102.   Because he was not afforded adequate preventative medical procedures, Abu Zubaydah emerged from the black site in Thailand without a functioning left eye. In a June 13, 2016 statement (through an interpreter) to the Combatant Status Review Tribunal, Abu Zubaydah accused the CIA of not caring

about the injuries "that they inflicted to my eye, to my stomach, to my bladder, and my left thigh and my reproductive organs."

103.    That Abu Zubaydah continues to suffer should come as no surprise. In one study undertaken by Physicians for Human Rights ("PHR"), the organization evaluated the long-term consequences of "detention and interrogation methods such as use of excessively hot or cold cells, constant exposure to light or loud music, inadequate food, and unsanitary conditions […], beatings, sexual abuse, sleep deprivation, and stress positions designed to put serious physical strain on their bodies." Physicians for Human Rights, *Broken Laws, Broken Lives* 30-31 (2008). There, *100%* of the former detainees evaluated by PHR suffered from persistent musculoskeletal pain and chronic severe headaches.

104.    Like many former detainees, Abu Zubaydah suffers from weakness and numbness in limbs as a result of being subjected to stress positions and exposure to cold temperatures for hours on end, hearing loss resulting from constant exposure to loud music, vision problems from being forcibly kept in constant bright fluorescent lighting, and memory loss as a result of the trauma he endured in captivity.

105.    As PHR has documented, former detainees like Abu Zubaydah who were subjected to cruel and inhumane treatment suffer from anxiety, depression, insomnia, post-traumatic stress disorder, feelings of hopelessness and isolation, panic attacks, and night terrors.

## I. Defendants Profit from Their Torture Program

106.    Mitchell and Jessen were well compensated as a result of their scheme. Following various salary raises, and in addition to the hundreds of thousands of dollars they had already received, on June 13, 2003, Defendants signed new contracts with the CIA for $598,000 each on an annual basis. Additionally, they received $78,000 each to coach newly hired psychologists, and Mitchell received $90,500 and Jessen received $99,900 to rewrite training materials. By the end of 2004, Mitchell had earned $1,459,601.30 and Jessen had earned $1,204,550.42.

107.    On March 5, 2005, Mitchell and Jessen leveraged the "expertise" they gained from torturing Abu Zubaydah to create MJA, a company that, according to a registration statement filed in Washington, would "provide consulting and training to the U.S. government." Incorporated in Delaware and operating in Washington, DC and Spokane, Washington, MJA profited for years from the purported experience and research insight gained through Defendants' uncontrolled "observational study" of Abu Zubaydah, allowing Mitchell and Jessen to earn even more than they were already earning in their individual capacities.

108.    In the period from 2005 to 2009, the CIA paid MJA $81 million. This is in addition to the more than $1 million that Mitchell and Jessen received from their individual "applied research" contracts.

109.   During this period and for long afterward, Mitchell and Jessen's identities remained unconfirmed, and their involvement with the torture-based interrogation program unknown. The United States initially refused to declassify records pertaining to Abu Zubaydah's interrogation, and only upon the release of the SSCI Report on December 9, 2014 did information about the so-called "enhanced interrogation" program and the torture endured by Abu Zubaydah enter the public domain. Before the release of the SSCI Report, any suits involving the program would have implicated classified "intelligence" information, been deemed a risk to national security, and been unable to progress, much less succeed. That such a claim could have been pursued by a Guantanamo detainee—even one alleging a first-hand account of the horrors he had personally endured—would have been even less likely, if not completely outside the realm of possibility.

110.   The SSCI Report did not disclose the identities of Abu Zubaydah's torturers. Instead, it referenced Mitchell and Jessen as unnamed "contractors" or via pseudonyms: Grayson Swigert and Hammond Dunbar. Thus, Mitchell and Jessen's identities remained unknown both to Abu Zubaydah and the public at large. In part, this was because his detention at various CIA sites, including Guantanamo, made it largely impossible for him to discover their identities and roles. But it was also because of a deliberate government policy that obfuscated both the interrogation program itself and the identities of persons involved in it—especially Mitchell and

Jessen, the civilian architects of that program. This policy stemmed from the recognition that knowledge of the interrogation program could severely damage United States interests abroad, and concerns that persons who participated in the program could be exposed to reprisals.

111.   This policy stayed in place for years. As a result, even when Abu Zubaydah had access to counsel, filed a habeas challenge, and supported a criminal proceeding in Poland, he was not initially able to bring a lawsuit against Mitchell and Jessen because their identities were unconfirmed, and there was not a reasonable expectation that their identities and their roles with the CIA would be permitted to be publicly aired in court sufficient to make out a claim.

112.   In 2014, Mitchell and Jessen were suspected of having a connection to the CIA's interrogation program, and Mitchell gave a personal interview concerning some of his involvement in December 2014. However, at that time and for years after, the reasonable expectation was that none of the information available to the public could be used by a Guantanamo detainee to support a suit in federal court because the vociferous claims to secrecy asserted against Guantanamo detainee litigants by the government made such a suit impossible.

113.   To date, the U.S. Government remains highly protective of the still-classified details of Mitchell and Jessen's torture-based interrogation program, and

attempts by Abu Zubaydah and others to seek justice and accountability have been thwarted as a result. *See United States v. Zubaydah*, 142 S. Ct. 959 (2022).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Torture and Other Cruel, Inhuman, and Degrading Treatment)**

114.   Plaintiff Abu Zubaydah realleges and incorporates by reference the allegations set forth in paragraphs 1 through 113 as if fully set forth herein.

115.   The use of torture and other cruel, inhuman, and degrading treatment is a violation of the law of nations and treaties of the United States.

116.   Defendants Mitchell and Jessen tortured Abu Zubaydah and subjected him to cruel, inhuman, and degrading treatment in that, working under the claimed authority of the CIA, Mitchell and Jessen designed and implemented a program specifically intended to inflict severe and prolonged physical and mental pain and injury on Abu Zubaydah.

117.   Defendants Mitchell and Jessen acted under color of law and/or in concert with those acting under color of official authority in that they acted with apparent (though not bona fide) authority.

118.   Defendants Mitchell and Jessen intentionally inflicted severe and prolonged physical and mental pain and suffering on Abu Zubaydah in order to

degrade his mental and psychological condition to a state of "learned helplessness" in which he would be unable to resist demands for information.

119. By design, the techniques were severely degrading to human dignity, and involved the deliberate use of terror, pain, disgrace, and unnecessary cruelty as tools against Abu Zubaydah's mental and emotional well-being.

120. Defendants Mitchell and Jessen's acts and omissions caused Abu Zubaydah to suffer damages, including severe and prolonged physical, mental, and emotional pain and suffering.

121. Defendants Mitchell and Jessen's acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Abu Zubaydah's rights under international and U.S. law and should be punished by an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Non-Consensual Medical and Scientific Experimentation)

122. Plaintiff Abu Zubaydah realleges and incorporates by reference the allegations set forth in paragraphs 1 through 121 as if fully set forth herein.

123. Non-consensual medical and scientific experimentation performed on humans is a violation of the law of nations and treaties of the United States.

124. Defendants Mitchell and Jessen experimented on Abu Zubaydah under color of law and without his consent. Specifically, Abu Zubaydah was a non-

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 57

consenting research subject for Mitchell and Jessen's experimental theory that prisoners could be reduced to a state of "learned helplessness" through abusive treatment and thereby rendered passive, compliant, and unable to resist interrogators' demands for information. Mitchell and Jessen selectively consulted with various psychologists and academics to develop their methodology, transforming the monitored defensive SERE program training into an offensive uncontrolled behavioral study on an unwilling research subject.

125.   As part of this experiment, Defendants Mitchell and Jessen designed, developed, and implemented an experimental protocol to test whether it was possible to induce a state of "learned helplessness" in the face of perceived "resistance techniques," and whether detainees became fully compliant with interrogators' demands once they had been reduced to a state of learned helplessness.

126.   Defendants Mitchell and Jessen experimented on Abu Zubaydah without his consent by attempting to induce in him a state of "learned helplessness" through torture, and by monitoring, recalibrating, and refining their mistreatment based on their assessment of Abu Zubaydah's physical and psychological reactions to torture and cruel treatment. Mitchell and Jessen collected data on the "efficacy" of their interrogation tactics in achieving total control over their test subject by torturing and degrading him to a state of learned helplessness. They made conscious

decisions in directing and overseeing the execution of their experiment, performing the dual roles of psychologist and interrogator.

127.   After having tested the "learned helplessness" theory by experimenting on Abu Zubaydah, Defendants Mitchell and Jessen used the data and revelations gained from experimenting on Abu Zubaydah to create educational materials for the CIA and instruct fellow interrogators on how to implement versions of the protocol developed on Abu Zubaydah when interrogating other prisoners.

128.   Defendants Mitchell and Jessen's acts and omissions caused Abu Zubaydah to suffer grave and foreseeable harm, including severe and prolonged physical, mental, and emotional pain and suffering.

129.   Defendants Mitchell and Jessen's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and in conscious disregard for Abu Zubaydah's rights under international and U.S. law prohibiting non-consensual human experimentation and should be punished by an award of punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (War Crimes)

130.   Plaintiff Abu Zubaydah realleges and incorporates by reference the allegations set forth in paragraphs 1 through 129 as if fully set forth herein.

131.   Torture, cruel treatment, and outrages upon personal dignity, as well as non-consensual medical and scientific experimentation, are prohibited under the law of nations and treaties of the United States applicable in non-international armed conflicts.

132.   Defendants Mitchell and Jessen subjected Abu Zubaydah to "outrages upon personal dignity," and "torture, corporal punishment . . . and medical or scientific experiments" without his consent while he was detained by the United States. To the extent that any parties argue that this conduct took place in the course of a non-international armed conflict, it amounted to a violation of customary international law prohibiting war crimes.

133.   Defendants Mitchell and Jessen experimented on Abu Zubaydah without his consent by attempting to induce in him a state of "learned helplessness" through torture, and by monitoring, recalibrating, and refining their mistreatment based on their assessment of Abu Zubaydah's physical and psychological reactions to torture and cruel treatment.

134.   After having tested the "learned helplessness" theory by experimenting on Abu Zubaydah, Defendants Mitchell and Jessen went on to recommend and then implement versions of the protocol developed on Abu Zubaydah when interrogating other prisoners, using information learned from experimenting on Abu Zubaydah.

135.   Defendants Mitchell and Jessen's acts and omissions described herein caused Abu Zubaydah to suffer damages, including severe and prolonged physical, mental, and emotional pain and suffering.

136.   To the extent that any parties argue that their conduct took place in the course of a non-international armed conflict, Defendants Mitchell and Jessen's acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Abu Zubaydah's rights under international and U.S. law prohibiting war crimes and should be punished by an award of punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Arbitrary Detention)

137.   Plaintiff Abu Zubaydah realleges and incorporates by reference the allegations set forth in paragraphs 1 through 136 as if fully set forth herein.

138.   Arbitrary detention is prohibited under the law of nations and treaties of the United States.

139.   Defendants Mitchell and Jessen subjected Abu Zubaydah to arbitrary detention insofar as they were a direct and proximate cause of, contributed to, and aided and abetted his detention in an official detention facility, without legal basis and without notice of charges, and he has been neither charged nor brought to trial despite the passage of over two decades since his capture.

140. At Defendants Mitchell and Jessen's urging, with their oversight, and pursuant to their baseless and counter-factual predictions that he would divulge actionable intelligence, Plaintiff Abu Zubaydah was detained at unregistered and unregulated CIA "black sites," without legal authority, for a prolonged and unreasonable periods, and in conditions that were incompatible with the principles of justice or with the dignity of the human person.

141. Abu Zubaydah was physically tied to a board by and under the direction of Defendants Mitchell and Jessen for at least 83 applications of water torture for prolonged and unreasonable periods.

142. As a direct and proximate result of the fact that Defendants Mitchell and Jessen tortured Abu Zubaydah, and at their explicit request and recommendation that he "remain in isolation and incommunicado for the remainder of his life," Abu Zubaydah has been held with limited opportunity to be charged or released, and has not been charged or released, for over two decades.

143. Defendants Mitchell and Jessen's acts and omissions described herein caused Abu Zubaydah to suffer damages, including severe and prolonged physical, mental, and emotional pain and suffering.

144. Defendants Mitchell and Jessen's acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Abu Zubaydah's rights under international and U.S. law prohibiting arbitrary

COMPLAINT AND DEMAND FOR JURY TRIAL

detention and should be punished by an award of punitive damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Abu Zubaydah respectfully requests that this Court grant the following relief:

A.    Compensatory damages in an amount to be proven at trial in excess of $75,000;

B.    Punitive and exemplary damages in an amount to be proven at trial;

C.    The reasonable attorneys' fees, costs, and disbursements incurred by Abu Zubaydah in this action; and

D.    Such other relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Abu Zubaydah demands a jury trial on all issues so triable.

Dated:        September 18, 2023

                                Respectfully submitted,

                                **FINER WINN**

                                By: /s/ Jeffry K. Finer

                                Jeffry K. Finer, Esq.
                                2850 East Rockhurst Lane, Suite 356
                                Spokane, WA 99223
                                (509) 981-8960

COMPLAINT AND DEMAND FOR JURY TRIAL

Page 63

**LEWIS BAACH KAUFMANN MIDDLEMISS PLLC**

 By: /s/ Solomon B. Shinerock

Solomon B. Shinerock (*pro hac vice* admission pending)
Adam Kaufmann (*pro hac vice* admission pending)
Elizabeth M. Vélez (*pro hac vice* admission pending)
Annika Conrad (*pro hac vice* admission pending)
The Chrysler Building
405 Lexington Avenue, 64th Floor
New York, NY 10174
Tel: (212) 826-7001

Eric L. Lewis, (*pro hac vice* admission pending)
David Short (*pro hac vice* admission pending)
1101 New York Ave, NW
Suite 1000
Washington, DC 20005

COMPLAINT AND DEMAND FOR JURY TRIAL