1   **EVANS, CRAVEN & LACKIE, P.S.**
2   James B. King, WSBA #8723
    818 W. Riverside, Suite 250
3   Spokane, WA 99201-0910
    (509) 455-5200; fax (509) 455-3632
4
5   **BLANK ROME LLP**
    James T. Smith (admitted *pro hac vice*)
6   Brian S. Paszamant (admitted *pro hac vice*)
7   Ann E. Querns (admitted *pro hac vice*)
    One Logan Square, 130 N. 18th Street
8   Philadelphia, PA 19103
    (215) 569-5500; fax (215) 832-5674
9
10  Attorneys for Defendants
11  James Mitchell and John "Bruce" Jessen
12
13              UNITED STATES DISTRICT COURT
14          FOR THE EASTERN DISTRICT OF WASHINGTON
15  ZAYN AL-ABIDIN MUHAMMAD HUSAYN        | Case No.: 2:23-cv-00270
16  also known as ABU ZUBAYDAH,
                                           | **DEFENDANTS' MOTION
17                      Plaintiff,         | AND MEMORANDUM IN
                                           | SUPPORT OF
18       v.                                | DEFENDANTS' MOTION
                                           | TO DISMISS
19  JAMES MITCHELL and JOHN "BRUCE"        | PLAINTIFF'S
20  JESSEN,                                | COMPLAINT
                                           | PURSUANT TO FRCP
21                      Defendants.        | 12(b)(1) AND 12(b)(6)**
22
23                                         | Hearing Date, Oral
                                           | Argument Requested,
24                                         | February 15, 2024,
                                           | at 11:00 am
25
26
27
28

139114.00603/133644505v.1

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ................................................................. 1
II. FACTUAL AND PROCEDURAL BACKGROUND ......................... 2
III. LEGAL STANDARD .......................................................... 5
IV. THIS CASE SHOULD BE DISMISSED BASED UPON RULE 12(b)(1) ........ 6

    A. The Military Commissions Act Divests the Court of Jurisdiction ........... 6

        1. Plaintiff Has Been Determined by the U.S. To Be "Properly Detained as An Enemy Combatant." ................................. 7

        2. Defendants Were Agents of the United States ............................. 8

    B. The Political Question Doctrine Also Divests the Court of Jurisdiction ...................................................... 13

        1. This Court Should Adopt the Two-Part Taylor Test for Evaluating Political Questions Involving Defense Contractors and Determine That Plaintiff's Claims Raise Nonjusticiable Political Questions ................................. 14

            (a) The CIA Exercised Actual and Plenary Control Over the Interrogation of Plaintiff. .............................. 15

            (b) National Defense Interests Were Closely Intertwined with Military Decisions Governing Defendants' Alleged Conduct. .............................................. 16

            (c) Defendants' Conduct Was Not Unlawful. .................. 19

        2. Al Shimari and Salim Are Not Controlling ........................... 21

V. THIS CASE SHOULD BE DISMISSED BASED UPON RULE 12(b)(6) ...... 23

    A. Defendants Are Entitled to Derivative Sovereign Immunity .................. 23

        1. Defendants Are Entitled to *Yearsley*-Based Immunity ................. 24

            (a) The Authority Granted Was "Validly Conferred." ............. 24

            (b) Defendants Did Not Exceed the Scope of Their Authority. ...................................................... 27

            (c) *Yearsley* Immunity Is Not Limited to Situations Where the Contractor Had "No Discretion" in the Design Process and Completely Followed Government Specifications. ................................. 28

    B. Defendants are Entitled to *Filarsky*-Based Immunity ...................... 30

        1. Immunity for the Government Function Being Delegated to Defendants Is Historically Grounded in the Common Law ......... 31

i

2.    Defendants Did Not Violate Well-Established Prohibitions of Conduct Involving the Treatment of Enemy Combatants.........34

C.    Plaintiff Has Not Sufficiently Alleged ATS Claims................................34

1.    Plaintiff Cannot Allege That Defendants Engaged in the Requisite State Action Required for Counts I, II, and IV .............34

2.    Plaintiff Also Has Not Alleged That Defendants Violated The "Law of Nations" for Purposes of Counts II and IV .............36

(a)    Non-consensual Medical Experimentation Cannot Support an ATS claim, and Plaintiff Has Not Alleged Non-Consensual Medical Experimentation. ......................37

(b)    Plaintiff Has Not Alleged Defendants Arbitrarily Detained Him.......................................................................39

VI.    CONCLUSION ...............................................40

139114.00603/133644505v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullahi v. Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009) ................................................................. 35, 37, 38

*Ackerson v. Bean Dredging LLC*,
  589 F.3d 196 (5th Cir. 2009) ................................................................. 24

*ACLU v. DOD*,
  2017 U.S. Dist. LEXIS 159108 (S.D.N.Y. Sep. 27, 2017) ......................... 5

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
  790 F.3d 641 (6th Cir. 2015) ................................................................. 24

*Agredano v. U.S. Customs Serv.*,
  223 F. App'x 558 (9th Cir. 2007) .......................................................... 24

*Aktepe v. USA*,
  105 F.3d 1404 (11th Cir. 1997) ............................................................. 17

*Al Shimari v. CACI Premier Tech. Inc.*,
  840 F.3d 147 (4th Cir. 2016) ................................................... 19, 21, 22, 23

*Al-Zahrani v. Rodriguez*,
  669 F.3d 315 (D.C. Cir. 2012) ................................................................. 8

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
  416 F.3d 1242 (11th Cir. 2005) ............................................................. 35

*Alfaro-Huitron v. Cervantes Agribusiness*,
  982 F.3d 1242 (10th Cir. 2020) .............................................................. 9

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) .............................................................. 28

*In re Am. Boiler Works*,
  220 F.2d 319 (3d Cir. 1955) ................................................................. 25

*In re: Application of Zayn Al-Abidin Muhammad Husayn.*
  No. 17-cv-171-JLQ (E.D. Wash.) ............................................................. 4

iii

*Assoc. Gen. Contractors v. Metro. Water Dist.*,
  159 F.3d 1178 (9th Cir. 1998) ...................................................................... 6

*Assoc. of Am. Med. Coll. v. U.S.*,
  217 F.3d 770 (9th Cir. 2000) ........................................................................ 6

*Bader v. State*,
  43 Wn. App. 223, 716 P.2d 925 (1986) ...................................................... 32

*Baker v. Carr*,
  369 U.S. 186 (1962) ................................................................................ 13, 15

*Barr v. Matteo*,
  360 U.S. 564 (1959) ...................................................................................... 24

*Bartell v. Lohiser*,
  215 F.3d 550 (6th Cir. 2000) .................................................................. 28, 34

*Bednarski v. Potestivo & Assocs., P.C.*,
  2017 U.S. Dist. LEXIS 32522 (N.D. Ill. Mar. 7, 2017) ............................ 27

*Bishop v. Karney*,
  408 F. App'x 846 (5th Cir. 2011) ................................................................ 32

*Boyle v. United Tech. Corp.*,
  487 U.S. 500 (1988) ...................................................................23, 28, 29, 30

*Braswell v. Shoreline Fire Dep't*,
  2012 U.S. Dist. LEXIS 71308 (W.D. Wash. May 22, 2012) ................ 33, 34

*Brosseau v. Haugen*,
  543 U.S. 194 (2004) ...................................................................................... 34

*Brown v. DirecTV, LLC*,
  562 F. Supp. 3d 590 (C.D. Cal. 2021) .............................................. 9, 10, 12

*Butters v. Vance Int'l, Inc.*,
  225 F.3d 462 (4th Cir. 2000) .................................................................. 24, 31

*Cabalce v. Thomas E. Blanchard & Assocs.*,
  797 F.3d 720 (9th Cir. 2015) .................................................................. 29, 30

*Cabalce v. VSE Corp.*,
  922 F. Supp. 2d 1113 (D. Haw. 2013) ........................................................ 28

iv

*Campbell-Ewald Co. v. Gomez,*
  136 S. Ct. 663 (2016) ...................................................................................24, 28, 31

*Carmichael v. Kellogg, Brown & Root Servs., Inc.,*
  572 F.3d 1271 (11th Cir. 2009) ..................................................................15, 17, 18

*Chesney v. TVA,*
  782 F. Supp. 2d 570 (E.D. Tenn. 2011) ............................................................28, 29

*Cooper v. Tokyo Elec. Power Co. Inc.,*
  860 F.3d 1193 (9th Cir. 2017) .................................................................................14

*Corr. Servs. Corp. v. Malesko,*
  534 U.S. 61 (2001) ...................................................................................................24

*Corrie v. Caterpillar, Inc.,*
  503 F.3d 974 (9th Cir. 2007) .........................................................................13, , 17

*Cunningham v. Gen'l Dynamics Info. Tech., Inc.,*
  888 F.3d 640 (4th Cir. 2018) ...................................................................................26

*DaCosta v. Laird,*
  471 F.2d 1146 (2d Cir. 1973) ..................................................................................14

*Doe I v. Cisco Sys., Inc.,*
  73 F.4th 700 (9th Cir. July 7, 2023) ........................................................................40

*Doe v. Qi,*
  349 F.Supp.2d 1258 (N.D. Ca. 2004) ......................................................................39

*Elsmore v. Cty. of Riverside,*
  2016 U.S. Dist. LEXIS 62564 (C.D. Cal. Mar. 31, 2016) .......................................28

*Filarsky v. Delia,*
  566 U.S. 377 (2012).................................................................23, 24, 30, 31, 33

*Flores v. S. Peru Copper Corp.,*
  414 F.3d 233 (2d Cir. 2003) ....................................................................................37

*Ford v. Anderson Cty.,*
  2022 U.S. Dist. LEXIS 81821 (E.D. Tex. May 5, 2022) .........................................33

*Garcia v. Chapman,*
  911 F. Supp. 2d 1222 (S.D. Fla. 2012) ....................................................................35

v

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)......................................................................23

*In re Hanford Nuclear Rsrv. Litig.*,
   534 F.3d 986 (9th Cir. 2008) .......................................................29

*Harris v. Kellogg Brown & Root Servs., Inc.*,
   724 F.3d 458 (3d Cir. 2013) ..........................................14, 15, 18

*Henderson v. United Student Aid Funds, Inc.*,
   918 F.3d 1068 (9th Cir. 2019) ......................................................9

*Ibrahim v. Titan Corp.*,
   391 F. Supp. 2d 10 (D.D.C. 2005).............................................35

*Janko v. Gates*,
   741 F.3d 136 (D.C. Cir. 2014)......................................................8

*Jawad v. Gates*,
   832 F.3d 364 (D.C. Cir. 2016)......................................................8

*Jensen v. Lane County*,
   222 F.3d 570 (9th Cir. 2000) ................................................33, 34

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950)....................................................................14

*Kadic v. Karadzic*,
   74 F.3d 377 (2d Cir. 1996) ....................................................35, 36

*In re: KBR, Inc.*,
   893 F.3d 241 (4th Cir. 2018) ...............................................*passim*

*In re KBR, Inc., Burn Pit Litigation.*,
   744 F.3d 326 (4th Cir. 2014) ................................................24, 27

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ......................................................6

*Kokkonen v. Guardian Life Ins. Co.*,
   511 U.S. 375 (1994)......................................................................6

*Koohi v. U.S.*,
   976 F.2d 1328 (9th Cir. 1992) ....................................................23

139114.00603/133644505v.1

*Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs.*,
    853 F.3d 173 (5th Cir. 2017) ................................................................... 24

*Lane v. Halliburton*,
    529 F.3d 548 (5th Cir. 2008) ..................................................... 14, 15, 18

*Lebron v. Rumsfeld*,
    670 F.3d 540 (4th Cir. 2012) ................................................................... 25

*Leitgeb v. Sark Wire Corp.–GA*,
    2022 WL 18777380 (N.D. Ga. Sept. 21, 2022) ..................................... 39

*Liu Bo Shan v. China Constr. Bank Corp.*,
    2011 WL 1681995 (2d Cir. May 5, 2011) .............................................. 39

*Estate of Lockett ex rel. Lockett v. Fallin*,
    841 F.3d 1098 (10th Cir. 2016) .............................................................. 33

*Mangold v. Analytic Servs., Inc.*,
    77 F.3d 1442 (4th Cir. 1996) ................................................................... 24

*Margitan v. Spokane Cnty.*,
    2023 U.S. Dist. LEXIS 13748 (E.D. Wash. Jan. 26, 2023) ..................... 6

*Martinez v. City of Los Angeles*,
    141 F.3d 1373 (9th Cir. 1998) ................................................................ 39

*McAdory v. M.N.S. & Assocs., LLC*,
    2021 WL 2321634 (D. Or. June 7, 2021) ......................................... 10, 12

*McKay v. Rockwell Int'l Corp.*,
    704 F.2d 444 (9th Cir. 1983) ................................................................... 31

*McMahon v. Presidential Airways, Inc.*,
    502 F.3d 1331 (11th Cir. 2007) ....................................................... 14, 15, 18

*Morales v. Brown*,
    2015 WL 6167451 (E.D. Cal. Oct. 20, 2015) ........................................ 38

*Myers v. U.S.*,
    323 F.2d 583 (9th Cir. 1963) ................................................................... 24

*Nicholes v. Jano*,
    2020 WL 2615529 (M.D. Fla. May 22, 2020) ....................................... 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

vii

*In re Oil Spill by the Oil Rig "Deepwater Horizon,"*
    2016 U.S. Dist. LEXIS 101175 (E.D. La. Aug. 2, 2016)...........................................25

*In re Oil Spill by the Oil Rig "Deepwater Horizon,"*
    2016 U.S. Dist. LEXIS 18248 (E.D. La. Feb. 16, 2016)...........................25, 27, 28

*Padilla v. Yoo*,
    678 F.3d 748 (9th Cir. 2012) ...........................................................*passim*

*Perniciaro v. Lea*,
    901 F.3d 241 (5th Cir. 2018) ...........................................................32, 33

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009) ...........................................................35

*Rasul v. Bush*,
    542 U.S. 466 (2004)...........................................................23

*Reddy v. Karr*,
    102 Wn. App. 742, 9 P.3d 927 (2000)...........................................................32

*Richardson v. McKnight*,
    521 U.S. 399 (1997)...........................................................34

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035, (9th Cir. 2004) ...........................................................6

*Saldana v. Occidental Petroleum Corp.*,
    774 F.3d 544 (9th Cir. 2014) ...........................................................13, 17

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009)...........................................................30, 31, 36

*Salim v. Mitchell*,
    183 F. Supp. 3d 1121 (E.D. Wash. 2016)...........................................................28, 30

*Salim v. Mitchell*,
    268 F. Supp.3d 1132, 1146 (E.D. Wash. 2017) ...........................................................22, 23

*Salim v Mitchell*,
    2017 WL 390270, (E.D. Wash. Jan. 27, 2017) ...........................................................12

Sanchez-Espinoza v. Reagan,
    770 F.2d 202 (D.C. Cir. 1985)...........................................................35

139114.00603/133644505v.1

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)...............................................................36, 37, 39

*Suhail Najim Abdullah Al Shimari v. CACI Premier Tech., Inc.*,
    300 F.Supp.3d 758 (E.D. Va. 2018) ...............................................21, 22

*Taylor Energy Co., LLC v. Luttrell*,
    3 F.4th 172 (5th Cir. 2021) .............................................................25, 26

*Taylor v. Kellogg Brown & Root Servs., Inc.*,
    658 F.3d 402 (4th Cir. 2011) ...........................................................*passim*

*U.S. v. Cox*,
    836 F. Supp. 1189 (D. Md. 1993).......................................................11

*U.S. v. Milovanovic*,
    678 F.3d 713 (9th Cir 2012) ...............................................................9

*U.S. v. Mitchell*,
    445 U.S. 535 (1980)...........................................................................23

*U.S. v. Zubaydah*,
    595 U.S. 195 (2022)........................................................................*passim*

*Von Staich v. Atwood*,
    2011 U.S. Dist. LEXIS 83705 (C.D. Cal. Feb. 22, 2011) .....................32

*Watson v. Weeks*,
    436 F.3d 1152 (9th Cir. 2006) .............................................................6

*Westfall v. Erwin*,
    484 U.S. 292 (1988)...........................................................................23

*Williams v. PillPack LLC*,
    644 F. Supp. 3d 845 (W.D. Wash. 2022) ...................................10, 11, 12

*Winter v. NRDC, Inc.*
    555 U.S. 7 (2008)...............................................................................25

*Yearsley v. W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940)........................................................................*passim*

*Young v. County of Hawaii*,
    947 F. Supp. 2d 1087 (D. Haw. 2013).............................................32, 33

ix

**Statutes**

18 U.S.C. § 2511 (2)(c) ........................................................................... 11

28 U.S.C. § 1350 ...................................................................................... 4

28 U.S.C. § 1782 ...................................................................................... 5

28 U.S.C. § 2241(e)(2) – Military Commissions Act ........................ 1, 6, 7, 8

42 U.S.C. § 1983 .................................................................................... 35

42 U.S.C. § 2000dd ................................................................................ 20

50 U.S.C. §§ 1541-1548 ......................................................................... 25

50 U.S.C. §§ 3035, 3036(c), (d)(1)-(4) (2005) ...................................... 25

Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat.
224 (2001) .......................................................................................... 25

War Powers Resolution, Pub. L. No. 93-148, 87 Stat. 555 (1973) ............. 25

RCW 71.05.120 ...................................................................................... 32

**Other Authorities**

152 Cong. Rec. H7,947-48 (Sept. 29, 2006) (statement of Rep.
Sensenbrenner) ..................................................................................... 8

U.S. Dep't of Justice, Office of Public Affairs, Press Release No. 09-356,
*available at* https://www.usDOJ.gov/opa/pr/2009/April/09-ag-
356.html .............................................................................................. 27

RESTATEMENT (THIRD) OF AGENCY (2006) ............................................... 9

Rule 12(b)(1) ....................................................................................... 5, 6

Rule 12(b)(6) ...................................................................................... 6, 23

S. Rep. No. 288, 113th Cong., 2d Sess. (2014) ("SSCI Report") ............... 5

U.S. CONST. art II § 2, cl. 1 ................................................................... 13

## I.    INTRODUCTION

Six months after September 11, 2001, when Al Qaeda orchestrated the deadliest terrorist attack on U.S. soil, killing more than 3,000 people, a joint force of U.S. and Pakistani agents captured Plaintiff Abu Zubaydah ("Plaintiff"). During initial interrogations, Plaintiff provided significant details about an attack that Al Qaeda was planning and identified the mastermind behind 9/11. Desperate to ensure Plaintiff was not withholding any additional information, the U.S. Central Intelligence Agency ("CIA") took over Plaintiff's interrogation and asked Defendants to propose interrogation techniques that could potentially be used on Plaintiff. Defendants, who had spent years serving as psychologists for the U.S.'s SERE training program that trained U.S. forces how to resist interrogation techniques if captured, answered the CIA's call. Defendants proposed interrogation techniques, based upon their SERE experience, that the CIA could consider using when interrogating Plaintiff. The CIA then sought and got approval from the U.S. Department of Justice ("DOJ") to use some of the proposed techniques. At the CIA's request and under the CIA's control, Defendants then interrogated Plaintiff at a CIA black site using the approved techniques while CIA staff observed and until CIA Headquarters permitted them to stop. Plaintiff now claims Defendants should be personally liable for his interrogation simply because Defendants were contractors of the CIA rather than CIA employees. Plaintiff brings claims under the Alien Tort Statute alleging that Defendants tortured him, subjected him to non-consensual medical experimentation, committed war crimes, and arbitrarily detained him. But Plaintiff's claims cannot proceed.

First, this Court does not have jurisdiction. In passing the Military Commissions Act, 28 U.S.C. § 2241(e)(2), Congress clearly and specifically divested all courts of jurisdiction to hear any non-habeas claims brought by enemy combatants (like Plaintiff) against agents of the U.S. (like Defendants) relating to any aspect of their detention or treatment. Second, the political question doctrine mandates that this Court refrain from exercising jurisdiction because the CIA's decision to direct Defendants to use enhanced

interrogation techniques on Plaintiff was inextricably intertwined with national defense interests, as the CIA desperately tried to avoid additional attacks by Al Qaeda and believed Plaintiff knew more about Al Qaeda's plans than he had shared. To adjudicate Plaintiff's claims will require the Court to pass judgment on the decisions the CIA made in trying to protect the American people in the wake of September 11. Such decisions are properly left to the Government's executive branch and are not justiciable.

Third, Plaintiff has failed to state a claim on which relief can be granted because Defendants are immune. The CIA specifically asked Defendants to interrogate Plaintiff using enhanced interrogation techniques. Through application of derivative sovereign immunity, Defendants are thus entitled to the same immunity protections as those CIA employees who made the request of Defendants and observed the directed interrogation. Had Defendants been CIA employees, Plaintiff would not be advancing these claims, as evidenced by Plaintiff's failure to name any CIA officials or employees alongside Defendants. Finally, Plaintiff has failed to sufficiently allege that Defendants (1) conducted medical experimentation on him, or (2) are responsible for the U.S. choosing to continue his detention at the U.S. military base in Guantanamo Bay.

In the end, this case should be dismissed.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was captured on March 28, 2002, during a raid in Faisalabad Province, Pakistan. Compl. ¶ 42.[1] At the time, U.S. intelligence "believed [Plaintiff] had connections to high-profile jihadists, including within Al Qaeda," he "was the 'number three' man in Al Qaeda, and that he had authored the Manchester Manual," "an Al Qaeda-generated document that included purported strategies to resist interrogation that British anti-terrorism police recovered in a May 2000 raid on a suspected Al Qaeda safe house in Manchester, England." *Id.* ¶¶ 16, 35, 44.

---

[1] Defendants accept as true the Complaint's allegations for purposes of this Motion.

These beliefs by the U.S. intelligence community were not unfounded, as Plaintiff admits shortly after his capture, he provided "valuable information regarding a planned attack," including "details such as the sources he had received money from, where the money was going, the individuals involved, and logistical and operational details." *Id.* ¶ 45. Indeed, Plaintiff knew so much about the planned attack that with the information Plaintiff provided, the CIA was able to confirm the intelligence and thwart the attack. *Id.* Plaintiff also knew more about Al Qaeda's September 11, 2001, attack than any other person the U.S. had ever interrogated, as Plaintiff "identified Khalid Shaykh Mohammad as 'Mokhtar'—the mastermind behind the September 11 attacks"—a fact Plaintiff admits had "never been previously confirmed." *Id.* ¶ 47.

Because Plaintiff provided detailed information about terrorist activities, the CIA took over his interrogation and transferred him to a CIA black site. *Id.* ¶¶ 57-58. At this time, the CIA was "keenly focused on its new mandate: to hold and interrogate people suspected of terrorist associations in order to gather intelligence and help avoid a 'second wave' of attacks." *Id.* ¶ 30. The CIA was trying to "regain footing after the intelligence failures apparent in the wake of the September 11 attacks," and was "under immense pressure to produce actionable intelligence." *Id.* ¶¶ 4, 30. Indeed, the Vice President specifically urged the CIA to "use any means at our disposal." *Id.* ¶ 30. In this environment, Plaintiff became the CIA's first "high-value detainee." *Id.* ¶ 4.

Because of the intense pressure the CIA was under, it sought out Defendants and asked them to "think big," and propose interrogation techniques that the CIA could use on Plaintiff. *Id.* ¶ 67. Defendants had, for years, served as psychologists at the SERE training school at Fairchild Air Force Base where U.S. forces were trained on how to withstand certain interrogation techniques including slapping, shaking, stress positions, isolation, forced nudity, body cavity searches, sleep deprivation, exposure to extreme heat or cold, confinement in cramped spaces, dietary manipulation, and waterboarding. *Id.* ¶ 21. Defendants, building upon their experience at SERE, "*proposed*" twelve potential enhanced interrogation techniques to the CIA similar to those utilized at

SERE. *Id.* ¶ 70 (emphasis added). The CIA then brought Defendants' proposal to DOJ's Office of Legal Counsel ("<u>OLC</u>")—seeking "legal clearance for the *proposed* techniques." *Id.* ¶ 73 (emphasis added).

After proposing the interrogation techniques, Defendants had no interaction with Plaintiff until after August 1, 2002—when the DOJ's OLC issued legal memoranda that concluded "the techniques did not cause the kind of pain associated with 'serious physical injury,' would not give rise to criminal liability," and "would not violate the federal statute criminalizing torture." *Id.* ¶¶ 76-77. Critically, the DOJ approved only 10 of the 12 techniques proposed by Defendants. *Id.* ¶ 78. And only after the DOJ's approval did Defendants begin interrogating Plaintiff, while the CIA observed. *Id.* ¶¶ 79, 80, 82. Defendants had to send CIA Headquarters a summary of Plaintiff's interrogation at the end of each day and maintain data concerning the specific techniques used. *Id.* ¶ 85. Plaintiff's interrogation ended on August 20, 2002, after which Plaintiff provided still more actionable intelligence about three Al Qaeda suspects. *Id.* ¶ 90, 94. Thereafter, and without any involvement from Defendants, the CIA transferred Plaintiff to various black sites until September 2006, when the U.S. transferred Plaintiff to the U.S. base in Guantanamo Bay where he remains detained. *Id.* ¶¶ 95, 97. Critically, Plaintiff does not allege that he has had any interactions with Defendants since 2006. *Id.* On March 27, 2007, a Combatant Status Review Tribunal of the Department of Defense determined that Plaintiff "meets the criteria for designation as an Enemy Combatant." *In re: Application of Zayn Al-Abidin Muhammad Husayn.* No. 17-cv-171-JLQ (E.D. Wash.), ECF No. 34-1, Decl. of Steven W. Dalbey, attached hereto as Appendix A.

Plaintiff advances claims for torture, non-consensual medical experimentation, war crimes, and arbitrary detention pursuant to the Alien Tort Statute ("<u>ATS</u>"), 28 U.S.C. § 1350. The ATS provides jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Plaintiff has not named any employee of the CIA or U.S. Government as a defendant.

Notably, this is not the first time Plaintiff has been before this Court. In 2017, he filed an *ex parte* 28 U.S.C. § 1782 motion seeking to compel Defendants to testify in connection with Polish litigation regarding Plaintiff's treatment at a CIA black site ("1782 Litigation"). *U.S. v. Zubaydah*, 595 U.S. 195, 198-99 (2022). The Government intervened and moved to quash, asserting the state secrets privilege, and claiming the disclosure of the information sought would harm national security—specifically, the actual location of a CIA black site. *Id.* at 199. This Court held the state secrets privilege applied and dismissed the action. *Id.* at 203.

The Ninth Circuit then affirmed in part and reversed in part, finding information that was already publicly known (like the location of the black site) was not protected by the state secrets privilege. *Id.*at 204. The Supreme Court reversed, holding the privilege applied because the CIA never "officially" disclosed the location of any CIA black site and Defendants' "confirmation (or denial) . . . would be tantamount to a disclosure from the CIA itself." *Id.* at 210-11. Moreover, the Supreme Court found the CIA sufficiently established such official disclosure could reasonably be expected to significantly harm national security interests. *Id.* The Supreme Court's opinion cites the S. Rep. No. 288, 113th Cong., 2d Sess. (2014) ("SSCI Report") to support factual statements about Plaintiff's interrogation, which Plaintiff also cites in his Complaint.

So too have Defendants faced similar claims arising under the ATS in this Court. In 2015, three foreign nationals, who had allegedly been subjected to enhanced interrogation techniques at CIA black sites, asserted similar claims to those Plaintiff brings here. *Salim v. Mitchell*, No. 15-cv-00286-JLQ (E.D. Wash.) (the "*Salim* Case"). In *Salim*, the plaintiffs had very little or no direct interactions with Defendants and the case settled in 2017 before trial. *ACLU v. DOD*, 2017 U.S. Dist. LEXIS 159108, at *6 n.2 (S.D.N.Y. Sep. 27, 2017) (citation omitted).

## III. LEGAL STANDARD

Rule 12(b)(1) provides for dismissal for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "'A Rule 12(b)(1) jurisdictional attack may be facial or

factual.'" *Margitan v. Spokane Cnty.*, 2023 U.S. Dist. LEXIS 13748, *5 (E.D. Wash. Jan. 26, 2023) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). "The Court's review of a facial attack is limited to the allegations in the complaint whereas [it] need not presume the truthfulness of the plaintiff's allegations' in a factual attack and can consider evidence outside the complaint.'" *Id.*; *Assoc. of Am. Med. Coll. v. U.S.*, 217 F.3d 770, 778 (9th Cir. 2000). Plaintiff has the burden of proving jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

Rule 12(b)(6), in turn, provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). For a 12(b)(6) motion, "all well-pleaded allegations of material fact [are accepted as true] and construe[d] in the light most favorable to the non-moving party." *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012). "[C]onclusory allegations of law and unwarranted inferences" are insufficient. *Assoc. Gen. Contractors v. Metro. Water Dist.*, 159 F.3d 1178, 1181 (9th Cir. 1998). A complaint must state "evidentiary facts which, if true, will prove [the claim]," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), otherwise it will be dismissed. *Watson v. Weeks*, 436 F.3d 1152, 1157 (9th Cir. 2006).

## IV. THIS CASE SHOULD BE DISMISSED BASED UPON RULE 12(B)(1).

### A. The Military Commissions Act Divests the Court of Jurisdiction.

The Military Commissions Act ("MCA") deprives a court of jurisdiction over non-habeas, detention-related claims where the alien plaintiff was determined to have been properly detained by the U.S. as an enemy combatant. It provides, in relevant part:

> Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(2).

The Ninth Circuit in *Hamad v. Gates*, explained that a court lacks jurisdiction under Section 2241(e)(2) when the following five elements are satisfied:

> (1) the action is against the 'United States or its agents'; (2) the action relates to 'any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States'; (3) the action relates to an alien who was 'determined by the United States to have been properly detained as an enemy combatant' or an alien awaiting such a determination; (4) the action is an action 'other' than an application for a writ of habeas corpus, which is covered in § 2241(e)(1); and (5) the action does not qualify for an exception under § 1005(e)(2) or (3) of the Detainee Treatment Act of 2005 (DTA), which provide the D.C. Circuit jurisdiction over a narrow class of challenges by enemy combatants, *see* Detainee Treatment Act of 2005, Pub.L. No. 109–148, div. A, title X, § 1005(e), 119 Stat. 2680, 2740–44.

732 F.3d 990, 995 (9th Cir. 2013). Here, all five elements are met, and this Court therefore lacks jurisdiction to preside over Plaintiff's claims.

The second, fourth, and fifth elements are clearly satisfied. The second is met because this action unquestionably relates to "any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States." Compl. ¶¶ 15-16, 122-44. The fourth is met because this is an action under the ATS and not an application for a writ of habeas corpus. Compl. ¶¶ 10, 114-44. And the fifth is met because this case does not qualify for an exception under section 1005(e)(2) or (3) of the Detainee Treatment Act of 2005, as those exceptions apply only to the D.C. Circuit's ability to review the validity of any final decision of a Combatant Status Review Tribunal ("CSRT") that an alien is properly detained as an enemy combatant, *i.e.*, an item not at issue here. *Hamad*, 732 F.3d at 997.

The first and third elements are also satisfied.

1. <u>Plaintiff Has Been Determined by the U.S. To Be "Properly Detained as An Enemy Combatant."</u>

The third *Hamad* element—*i.e.*, whether Plaintiff was "determined by the United States to have been properly detained as an enemy combatant"—is easily met, as

demonstrated by the Declaration of Steven W. Dalbey and the associated CIA Memorandum filed by the U.S. in November 2017 in the 1782 Litigation before this Court. *See* Appendix A. The CIA Memorandum states that the CSRT determined Plaintiff "meets the criteria for designation as an Enemy Combatant"; the Designed Civilian Office (DCO) approved the CSRT's decision. *Id.* Such a determination by CSRT satisfies element three. *See Hamad*, 732 F.3d at 995 ("Hamad's action satisfied the third requirement, because there is no dispute that a CSRT determined that Hamad was properly detained as an enemy combatant."); *Jawad v. Gates*, 832 F.3d 364, 368 (D.C. Cir. 2016) ("Jawad concedes that a CSRT found that he was an 'enemy combatant.' We have held that such a finding by a CSRT fully satisfies the section 7(a) requirement that an alien be determined by the United States to have been properly detained as an enemy combatant."); *Al-Zahrani v. Rodriguez,* 669 F.3d 315, 317 (D.C. Cir. 2012) (MCA deprived court of jurisdiction where a CSRT determined the plaintiffs were enemy combatants); *Janko v. Gates*, 741 F.3d 136, 144 (D.C. Cir. 2014) (same).

## 2. Defendants Were Agents of the United States.

The first element of Section 2241(e)(2) is also met—this is an action against "agents" of the U.S. A review of the MCA's legislative history demonstrates that Congress understood this provision would apply to government employees *and contractors alike*; it passed this legislation specifically to protect individuals, like Defendants, who interrogated enemy combatants:

> [T]here is one issue that really has not come up in this debate, and that is the immunity that is given in this bill to the people who are interrogating the enemy combatants. We need to pass this bill so that interrogations can start up again because without the immunity, anybody who is hired by the United States Government to try to find out whom they are planning on blowing up next would be subject to a lawsuit that would be filed by some attorney that would claim that he was representing the public interest. This is a protection bill for the interrogators. It is something that is needed, and that is another reason why it ought to pass.

152 Cong. Rec. H7,947-48 (Sept. 29, 2006) (statement of Rep. Sensenbrenner).

While the MCA does not specifically define "agent," the Restatement (Third) of Agency explains, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006). The essential element that establishes an agency relationship is that *the agent consent to act on the principal's behalf, as well as subject to the principal's control*." *Id.* § 1.01 at cmt. g (emphasis added). The principal has a right to control the agent's actions. *Id.* § 1.01, cmt. f. But such "control may concern only the overall mission, not operational details." *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1253 (10th Cir. 2020).

Critically, Defendants' label as "independent contractors" does not foreclose their agency status. RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (explaining "the common term 'independent contractor' is equivocal in meaning and confusing in usage because some termed independent contractors are agents"); *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019) (holding independent contractor status does not preclude a finding of agency status). Indeed, the Restatement on Agency is clear that how the parties label their relationship is not dispositive of whether an agency relationship exists. RESTATEMENT (THIRD) OF AGENCY § 1.02; *Henderson*, 918 F.3d at 1073. Rather, the Court must decide whether an agency relationship exists "based on an assessment of the facts of the relationship and not based on how the parties define their relationship." *Id.* § 1.02; *see U.S. v. Milovanovic*, 678 F.3d 713, 725 (9th Cir 2012). In the end, "[t]he hallmark of an agency relationship, in contrast with a mere contractual relationship to provide a service, is 'the power to give interim instructions.'" *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 608-09 (C.D. Cal. 2021) (quoting RESTATEMENT (THIRD) OF AGENCY § 1.01, cmt. f.).

Here, the Complaint concedes Defendants were agents of the CIA because they consented to act on the CIA's behalf in interrogating Plaintiff and were subject to the

CIA's control. For instance, Plaintiff claims that at the CIA's request, Defendants "proposed" twelve "enhanced interrogation techniques" to be used by the CIA or on the CIA's behalf. *Id.* ¶¶ 67, 70. And because Defendants were subject to the CIA's control, none of the proposed techniques were utilized until *after* it obtained legal clearance from the DOJ for the techniques to be applied to suspected terrorists; this took nearly a month. *Id.* ¶¶ 73, 76-77. Two of the techniques were ultimately not authorized. *Id.* ¶ 78.

The Complaint alleges more. After the CIA authorized Defendants to utilize 10 of the proposed interrogation techniques, Plaintiff admits the interrogation was done under the ultimate control of the CIA, with the CIA maintaining the power to give interim instruction. Plaintiff's interrogation also occurred at a black site controlled by the CIA, *id.* ¶ 58, and Defendants were accompanied by CIA personnel who monitored the interrogations. *See id.* ¶ 79 (Defendants were "accompanied by security personnel"), *id.* ¶¶ 80, 82 (a CIA team, a fellow SERE instructor and CIA guards were present during the interrogation). Plaintiff even admits the CIA medical team overrode an early interrogation suggestion by Dr. Mitchell. Compl. ¶ 62. Further, Defendants were required to send CIA Headquarters a summary of Plaintiff's interrogation at the end of each day and maintain data concerning the specific techniques used. *Id.* ¶ 85. These allegations alone are sufficient to establish an agency relationship. *Brown*, 562 F. Supp. 3d at 608-09 (finding independent contract was an agent where principal had to pre-approve script before use, principal visited sites to monitor performance, and agent had to regularly submit data and documentation to agent); *McAdory v. M.N.S. & Assocs., LLC*, 2021 WL 2321634, at *8 (D. Or. June 7, 2021) (finding independent contractor was an agent because principal "retained the right to control [agent] to the degree necessary to establish a principal-agent relationship" through means such as directing the agent to stop actions and reserving the right to audit actions); *Williams v. PillPack LLC*, 644 F. Supp. 3d 845, 852 (W.D. Wash. 2022) (finding independent contractor could be an agent where principal participated in the approval of the script used by agent on calls and agent made changes to services based upon feedback from principal).

But this is not all. Rather, Plaintiff further concedes the agency relationship by repeatedly alleging that Defendants "acted under color of law," Compl. ¶¶ 117, 124, and acting "under color of law" has been equated to acting as an agent in various statutory contexts. *See Nicholes v. Jano*, 2020 WL 2615529, *5 (M.D. Fla. May 22, 2020) ("under color of law" in the context of 42 U.S.C. § 1983 "means that the defendant must have acted as an agent of a government"); *U.S. v. Cox*, 836 F. Supp. 1189, 1197 n.9 (D. Md. 1993) ("acting under color of law," in the context of 18 U.S.C. § 2511 (2)(c), equates to "acting as a government agent").

Additionally, the agency relationship between Defendants and the CIA is further born out in the Supreme Court's discussion in the 1782 Litigation of Defendant's role in Plaintiff's interrogation. *See 1782 Litigation*, 595 U.S. at 238 (Gorsuch, J., dissenting). There, Justice Gorsuch noted "Zubaydah seeks information about his torture *at the hands of the CIA*." *Id.* (emphasis added). Justice Gorsuch explains—citing exclusively to the SSCI Report—that Defendants sought to end the interrogation six days into applying the interrogation techniques on Plaintiff:

> Mitchell and Jessen concluded that it was "'highly unlikely' that Zubaydah possessed the information they were seeking," and they sought to end the interrogations. It seems their assessment may have been correct. . . . At the time, however, CIA headquarters was not yet persuaded by Mitchell's and Jessen's report. *It instructed the pair to continue their work. Following these directions*, Mitchell and Jessen carried on for two more weeks until *their superiors finally concluded* that Zubaydah "did not possess any new terrorist threat information."

*Id.* (citing and quoting the SSCI Report). Further, the SSCI Report, on which Plaintiff extensively relies, demonstrates Defendants acted under the control of the CIA; received interim instruction from the CIA; and that it was the CIA that determined when to end the interrogation—factors that support existence of an agency relationship. *Id.*

That an agency relationship existed between Defendants and the CIA is also consistent with the Supreme Court's holding in the 1782 Litigation, which held Defendants' "confirmation (or denial) of the information Zubaydah seeks would be

tantamount to a disclosure from the CIA itself." 595 U.S. at 211. In other words, the Supreme Court concluded that because Defendants were acting on behalf of the CIA to such a degree, Defendants' testimony was equivalent to that of the CIA. *Id.* And Defendants remain subject to the control of the CIA, such that they are still not permitted to disclose the information Plaintiff sought in that case. *Id.* at 210-11. Indeed, Justice Gorsuch, in his dissent, recognized Defendants were "executive agents." *Id.* at 261 (Gorsuch, J., dissenting).

In *Salim*, this Court declined to apply the MCA to Defendants because, based upon the limited record before the Court for that specific motion to dismiss, Defendants had not established an "agency relationship," or that the plaintiffs were "enemy combatants." *Salim v Mitchell*, 2017 WL 390270, at *7 (E.D. Wash. Jan. 27, 2017). That ruling, however, is not controlling or even instructive here, where the allegations in the Complaint differ from those in *Salim* in that Defendants had limited or no interactions with the *Salim* plaintiffs. Conversely, here, the CIA and Defendants' agency relationship is evident because the CIA observed and provided feedback during Defendants' interrogation of Plaintiff. Additionally, the *Salim* Court did not have the benefit of the Supreme Court's findings regarding Defendants' role in Plaintiff's interrogation or Justice Gorsuch's summary of the SCCI Report that evidences that Defendants were ordered to continue Plaintiff's interrogation even when they wanted to stop. Nor did the *Salim* Court have the benefit of recent caselaw that explains when an independent contractor qualifies as an agent. *See Brown*, 562 F. Supp. 3d at 608-09; *Williams*, 644 F. Supp. 3d at 852; *McAdory*, 2021 WL 2321634, at *8.

In sum, the Complaint evidences that Defendants were "agents" of the CIA, and thus, all elements of the MCA are met.[2] As such, this Court lacks jurisdiction.

_____

[2] To the extent the Court determines an agency relationship has not yet been established, it should allow the parties to engage in jurisdictional discovery on the issue to avoid the case moving forward on the merits when subject matter jurisdiction may be lacking.

**B.     The Political Question Doctrine Also Divests the Court of Jurisdiction.**

The Supreme Court has long recognized an exception to the federal courts' duty to decide cases—known as the political question doctrine—which prevent courts from deciding issues assigned to the executive or legislative branches. *Baker v. Carr*, 369 U.S. 186 (1962). Against this backdrop, *Baker*, *id*. at 217, opined "[p]rominent on the surface of any case held to involve a political question is":

(1)     'a textually demonstrable constitutional commitment of the issue to a coordinate political department';

(2)     'a lack of judicially discoverable and manageable standard for resolving it';

(3)     'the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion';

(4)     'the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government';

(5)     'an unusual need for unquestioning adherence to a political decision already made'; or

(6)     'the potentially of embarrassment from multifarious pronouncement by various departments on one question.'

Using the *Baker* factors as a guide, courts must conduct a "*discriminating* case-by-case analysis … to determine whether a political question is so inextricably tied to a case as to divest the court of jurisdiction." *Saldana v. Occidental Petroleum Corp*., 774 F.3d 544, 551 (9th Cir. 2014) (emphasis added) (citations omitted).

Governing precedent recognizes that although not every case that "touches foreign relations lies beyond judicial cognizance, *Baker*, 369 U.S. at 211, "the foreign relations of our government is committed by the Constitution to the executive and legislative [branches] … and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Corrie v. Caterpillar, Inc*., 503 F.3d 974, 982 (9th Cir. 2007) (citation omitted). The Constitution expressly assigns war and foreign policy decisions to the Executive and Legislative Branches. U.S. CONST. art II § 2, cl. 1; art. I, § 1, cls. 12-14; art. II, § 2. And the "strategy and tactics

employed on the battlefield are clearly not subject to judicial review." *Lane v. Halliburton*, 529 F.3d 548, 559 (5th Cir. 2008) (citation omitted); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (President's decision to deploy troops in a foreign land nonjusticiable); *DaCosta v. Laird*, 471 F.2d 1146, 1153-57 (2d Cir. 1973) (decision to mine another country's harbors during war nonjusticiable).

Claims are textually committed to another branch of government when they "will require reexamination of" a decision made by a coordinate branch of government that is "insulated from judicial review." *McMahon v. Presidential Airways, Inc*., 502 F.3d 1331, 1359-60 (11th Cir. 2007). And, importantly, "even when the face of a complaint does not ask the court to review a political question, issues 'that are textually committed to the executive sometimes lie just beneath the surface of the case.'" *Cooper v. Tokyo Elec. Power Co. Inc*., 860 F.3d 1193, 1212 (9th Cir. 2017) (citing *Harris v. Kellogg Brown & Root Servs., Inc*., 724 F.3d 458, 465 (3d Cir. 2013)).

    1.   <u>This Court Should Adopt the Two-Part Taylor Test for Evaluating Political Questions Involving Defense Contractors and Determine That Plaintiff's Claims Raise Nonjusticiable Political Questions.</u>

"Given the unprecedented levels at which today's military relies on contractors to support its mission, [courts have] recognized that a military contractor acting under military orders can also invoke the political question doctrine as a shield under certain circumstances." *In re: KBR, Inc*., 893 F.3d 241, 259 (4th Cir. 2018) (citing *Taylor v. Kellogg Brown & Root Servs., Inc*., 658 F.3d 402, 411 (4th Cir. 2011)). And while the Ninth Circuit has not had a chance to opine on the matter, this Court should take this opportunity to follow those circuits that have adopted the Fourth Circuit's *Taylor* test as applied to governmental defense contractors. The Third, Fifth and Eleventh Circuits have developed a similar test to *Taylor* related to defense contractors under which "a determination must first be made whether the case requires evaluation of a military decision. If so, those military decisions must be of the type that are unreviewable

because they are textually committed to the executive." *Harris*, 724 F.3d at 466 (citing *Lane*, 529 F.3d at 565; *McMahon*, 502 F.3d at 1359-60).

Under *Taylor*, courts have distilled the *Baker* factors to two primary questions when asked to invoke the political question doctrine on behalf of a military contractor: whether "(1) the military exercised direct control over the contractor, or (2) 'national defense interests were closely intertwined with the military's decision regarding [the contractor's] conduct.'" *In re: KBR, Inc.*, 893 F.3d at 260 (citing *Taylor*, 658 F.3d at 411). An affirmative answer to *either* inquiry renders the case nonjusticiable. *Id.*

(a)     *The CIA Exercised Actual and Plenary Control Over the Interrogation of Plaintiff.*

Under the first prong of the *Taylor* test, a case against a military contractor will be dismissed as a nonjusticiable political question if the miliary exercised "actual" and "plenary" control over the contractor. *In re: KBR Inc.*, 893 F.3d at 260. To establish actual control, the government or military must have exercised more than mere "[f]ormal command authority;" it entails "actual control of day-to-day interrogation operations." *In re: KBR Inc.*, 893 F.3d at 261 (citation omitted). Plenary control involves "whether the military clearly chose how to carry out [the contractor's activities], rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed." *Id.* at 260.(citation omitted); *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281 (11th Cir. 2009) (finding plenary control when "military judgments governed the planning and execution of virtually every aspect" of the contractor's activities). Here, the Complaint establishes the CIA's actual and plenary control over Defendants.

As explained in Section IV.A.2., the CIA exercised actual control over Defendants. The Complaint alleges that Defendants reported to the CIA and the CIA had direct and consistent control over Plaintiff's interrogation. In fact, Plaintiff admits the government and military were heavily involved from the very beginning: U.S. forces captured Plaintiff on March 28, 2002, and he was then immediately interrogated by

agents from the FBI. Compl. ¶ 16. There was then a "CIA takeover" of Plaintiff's interrogation, as the CIA had to assemble "an interrogation team" to face a "life-threatening short fuse situation." *Id*. ¶¶ 49, 57. At multiple points, the Complaint refers to Defendants' plan as a "proposal" requiring CIA "approv[al]" and "accept[ance]" before it was used. *Id*. ¶¶ 1, 4, 27, 33, 41, 66, 70. Plaintiff concedes Defendants' use of enhanced interrogation techniques during Plaintiff's interrogation was undertaken at the request of, and pursuant to, the direct supervision of the CIA and did not begin until approved by the DOJ. *Id*. ¶¶ 16, 32, 33, 41, 49, 57, 70, 73, 76, 77, 85, 140.

Additionally, the Complaint alleges the CIA had plenary control over Defendants because it determined how Defendants would interrogate Plaintiff. In this respect, the CIA asked Defendants to "provide real-time recommendations" and deliver "summar[ies] of the da[ily] interrogation." *Id*. ¶¶ 49, 85. The CIA observed Plaintiff's interrogation and the CIA even required Defendants to continue utilizing the enhanced interrogation techniques after Defendants sought to end the interrogation because Defendants thought it highly unlikely Plaintiff possessed the information the U.S. was seeking. *1782 Litigation*, 595 U.S. at 238 (Gorsuch, J., dissenting). In fact, the interrogation did not end until CIA headquarters was satisfied that Plaintiff did not possess any new terrorist threat information. *Id*. Finally, after Plaintiff's interrogation, the CIA maintained control over Plaintiff's transfer via a number of different CIA black sites and ultimately to the U.S. military base in Guantanamo Bay. Compl. ¶¶ 95, 97.

Because the CIA's actual and plenary control is evident on the face of the Complaint, this Court lacks the necessary jurisdiction to hear this case. *See In re: KBR, Inc*., 893 F. 3d at 259-60 (citing *Taylor*, 658 F.3d at 411).

        (b)    *National Defense Interests Were Closely Intertwined with Military Decisions Governing Defendants' Alleged Conduct.*

Under *Taylor*'s second prong, the court must consider whether "national defense interests were closely intertwined with the military decisions regarding [the contractor's] conduct." *In re: KBR, Inc*., 893 F.3d at 260 (citation omitted). Indeed,

courts "lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Carmichael*, 572 F.3d at 1290 (citation omitted). In such cases, "it is completely evident that the suit would require [the court] to review many basic questions traditionally entrusted to the military, and [there are] no judicially manageable standards for adjudication of the issues." *Id.* at 1291. And a court cannot adjudicate a claim that would require the judiciary to question "actual, sensitive judgments made by the military." *Taylor*, 658 F.3d at 411. Here, Plaintiff seeks to involve this Court in issues which are "inherently entangled" with political decisions—whereby a favorable judgment will "necessarily conflict with and denounce our government's official actions," *Saldana*, 774 F.3d at 554-55, and/or require this Court to render a policy determination akin to making a judicial pronouncement as to the "necessity of simulating actual battle conditions." *Aktepe v. USA*, 105 F.3d 1400, 1404 (11th Cir. 1997). This Court simply cannot find for Plaintiff "without implicitly questioning, and even condemning," U.S. policy on the war against Al Qaeda. *Corrie*, 503 F.3d at 984.

The requisite intertwinement is present on the face of the Complaint. Plaintiff's claims cannot be adjudicated "without inquiring into or passing judgment" on political decisions, the sensitivity of which is evident from Plaintiff's allegations. *Saldana*, 744 F.3d at 555. Plaintiff admits that when he was first captured, U.S. intelligence "believed [he was] Al Qaeda's third in command"; and that "he had authored the Manchester Manual[,]" Compl. ¶¶ 16, 44, "an Al Qaeda-generated document that included purported strategies to resist interrogation that British anti-terrorism police recovered in a May 2000 raid on a suspected Al Qaeda safe house in Manchester, England." *Id.* ¶ 35. Plaintiff further admits that after his capture, he provided "valuable information regarding a planned attack," including significant financial, logistical, and operational details about the planned attack that allowed the CIA to confirm the intelligence and thwart the attack. *Id.* ¶ 45. Moreover, Plaintiff provided the U.S. with "vital intelligence that had never been previously confirmed" in that he identified Khalid Shaykh

Mohammad as "Mokhtar"—the mastermind behind the September 11 attacks. *Id.* ¶ 47. It was in these circumstances—after Plaintiff admitted to knowing of a planned attack against the U.S. and knowing the identity of the man who planned September 11—that the CIA encouraged Defendants to "think big" when proposing methods to use in interrogating Plaintiff. *Id.* ¶ 67. This same context propelled the CIA's decision to seek the DOJ's approval to use the proposed techniques. *Id.* ¶¶ 73, 76, 77.

Plaintiff acknowledges that when the CIA chose to utilize enhanced interrogation techniques on him, it was attempting to "regain footing after the intelligence failures apparent in the wake of the September 11 attacks," and was "under immense pressure to produce actionable intelligence" to "help avoid a second wave of attacks." *Id.* ¶¶ 4, 30. Thus, the actions Plaintiff complains of here—the application of enhanced interrogation techniques on him—is inextricably intertwined with the CIA's actions and judgments in response to the threat posed by Al Qaeda. *Id.* ¶¶ 16, 32, 33, 41, 49, 57, 70, 73, 76, 77, 85, 140.

As in *Carmichael* and *Taylor*, adjudicating the instant claims would require this Court to deploy hindsight to determine whether a military policy was correct. *See* 572 F.3d 1271; 658 F.3d 402. Plaintiff concedes that at the outset of the "War on Terror," the government and CIA were required to make "sensitive judgments" as to the best course forward to prevent a "second wave of attacks" even considering the "significant harm to important national interest[s]" these decisions might have posed and that the decisions may "erode[] the mutual deterrence that existed before September 11." Compl. ¶¶ 6, 30; *Taylor*, 658 F.3d at 411. It is exactly these sorts of decisions that are "textually committed to the executive." *Harris*, 724 F.3d at 466 (citing *Lane*, 529 F.3d at 560; *McMahon*, 502 F.3d at 1359-60). Because both prongs of the *Taylor* test are satisfied, the political question doctrine applies to bar jurisdiction. *In re: KBR, Inc.*, 893 F. 3d at 259-60; *Taylor*, 658 F.3d at 411.

(c) *Defendants' Conduct Was Not Unlawful.*

The Fourth Circuit applied the *Taylor* test in a similar, yet distinguishable, circumstance involving an ATS claim against a government contractor. *See Al Shimari v. CACI Premier Tech. Inc.* ("*Al Shimari IV*"), 840 F.3d 147 (4th Cir. 2016). In *Al Shimari IV*, the Fourth Circuit had previously instructed the lower court to apply the *Taylor* test and conduct discovery pursuant to its two prongs. It then evaluated the resulting factual record—while also noting that the contractor must be engaged in "a lawful action under actual control of the military"—because "the military cannot lawfully exercise its authority by directing a contractor to engage in unlawful activity." *In re: KBR*, 893 F.3d at 261 (citing *Al Shimari IV*, 840 F.3d at 157).

Here, Plaintiff cannot demonstrate that Defendants' conduct was "unlawful" at the time it occurred in light of the Ninth Circuit's decision in *Padilla*, 678 F.3d at 763. Padilla was an individual who, like Plaintiff, was designated an enemy combatant by the U.S. Government because he was "closely associated with [A]l Qaeda," possessed intelligence that "would aid U.S. efforts to prevent attacks by [A]l Qaeda on the United States," and "represented a continuing, present and grave danger to the national security of the United States." *Id.* at 751. Padilla complained about his detention conditions and brought suit against John Yoo, former Deputy Assistant Attorney General at the Office of Legal Counsel, who Padilla claimed "set in motion" Padilla's illegal interrogation and detention by "issuing legal memoranda designed to evade legal restraints on those policies and immunize those who implemented them." *Id.* at 752. The memoranda at issue in *Padilla* included those cited by Plaintiff in his Complaint, memoranda that concluded that enhanced interrogation techniques would not violate the federal statue criminalizing torture. *Id.*; Compl. ¶¶ 76-77. The Ninth Circuit found that Yoo was not liable to Padilla for two reasons. First, Yoo had qualified immunity because at the time he acted, the law was not sufficiently clear as to the rights of enemy combatants such that every reasonable official would have understood that what he was doing violated

the plaintiff's rights. *Id.* at 750. Second, the Ninth Circuit held it was not clearly established in 2001-03 that the treatment Padilla allegedly received was torture. *Id.*

The Ninth Circuit explained that in 2001-03, there was general agreement that torture meant the intentional infliction of severe pain or suffering, whether physical or mental. *Id. at* 763. On the other hand, the Ninth Circuit found that the meaning of "severe pain or suffering" was less clear at that time because there was "considerable debate, both in and out of government, over the definition of torture as applied to specific interrogation techniques." *Id*. at 768. As a result, the Ninth Circuit could not "say that any reasonable official in 2001-03 would have known that the specific interrogation techniques allegedly employed against Padilla, however appalling, necessarily amounted to torture." *Id. at* 767-68.

Applying *Padilla's* reasoning here, Defendants' alleged conduct in interrogating Plaintiff at the CIA's direction was not unlawful. At the request of the CIA, Defendants proposed potential interrogation techniques based upon techniques that had been employed at SERE. Compl. ¶ 28. Critically, Defendants did not apply any of the techniques until after the DOJ—through Yoo—issued legal memoranda in August 2002 that indicated the proposed techniques did not constitute torture. Compl. ¶¶ 76-77. Indeed, the DOJ's memoranda laid at the heart of the "debate" that the *Padilla* Court found existed at the time, finding "the techniques did not cause the kind of pain associated with 'serious physical injury,' and that the techniques would not give rise to criminal liability,". . . [nor] "prolonged mental harm', and that they would not violate the federal statute criminalizing torture." Compl. ¶¶ 77; *see also* 42 U.S.C. § 2000dd. And for his part, Plaintiff acknowledges the intent of the program was to "prevent imminent, significant physical harm to persons," and that the CIA made "every effort possible to ensure the subject [was] not permanently physically or mentally harmed." Compl. ¶¶ 31, 73. If Yoo, a lawyer for the OLC, could not have known that the enhanced interrogation techniques addressed in the memoranda he authored for the DOJ amounted to torture and were thus unlawful, how could Defendants have known that—

particularly when they were provided with Yoo's memoranda concluding otherwise? *See Padilla*, 678 F.3d at 767-68. Thus, in light of Yoo's memoranda, Defendants' alleged conduct *at a minimum* falls within the "grey area" of non-justiciable conduct per the political question doctrine. *Al Shimari IV*, 840 F.3d at 159-60. As Defendants' conduct was not unlawful, the political question doctrine applies to bar Plaintiff's claims.

## 2.   *Al Shimari* and *Salim* Are Not Controlling.

Plaintiff may point to *Al Shimari*[3] or *Salim* to claim that the political question doctrine does not apply here—neither case controls.

In *Al Shimari*, following the invasion of Iraq in 2003, the U.S. took control of Abu Ghraib prison, to detain criminals and other enemies of the provisional government, for purposes of interrogation and intelligence gathering. *See* 840 F.3d at 151-52. Due to a shortage of military interrogators, the U.S. contracted with CACI to provide additional interrogation services. *Id.* at 152. The CACI personnel deployed many unauthorized interrogation techniques including forced masturbation and sexual arousal; inserting fingers into detainees' rectums; the use of dogs and inflicting dog bites; dragging detainees by a rope tied around their necks; and repeated electric shocks. *Suhail Najim Abdullah Al Shimari v. CACI Premier Tech., Inc.*, 300 F.Supp.3d 758, 765-71 (E.D. Va. 2018). The detainees brought ATS claims for torture, cruel inhuman, or degrading treatment, and war crimes. *Id.* at 763. Ultimately, the District Court found the case justiciable because the conduct was unlawful, as it rose "to the level of torture."

While Plaintiff's claims and those in *Al Shimari* both arise from the interrogation of U.S. detainees, the similarities end there. The conduct in *Al Shimari* was found to be unlawful because "what began as 'nakedness and humiliation, stress and physical

---

[3] *Al Shimari* has been the subject of extensive litigation, reaching the 4th Circuit on five separate occasions. When referencing "*Al Shimari*" Defendants are generally referring to the litigation as a whole and will cite to the relevant decisions for specific findings.

training (exercise)' devolved into 'sexual and physical assaults by a small group of morally corrupt and unsupervised soldiers and civilians.'" *Id.* at 764. Indeed, the conduct was the basis of numerous criminal proceedings where individuals were punished under military law by court martial, some even receiving significant terms of imprisonment. *Al Shimari IV*, 840 F.3d at 153. Nothing of the sort is alleged here. *See generally* Compl. To the contrary, Yoo was specifically held to have qualified immunity such that he could not be held civilly liable for his role in drafting the memoranda that specifically approved Defendants' interrogations. *See Padilla*, 678 F.3d at 767-68. And Plaintiff does not allege that any of those individuals who observed Plaintiff's interrogation have been prosecuted. *See generally* Compl. Additionally, the conduct at issue in *Al Shimari* did not occur during the infancy of the War on Terror, but at the end of 2003 into 2004—*i.e.*, a period beyond when *Padilla* found there existed a "debate" as to whether certain interrogation techniques constituted torture. *Al Shimari*, 300 F. Supp. 3d at 763; *Padilla*, 678 F.3d at 763-64.

*Al Shimari* explained that "instances in which the lawfulness of such conduct was not settled at the time the conduct occurred, and the conduct occurred under the actual control of the military or involved sensitive military judgment, that conduct will not be subject to judicial review." *Al Shimari IV*, 840 F.3d at 160 (citation omitted). As explained above, the instant matter is one such instance because "[t]he absence of clear norms of international law or applicable criminal law regarding the lawfulness of a particular mode of treatment will render that 'grey area' conduct non-justiciable under the political question doctrine [because] …the conduct was committed under the actual control of the military [and/or] implicated sensitive military judgments. *Id*.

*Salim* similarly does not establish that Plaintiff's claims are justiciable. In *Salim*, this Court declined to invoke the political question doctrine on the basis that "[o]ther courts have adjudicated cases touching the same, or similar, subject matter." *Salim v. Mitchell,* 268 F. Supp.3d 1132, 1146 (E.D. Wash. 2017). In so ruling, *Salim* did not accept or reject the *Taylor* test, but simply noted it existed. *Id.* This Court should now

accept the *Taylor* test because years have passed since *Salim's* ruling, during which the *Taylor* test has gained further support as courts have recognized the U.S. military continues to rely upon contractors at unprecedented levels. *See In re: KBR, Inc.*, 893 F. 3d at 259. Additionally, this Court should decline to follow *Salim* because the cases relied upon therein do not indicate that the subject matter before the Court—Plaintiff's interrogation by Defendants—is justiciable. *See Salim*, 268 F.Supp.3d at 1146. Most of those cases deal with different factual circumstances. *See Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (pertaining to an American Citizen's right to challenge his status as an enemy combatant to contest his indefinite detention); *Rasul v. Bush*, 542 U.S. 466, 505 n.6 (2004) (Scalia, J., dissenting) (pertaining to the legality of the detention of foreign nationals at Guantanamo Bay Naval Base. In dissent, Justice Scalia noted, "[t]he ATS, while invoked below, was repudiated as a basis for jurisdiction by all petitioners, either in their petition for certiorari, in their briefing before this Court, or at oral argument"); *Koohi v. U.S.*, 976 F.2d 1328, (9th Cir. 1992) (finding plaintiffs' claims against the U.S. government and its contractors for downing a civilian aircraft to be preempted by the combatant activities exception to the FTCA). The sole case cited in *Salim* that concerns the evaluation of interrogation techniques is *Padilla*, in which no party raised the political question doctrine. Moreover, as discussed above, *Padilla* supports finding a lack of jurisdiction under the political question doctrine because it establishes Defendants' conduct was not unlawful and that the CIA was making sensitive military decisions when the law was unsettled based upon the advice from DOJ. 678 F.3d at 750.

## V. THIS CASE SHOULD BE DISMISSED BASED UPON RULE 12(B)(6).

### A. Defendants Are Entitled to Derivative Sovereign Immunity.

A sovereign is immune absent an immunity waiver and consent to suit. *U.S. v. Mitchell*, 445 U.S. 535, 538 (1980). Government employees and contractors performing government work likewise may be immune from suit based upon *derivative* sovereign immunity. *See Filarsky v. Delia*, 566 U.S. 377 (2012); *Westfall v. Erwin*, 484 U.S. 292 (1988); *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988); *Barr v. Matteo*, 360 U.S. 564

(1959); *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940). Such immunity arises where, as here, "the government has directed a contractor to do the very thing that is the subject of the claim." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001). Here, Defendants followed the government's valid instructions (*Yearsley*), and would be immune were they government employees performing the same job function (*Filarsky*).

1.    Defendants Are Entitled to *Yearsley*-Based Immunity.

The Supreme Court has repeatedly recognized government contractors share the U.S.'s immunity when they act: (1) pursuant to authority "validly conferred" by the government; and (2) within the scope of their contracts. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (citing *Yearsley*, 309 U.S. at 21); *see also Agredano v. U.S. Customs Serv.*, 223 F. App'x 558, 559 (9th Cir. 2007) (company contracting with the U.S. cannot be liable for third-party injuries arising from the contract's execution where company did not breach contract's terms) (citing *Myers v. U.S.*, 323 F.2d 580, 583 (9th Cir. 1963)); *In re KBR, Inc., Burn Pit Litigation*, 744 F.3d 326, 345 (4th Cir. 2014); *Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs.*, 853 F.3d 173, 185 (5th Cir. 2017) ("contractor may not be liable for harm resulting from its strict execution of a constitutionally authorized government order."). Extending immunity to contractors avoids "imped[ing] the significant governmental interest in the completion of its work." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000); *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1447-48 (4th Cir. 1996) ("it is a small step to protect [a government] function when delegated to private contractors"); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 204 (5th Cir. 2009); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 646 (6th Cir. 2015). Defendants did not exceed the scope of the authority that was "validly conferred" by the U.S. government for national security purposes.

(a)    *The Authority Granted Was "Validly Conferred."*

"After al Qaeda killed over three thousand people in its September 11, 2001, attacks on the United States, Congress empowered the President to use his warmaking authority to defeat this terrorist threat to our nation." *Lebron v. Rumsfeld*, 670 F.3d 540,

544 (4th Cir. 2012) (citing Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001)). To that end, "[i]n an effort to extract . . . information [about the September 11 attacks and potential future assaults], the CIA hired two contractors, James Mitchell and John Jessen, *and authorized them* to employ what it called 'enhanced interrogation techniques.'" *1782 Litigation*, 595 U.S. at 986 (Gorsuch, J., dissenting) (emphasis added). It is this valid delegation of authority[4] from Congress; to the President; to the CIA; to Defendants that shields Defendants where the government "directed and led" the interrogation of Plaintiff. *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 2016 U.S. Dist. LEXIS 18248, at *32 (E.D. La. Feb. 16, 2016) (contractors were "immunized under the [Clean Water Act] for any damages resulting from their actions or omissions … so long as they adhered to, and acted within the scope of, the federal government's directives."); *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 2016 U.S. Dist. LEXIS 101175, at *36 (E.D. La. Aug. 2, 2016) (same). Notably, *Yearsley* immunity also applies where, as here, contractors designed certain "procedures," or implemented their own "plans," which the government then "authorized." *See, e.g., Taylor Energy Co., LLC v. Luttrell*, 3 F.4th 172, 176 (5th Cir. 2021) (*Yeasley* immunity applied where "[t]he Government directed [the contractor] to come up with [a] site assessment procedure for the Rapid Response Solution containment project," and "authorized [the contractor's] plan, the design of the response system, and the installation of the system.").

---

[4] War Powers Resolution, Pub. L. No. 93-148, 87 Stat. 555 (1973), *codified at* 50 U.S.C. §§ 1541-1548; *Winter v. NRDC, Inc.* 555 U.S. 7, 24, 26 (2008) (President has authority to delegate national security matters to the CIA); National Security Act of 1947, *as amended*, 50 U.S.C. §§ 3035, 3036(c), (d)(1)-(4) (2005). The CIA had authority to contract with Defendants to perform such services. Exec. Order 12333, 46 Fed. Reg. 59941, 59951 § 2.7 (Dec. 4, 1981), *amended by*, Exec. Order 13470, 73 Fed. Reg. 45325, 45339 (July 30, 2008); *In re Am. Boiler Works*, 220 F.2d 319, 321 (3d Cir. 1955).

Importantly, under *Yearsley*, the legality of a given action is recognized as distinct from the "authority to act" under government instruction.[5] 39 U.S. at 19 (focus was on whether the work done was "under the direction of" the Secretary of War and "supervision" of the Chief of Engineers). Here, the government's "authority" to assign Defendants the task of recommending interrogation techniques—and then employing said techniques on Plaintiff in the name of national security to prevent future attacks—is well-documented.  And to the extent Plaintiff asserts that the government somehow lacked the "authority to act" because the conduct was allegedly "torture," Compl. ¶ 31, this argument fails.  Critically,  as explained in Section IV.B.1.c. *infra*, contrary to Plaintiff's claims, using the interrogation techniques on suspected terrorists in 2001-03 was *not* unlawful at the time when done by the government. Compl. ¶¶ 2, 5, 16, 42, 90 (Plaintiff was captured March 28, 2002, and the "interrogation period" ended August 20, 2002); *id.* ¶ 67 (Defendants' techniques gained support of officials at CTC); *id.* ¶ 73 (CIA sends memo to DOJ attorney Yoo seeking "legal clearance for the proposed techniques"); *id.* ¶¶ 76-78 (detailing OLC memos finding interrogation techniques would not give rise to criminal liability). The U.S.'s immunity thus extends to Defendants "regardless of the wisdom of [the CIA's] judgments" since, at the time, "there was considerable debate, both in an out of government, over the definition of torture as applied to specific interrogation techniques"—even if that debate was later settled. *Padilla*, 678 F.3d at 764-69. As Attorney General Eric Holder explained in an

---

[5] As the Fourth Circuit explained, "[t]he question is not whether [the conduct alleged] violated the law, but rather whether Congress had the authority to assign [the contractor] to complete that task. The purpose of *Yearsley* immunity is to prevent a government contractor from facing liability for an alleged violation of law, and thus, *it cannot be that an alleged violation of law* per se *precludes* Yearsley *immunity*." *See, e.g., Cunningham v. Gen'l Dynamics Info. Tech., Inc.*, 888 F.3d 640, 648 (4th Cir. 2018) (citing *Yearsley*, 309 U.S. at 20) (emphasis added).

April 16, 2009, press release, "[i]t would be unfair to prosecute dedicated men and women working to protect America for conduct that was sanctioned in advance by the Justice Department." U.S. Dep't of Justice, Office of Public Affairs, Press Release No. 09-356, *available at* https://www.usDOJ.gov/opa/pr/2009/April/09-ag-356.html (last visited Nov. 6, 2023); *see also Bednarski v. Potestivo & Assocs., P.C.*, 2017 U.S. Dist. LEXIS 32522, at *3-4 (N.D. Ill. Mar. 7, 2017) ("*Yearsley* teaches that, where the sovereign has agreed to accept responsibility for the actions of a contractor that has acted within the scope of its authority, the proper defendant is the United States[.]").

(b) *Defendants Did Not Exceed the Scope of Their Authority.*

Plaintiff concedes Defendants "signed a contract with the CIA" in December 2001. Compl. ¶ 36. This contract was extended on April 1, 2002, for Defendants to "provide real-time recommendations to overcome Abu Zubaydah's resistance to interrogation," *id.* ¶ 49; Mitchell also signed another contract around April 3, 2002, to provide "psychological consultation to CTC in debriefing and interrogation operations for Quick Response Tasking." *Id.* ¶ 50. Jessen signed a contract to perform "applied research" in or around May 2002. *Id.* ¶ 54. And Plaintiff admits these "contracts . . . specified the experimental, research-oriented aspects of their roles." *Id.* ¶ 72. Additionally, Defendants signed new contracts on June 13, 2003, to "coach newly hired psychologist" and to "rewrite training materials." *Id.* ¶ 106. Notably, Plaintiff does *not* allege Defendants ever breached any such contract(s).

In assessing conformance with a contract, a court may look to its "appended task orders, and any laws and regulations that the contract incorporates." *In re KBR, Inc., Burn Pit Litigation*, 744 F.3d at 345. Importantly, here, there is no allegation Defendants "exceed[ed] or disobey[ed] the authority conferred" by the CIA. *In re Oil Spill*, 2016 U.S. Dist. LEXIS 18248, at *32-33.[6] And, as detailed above, not only did the CIA

_____

[6] Further, Jessen is independently immune for any conduct while employed by the Department of Defense. Compl. ¶¶ 19, 54.

determine who would be detained at a black site, *id.* ¶ 58, it also possessed "ultimate authority" to "determine which, if any, of Defendants' recommendations and advice to follow or implement." *Chesney v. TVA*, 782 F. Supp. 2d 570, 586 (E.D. Tenn. 2011); *Gomez*, 136 S. Ct. at 673 n.7 (Court "disagree[d]" with Ninth Circuit's "narrow" reading of *Yearsley*, noting "[c]ritical in *Yearsley* was the … contractor's performance *in compliance with all federal directions*.") (emphasis added); *Elsmore v. Cty. of Riverside*, 2016 U.S. Dist. LEXIS 62564, at *9 n.3 (C.D. Cal. Mar. 31, 2016); *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) (granting immunity where state agency closely supervised private agency, including appointing caseworker to monitor and approve foster-care plans); *see also Ali v. Rumsfeld*, 649 F.3d 762, 765 (D.C. Cir. 2011) (granting immunity where conduct involved detaining and interrogating enemy aliens).

        (c)    Yearsley *Immunity Is Not Limited to Situations Where the Contractor Had "No Discretion" in the Design Process and Completely Followed Government Specifications.*

Lastly, it is worth noting *Salim*'s observation that *Yearsley* immunity is "limited to cases in which a contractor '*had no discretion* in the design process and completely followed government specifications.'" *Salim v. Mitchell*, 183 F. Supp. 3d 1121, 1131 (E.D. Wash. Apr. 28, 2016) (citing *Cabalce v. Thomas E. Blanchard & Assocs.*, 797 F.3d 720 (9th Cir. 2015)) (emphasis added). This observation wrongly conflates "derivative sovereign immunity" under *Yearsley*, with the "distinct" "government contractor defense" test established in *Boyle*. *Cabalce v. VSE Corp.*, 922 F. Supp. 2d 1113, 1125 (D. Haw. 2013). In *Boyle*, the Supreme Court built upon *Yearsley* and held that government contractors involved in the design of military equipment should not be liable for state law claims where their design conformed to "reasonably precise" government specifications. 487 U.S. at 512. And while *Yearsley* and *Boyle* both "address the same federal interest of a contractor's performance of a government contract, . . . the context in which the immunities apply is different." *Chesney*, 782 F. Supp. 2d at 581-82 (citations omitted).

In *Cabalce*, a private contractor signed a contract with the U.S. Department of the Treasury to store and destroy fireworks that had been seized by the federal government. 797 F.3d at 723. Following a deadly explosion involving the seized fireworks, the contractors each sought to oppose remand and remain in federal court based on the presence of two "colorable federal defenses"—*i.e.,* the "government contactor defense" under *Boyle*, and "derivative sovereign immunity" under *Yearsley*.

After observing the "government contractor defense" is "only available to contractors who design and manufacture military equipment," *id.* at 731, *Cabalce* turned to "derivative sovereign immunity." It was at this point the Ninth Circuit opined that "*Yearsley* is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications,'" *id.* at 732, relying on its prior decision in *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008) as support. But *In re Hanford* was instead focused on whether the federal statute governing nuclear accidents, the Price-Anderson Act, preempted the "government contractor defense" under *Boyle*. 534 F.3d at 1001. In holding the "government contractor defense" was inapplicable, *In re Hanford* mentioned *Yearsley* only in passing—describing *Yearsley* as the "origin" of *Boyle*'s "government contractor defense." *Id.* Further compounding this confusion, *In re Hanford* relied on Justice Brennan's *dissent* in *Boyle* for the proposition that "[n]othing in *Yearsley* extended immunity to military contractors exercising a discretionary governmental function." *Id.* (citing *Boyle*, 487 U.S. at 524-25 (Brennan, J., dissenting)). Courts have observed "[e]xplicit language" in *Boyle* indicates the limited nature of this defense. *Chesney*, 782 F. Supp. 2d at 582 (citing *Boyle*, 487 U.S. at 505 n.1 (noting "Justice Brennan's dissent misreads our discussion," and observing the issue of immunity for government contractors was "not before us")). Based on this muddled history, *Cabalce* held the contractors were *not* immune, as the "record does not reflect that [the contractors] 'had no discretion' in devising the destruction plan for the fireworks," and instead, "designed the destruction plan without government control or supervision." 797 F.3d at 732.

It is this confused *dicta* from *Cabalce*—which traces its roots back to *Boyle*, not *Yearsley*—that the *Salim* Court seized upon to deny "derivative sovereign immunity" to Defendants on the basis they purportedly had "discretion" in the design/implementation of the interrogation plan applied to Plaintiff. 183 F. Supp. 3d at 1131. This was error. Here, Defendants do *not* rely on *Boyle*'s "government contractor defense." Nor does *Yearsley* (or its properly interpreted progeny) contain a contractor "discretion" component. Indeed, the term "discretion" does not appear anywhere in *Yearsley*. Defendants are thus entitled to *Yearsley*-based derivative sovereign immunity.

## B. Defendants are Entitled to *Filarsky*-Based Immunity.

The Supreme Court has held government contractors should not be left "holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Filarsky*, 566 U.S. at 391. Plaintiff proposes that Defendants suffer precisely this fate. But, if the government's *own lawyers* were held immune from liability, *Padilla*, 678 F.3d at 768, contractors like Defendants should likewise not be liable for engaging in "the same activity" as CIA medical staff officers, guards, site managers, operational psychologists, analysts, and the numerous other members of the team specifically tasked with interrogating Plaintiff.

Relatedly, the Supreme Court has observed important "policy reasons" behind granting *Filarsky* immunity include ensuring "talented individuals" with "specialized knowledge or expertise" are willing to accept public engagements. 132 S. Ct. at 1665-66. Thus, this immunity serves at least two vital purposes. First, it protects the government's own sovereign immunity; otherwise, private individuals incurring liabilities during contract performance would pass those costs onto the government, directly or indirectly. *Saleh v. Titan Corp.*, 580 F.3d 1, 8 (D.C. Cir. 2009), *cert. denied*, 564 U.S. 1037 (2011); *Boyle*, 487 U.S. at 511-12. Second, it ensures private contractors remain willing to perform essential tasks, rather than declining for fear of being held liable for doing the government's work. *Filarsky*, 132 S. Ct. at 1665-66.

*Filarsky* did *not* establish a bright-line test to determine when a government contractor is entitled to immunity; rather, it "considered" if the contractor's immunity claim was: (1) "historically grounded in common law"; or (2) did not "violate[e]" "clearly established rights." *Gomez*, 136 S. Ct. at 673. Defendants satisfy both prongs.

1. Immunity for the Government Function Being Delegated to Defendants Is Historically Grounded in the Common Law.

The proper focus under *Filarsky*'s first prong is on the government "function" being delegated—not the position or title. 566 U.S. at 382-92; *see also Butters*, 225 F.3d at 466. What mattered in *Filarsky* was not that the defendant was a private attorney; it was that he was performing an investigatory function for the local government. 566 U.S. at 392. Likewise, what matters here is not that Defendants are psychologists; it is that they were performing national security support and law enforcement "functions" for the U.S. alongside government employees. In such situations, contractors have consistently been deemed to be immune. *Saleh*, 580 F.3d at 2 (private contractors providing interpretation/interrogation services to the U.S. in Iraq immune); *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 448-49 (9th Cir. 1983).

Here, the CIA recruited and retained Defendants to propose interrogation techniques for potential use on Plaintiff, and to then apply those techniques following CIA and DOJ approval. Defendants were thus "agents," Compl. ¶¶ 58, 62, 67, 70, 73, 76-77, 78-79, 85, acting as an "arm" of the government in interrogating Plaintiff—a suspected terrorist who had recently provided detailed information about a planned attack by Al Qaeda, as well as the identity of the man who planned the September 11 attacks—at a CIA black site. For this reason alone, *Filarsky* mandates Defendants be treated like the "CIA team," government psychologists, "interrogators," "security personnel," and "medical team" who *also* participated in the interrogation—all of whom are immune. Compl. ¶¶ 62-63, 79, 80, 89, 94. And this is true whether Defendants performed the "function" of a government psychologist *or* an interrogator. *Id.* ¶ 69 (Defendants acted as "both interrogator *and* psychologist") (emphasis in original).

Indeed, courts have repeatedly found private psychologists who, like Defendants, worked "alongside government employees" to be immune.[7] *Perniciaro v. Lea*, 901 F.3d 241, 252 (5th Cir. 2018) ("general principles of immunity at common law" in 1871 supported the right of two privately employed psychiatrists to assert qualified immunity where they "work[ed] in a public institution and alongside government employees . . . [and] their public counterparts would be entitled to assert qualified immunity."); *Bishop v. Karney*, 408 F. App'x 846, 848-49 (5th Cir. 2011) (licensed psychiatrist who worked for the Texas Department of Criminal Justice under a personal services contract with the Texas Tech University Health Sciences Center entitled to qualified immunity).

Alternatively, when contractors are enlisted to work in "close collaboration" with, and under the supervision of, law enforcement, this too has resulted in immunity. *Young v. County of Hawaii*, 947 F. Supp. 2d 1087, 1108-09 (D. Haw. 2013) (noting the "close collaboration" between the humane society S.P.C.A. ("HIHS") and the Hawaii County Police Department ("HCPD"), and the "HCPD's power to review HIHS procedures," merited the conclusion that "officers of HIHS are private actors enlisted by the police department to exercise police powers to discharge special public duties"

---

[7] Psychologists performing similar reporting/advising "function[s]" were immune under the common law. Indeed, Washington courts have consistently recognized that "[w]hen psychiatrists or mental health providers are appointed by the court and render an advisory opinion … on a criminal defendant's mental condition, they are acting as an arm of the court and are protected from suit by absolute judicial immunity." *Bader v. State*, 43 Wn. App. 223, 226, 716 P.2d 925 (1986) (citations omitted); *Reddy v. Karr*, 102 Wn. App. 742, 748-50, 9 P.3d 927 (2000). Washington law also offers qualified immunity for mental health professionals involved in involuntary commitments. RCW 71.05.120; *see also Von Staich v. Atwood*, 2011 U.S. Dist. LEXIS 83705, at *8 (C.D. Cal. Feb. 22, 2011) ("Ninth Circuit has held that a court-appointed psychologist has quasi-judicial immunity [for] preparing and submitting medical reports[.]").

such that "the private actors also enjoy the same protections afforded to law enforcement officers."), *aff'd*, 578 F. App'x 728, 730 (9th Cir. 2014); *see also Braswell v. Shoreline Fire Dep't*, 2012 U.S. Dist. LEXIS 71308, at *17-18 (W.D. Wash. May 22, 2012) (granting immunity to medical director for firefighter department performing "supervisory services" where "traditional justifications for according qualified immunity to government officials apply equally to Dr. Somers . . . as they would if [he] were a government employee."); *Estate of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016) (extending immunity against allegations of "torture and deliberate indifference" for privately employed physician providing services, including administering drugs for prisoner executions, at state penitentiary), *cert. denied*, 582 U.S. 950, 137 S. Ct. 2298 (2017); *Ford v. Anderson Cty.*, 2022 U.S. Dist. LEXIS 81821, at *48-49 (E.D. Tex. May 5, 2022) (physician hired by county to perform medical services at the jail for $1,500 per month immune). Either way, *Filarsky* immunity applies here.[8]

---

[8] Notably, the Fifth Circuit has criticized the Ninth Circuit's decision in *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000), to deny immunity to private contractors based on a narrow reading of the need for historical immunity at common law. *Perniciaro*, 901 F.3d at 252 n.9. Observing that *Jensen* did not have the benefit of the Supreme Court's *Filarsky* decision, the Fifth Circuit opined that "where the defendant at issue worked in a governmental entity and alongside government employees, the relevant historical question asks whether someone bearing that relationship to the state would have had immunity at common law, not whether immunity was accorded to purely private persons performing some governmental function." *Id.* Under this broad "focus" Defendants qualify for *Filarsky* immunity based on their "relationship" to the CIA.

### 2. Defendants Did Not Violate Well-Established Prohibitions of Conduct Involving the Treatment of Enemy Combatants.

As to *Filarsky's* second prong, Defendants did not "violate well-established prohibitions." *See* Sec. IV.B.1.(c) *supra* and Sec. V.C. *infra*. This is especially true *in 2001-03*, and as applied to enemy combatants like Plaintiff. Compl. ¶¶ 67, 73, 76-78, 90; *Padilla*, 678 F.3d at 768; *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (observing "reasonableness is judged against the backdrop of the law at the time of the conduct"; accordingly, the "inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.") (quotation marks omitted).

Finally, the CIA's "close official supervision" of Defendants further distinguishes this case from those that have opted to deny immunity. Compl. ¶¶ 59-60, 62, 66-67, 70; *cf. Richardson v. McKnight*, 521 U.S. 399, 413 (1997) (case did "not involve a private individual briefly associated with a government body, service as an adjunct to government in an essential governmental activity, *or acting under close official supervision.*") (emphasis added); *Bartell*, 215 F.3d at 557. So too does the "direct" nature of Defendants' CIA contract(s) weigh in favor of immunity and implicate the above sensitive "policy reasons" therefor. Compl. ¶¶ 49-50 (conceding the "CIA contacted Mitchell" to request "recommendations" for Plaintiff; Mitchell was the "only candidate considered"; and signed a contact directly with the CIA); *Braswell*, 2012 U.S. Dist. LEXIS 71308, at *14-18 (distinguishing *Jensen*, 222 F.3d at 570, and noting the private contract in *Jensen* was "qualitatively different" where it was with a group of psychiatrists, rather than "directly with the government entity" to "carry out responsibilities delegated by [the program director] pursuant to a state statute"; "market factors" and "privatization" arguments supporting immunity applied).

### C. Plaintiff Has Not Sufficiently Alleged ATS Claims.

#### 1. Plaintiff Cannot Allege That Defendants Engaged in the Requisite State Action Required for Counts I, II, and IV.

Plaintiff brings four counts for violation of the ATS, alleging torture (Count I), non-consensual medical experimentation (Count II), war crimes (Count III), and

arbitrary detention (Count IV).  For each of these claims, Plaintiff must allege he (1) is an alien; (2) claiming damages for a tort; (3) resulting from a violation of the law of nations or of a treaty of the United States. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 255 (2d Cir. 2009). Additionally, for Count I (torture) Plaintiff must also allege Defendants engaged in official action. *Id.*; *see also Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) ("the basis for jurisdiction [for an ATS claim] requires action authorized by the sovereign as opposed to private wrongdoing"). This is because only "state-sponsored torture" is actionable under the ATS. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005).  Similarly, Plaintiff must allege state action for purposes of his claims based upon non-consensual human medical experimentation (Count II) and arbitrary detention (Count IV). *See Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 188 (2d Cir. 2009); *Garcia v. Chapman*, 911 F. Supp. 2d 1222, 1235 (S.D. Fla. 2012)

"In construing this state action requirement, [courts] look 'to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983.'" *Aldana*, 416 F.3d at 1247, quoting *Kadic v. Karadzic,* 70 F.3d 232, 245 (2d Cir. 1995). As established above, Plaintiff has alleged that an agency relationship existed between the CIA and Defendants. *See supra*, Sec. IV. A. Plaintiff has thus alleged the requisite state action to support Counts I, III, and IV. But that agency relationship simultaneously divests the Court of jurisdiction to hear this case, pursuant to the MCA. *Id.*

On the other hand, if Plaintiff disavows the agency relationship between the CIA and Defendants, Plaintiff cannot meet the ATS's state action requirement and Counts I, III, and IV fail. In short, Plaintiff cannot have it both ways—by alleging that conduct is state action for one purpose but private action for another purpose. He cannot claim Defendants were not acting on behalf of the CIA and under its control for purposes of avoiding application of the MCA, while simultaneously claiming that the alleged torture, non-consensual medical experimentation, and arbitrary detention were "state-sponsored." *See Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 14 n.3 (D.D.C. 2005)

("plaintiffs cannot allege that conduct is state action for jurisdictional purposes but private action for sovereign immunity purposes"); *Saleh*, 580 F.3d 1, 15 ("appellants are caught between Scylla and Charybdis: they cannot artfully allege that the contractors acted under color of law for [ATS] jurisdictional purposes while maintaining that their action was private when the issue is sovereign immunity."). As such, Plaintiff's claims must be dismissed either because (1) Defendants were agents of the CIA and the Court therefore lacks subject matter jurisdiction to address these claims; or (2) Plaintiff has not established the conduct at issue was state sponsored, rendering these claims outside the ATS. In either scenario, Plaintiff's claims fail.

### 2. Plaintiff Also Has Not Alleged That Defendants Violated The "Law of Nations" for Purposes of Counts II and IV.

"Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations"—a prerequisite to potential ATS liability. *Id.* Indeed, when the ATS was first enacted in 1789, Congress contemplated it would give rise to causes of action only for piracy, infringement on the rights of ambassadors, and violation of safe conducts. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004). And though conduct that constitutes a violation of the "law of nations" has been extended to include additional torts, ATS jurisdiction still does *not* apply "for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar" when the law was enacted in 1789. *Id.* at 732. Moreover, while the "judicial power" to recognize actionable international norms may still be exercised, it must be "subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." *Id.* at 729. And even when an international norm supports ATS jurisdiction, plaintiffs must still allege facts that do more than state a "colorable violation of the law of nations." *Kadic v. Karadzic*, 74 F.3d 377 (2d Cir. 1996). Here, Plaintiff has not sufficiently alleged that Defendants engaged in non-consensual medical experimentation (Count II) or arbitrary detention (Count IV).

(a)   *Non-consensual Medical Experimentation Cannot Support an ATS claim, and Plaintiff Has Not Alleged Non-Consensual Medical Experimentation.*

Only one circuit has substantively evaluated whether the prohibition against non-consensual human medical experimentation is "a norm that is specific, universal, and obligatory," and thus, can give rise to an ATS claim. *Pfizer*, 562 F.3d 163, 175-188. Defendants respectfully submit *Pfizer*'s reasoning was flawed for three reasons. First, it is not *specific*, in that the parameters of non-consensual human medical experimentation are not defined. Second, it is not a sufficiently *universal* norm abided by nations out of a sense of mutual concern because non-consensual human medical experimentation does not "threaten[] serious consequences in international affairs" in the same manner as the three offenses originally contemplated by the ATS (*i.e.*, piracy, rights of ambassadors, and safe conduct). *Cf. Sosa*, 542 U.S. at 715 (assault against an ambassador "impinged upon the sovereignty of the foreign nation and if not adequately addressed could rise to an issue of war"). And third, it is not *obligatory* as the prohibition is not enshrined in international treaties or custom. *See, e.g.*, *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 250 (2d Cir. 2003) ("In determining whether a particular rule is a part of customary international law—*i.e.*, whether States universally abide by, or accede to, that rule out of a sense of legal obligation and mutual concern— courts must look to concrete evidence of the customs and practices of States."). Indeed, the sources of law *Pfizer* relied upon are "incapable of carrying the weight" needed to support a conclusion that non-consensual medical experimentation is universal and obligatory. 562 F.3d at 202 (Wesley, J., dissenting). Thus, non-consensual human medical experimentation cannot support an ATS claim, and Count II must fail.

However, even if this Court were willing to follow *Pfizer*, Plaintiff's ATS claim for non-consensual medical experimentation fails because *Pfizer* narrowly dealt with obvious medical experiments involving the testing of pharmaceuticals. The actions in *Pfizer* included the requisite characteristics of a medical experiment which are not

present here, including: variable and control groups, a comprehensive research headquarters and test protocol, and a separate purpose for *Pfizer* to use the results of the experiment to gain FDA approval for use of the drug on children in the U.S. 562 F.3d at 169-170. Given this was the conduct at issue, in finding a valid ATS claim, *Pfizer* relied on domestic and international laws specifically applicable to pharmaceuticals and medical experiments conducted for a separate purpose. *Id* at 178. The same laws cannot be relied upon here, where there was no medical experiment or pharmaceutical product involved. To find Plaintiff's allegations state a claim for non-consensual medical experimentation in violation of the "law of nations" would greatly and improperly expand the ATS.

To be sure, Plaintiff has not alleged Defendants engaged in a medical experiment involving pharmaceuticals. The Complaint does not mention a pharmaceutical product. It also does not allege that a "medical experiment" like that which was done in *Pfizer* occurred. Rather, here, Plaintiff attempts to claim that the alleged interrogation program was an "experiment" because the underlying theories were untested interrogation methods. Compl. ¶¶ 2, 3, 5. This, however, is contradicted by Plaintiff's concessions that the interrogation program was based on the SERE training program, with which Defendants had years of experience. *Id.* ¶¶, 27, 60, 73. Plaintiff also refer to the interrogation program as an opportunity for Defendants to test their hypothesis, continually refining the methodologies in order to produce actionable intelligence. *Id.* ¶ 5. This is far removed from what took place in *Pfizer*, where the defendant's medical experimentation involved controlled groups of patients receiving different drugs, a test protocol, and a research headquarters. 562 F.3d at 169-70. Simply put, Plaintiff cannot allege Defendants engaged in non-consensual human medical experimentation because the purported conduct is not, nor can it be, characterized as either "experimentation" or "medical" in nature. Tellingly, other courts have been hesitant to find a claim for non-consensual medical experimentation without clear evidence that an actual medical experimentation occurred. *See Morales v. Brown*, 2015 WL 6167451, at *8 (E.D. Cal.

Oct. 20, 2015) (dismissing plaintiff's claim that building prisons in location known to have highly toxic levels of Valley Fever spores was tantamount to conducting non-consensual medical experiments on inmates); *Leitgeb v. Sark Wire Corp.–GA*, 2022 WL 18777380, at *9 (N.D. Ga. Sept. 21, 2022) (rejecting claim that a COVID-19 vaccine mandate constituted non-consensual medical experimentation because the vaccine was based upon "poor research"). Because Plaintiff has not alleged non-consensual medical experimentation, Count II should be dismissed.

(b)     *Plaintiff Has Not Alleged Defendants Arbitrarily Detained Him.*

Prolonged arbitrary detention in violation of international law can give rise to an ATS claim in some circumstances. *Sosa*, 542 U.S. at 735-736; *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1384 (9th Cir. 1998); *Doe v. Qi*, 349 F.Supp.2d 1258, 1325 (N.D. Ca. 2004). But, Plaintiff has not alleged such circumstances with respect to Defendants. In particular, Plaintiff claims Defendants "were a direct and proximate cause of, contributed to, and aided and abetted [Plaintiff's] detention in an official detention facility." Compl. ¶ 139. Yet, Plaintiff admits that he was captured by U.S./Pakistani joint forces and flown to Thailand and interrogated by the FBI with no involvement from Defendants. *Id.* ¶ 16. And he admits that even before Defendants were retained for any work regarding interrogations, the "CIA was keenly focused on its new mandate: to hold and interrogate people suspected of terrorist associations to gather intelligence and help avoid a 'second wave' of attacks." *Id.* ¶ 30. Even more critically, Plaintiff does not allege that Defendants have had any contact with him since September 2006 when the U.S. decided to transfer Plaintiff to the U.S. base at Guantanamo Bay. *Id.* ¶ 97. Thus, Defendants cannot be held directly liable for the CIA's decision to capture and detain Plaintiff. *Liu Bo Shan v. China Constr. Bank Corp.*, 2011 WL 1681995 (2d Cir. May 5, 2011) (allegations that a bank called the police on plaintiff and manufactured evidence to induce the plaintiff's arrest insufficient to support a

1   reasonable inference of direct liability for arbitrary detention committed by Chinese

2   government police, not the bank).

3          Defendants similarly did not aid and abet Plaintiff's detention. To establish aiding

4   and abetting, Plaintiff must show Defendants acted "with knowledge that the

5   defendant's action will assist in the commission of a crime or with awareness of a

6   'substantial likelihood that the defendant's actions would assist the commission of a

7   crime.'" *Doe I v. Cisco Sys., Inc.,* 73 F.4th 700, 734 (9th Cir. 2023). Plaintiff has not

8   alleged Defendants had requisite knowledge their actions would result in Plaintiff's

9   alleged arbitrary detention where Plaintiff was detained before any involvement by

10  Defendants. Nor does Plaintiff allege Defendants had any role in the U.S.'s decision to

11  continue his detention. To try to bridge the gap, Plaintiff alleges only that Defendants

12  "request[ed] and recommend[ed]" he "remain in isolation and incommunicado for the

13  remainder of his life." Compl. ¶ 142. This statement alone plainly does not indicate

14  Defendants assisted in Plaintiff's alleged arbitrary detention whereby Plaintiff fails to

15  connect that alleged singular statement in 2002 to the ongoing decision by the U.S.—

16  more than twenty years later—to detain Plaintiff or the decision on how to prosecute

17  Plaintiff. Indeed, Plaintiff includes no allegations that Defendants have had anything to

18  do with his detention after September 2006 when the U.S. transferred Plaintiff to

19  Guantanamo Bay—a decision that was obviously made without any input from

20  Defendants. And most critically, Plaintiff admits that he "would have been detained

21  regardless" of whether Defendants made that statement. Compl. ¶ 98. Because Plaintiff

22  has not alleged Defendants arbitrarily detained him or that Defendants aided and abetted

23  in any arbitrary detention by the U.S. Government, Count IV should be dismissed.

24  **VI.    CONCLUSION**

25         Based on the foregoing, Defendants respectfully request the Court grant

26  Defendants' Motion to Dismiss and dismiss this action in its entirety with prejudice.

27

28

DATED this 13th day of November, 2023.

                                        **EVANS, CRAVEN & LACKIE, P.S.**

                                        By s/ James B. King, WSBA #8723

                                        James B. King, WSBA #8723
                                        Attorneys for Defendants
                                        Evans, Craven & Lackie, P.S.
                                        818 W. Riverside Ave., Ste. 250
                                        Spokane, WA 99201
                                        (509) 455-5200
                                        (509) 455-3632 facsimile
                                        jking@ecl-law.com

                                        **BLANK ROME LLP**

                                        By:  /s James Smith

                                        James Smith (*Pro Hac Vice*)
                                        Brian Paszamant (*Pro Hac Vice*)
                                        Ann Querns (*Pro Hac Vice*)
                                        Attorneys for Defendants
                                        One Logan Square
                                        130 North 18th Street
                                        Philadelphia, PA 19103
                                        Phone:      (215) 569-5791

                                        *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Jeffry K. Finer, Esquire (Jeffry@FinerWinn.com)
Finer Winn
2850 East Rockhurst Lane, Suite 356
Spokane, WA 99223
(509) 981-8960
*Counsel for Plaintiff*

Solomon B. Shinerock, Esquire (Solomon.Shinerock@lbkmlaw.com)
Adam Kaufmann, Esquire (Adam.Kaufmann@lbkmlaw.com)
Elizabeth M. Velez, Esquire (Elizabeth.Velez@lbkmlaw.com)
Anika Conrad, Esquire (Annika.Conrad@lbkmlaw.com)
Lewis Baach Kaufmann Middlemiss PLLC
The Chrysler Bldg, 405 Lexington Avenue, 64th Floor
New York, NY 10174
(212) 826-7001
Eric L. Lewis, Esquire (Eric.Lewis@lbkmlaw.com)
David Short, Esquire (David.Short@lbkmlaw.com)
Lewis Baach Kaufmann Middlemiss PLLC
1101 New York Avenue NW, Suite 1000
Washington, DC 20005

*Counsel for Plaintiff*

**EVANS, CRAVEN & LACKIE, P.S.**

By s/ James B. King, WSBA #8723_

James B. King, WSBA #8723
Attorneys for Defendants
Evans, Craven & Lackie, P.S.
818 W. Riverside Ave., Ste. 250
Spokane, WA 99201
(509) 455-5200
(509) 455-3632 facsimile

jking@ecl-law.com

**BLANK ROME LLP**

By:  /s James Smith

James Smith (*Pro Hac Vice*)
Brian Paszamant (*Pro Hac Vice*)
Ann Querns (*Pro Hac Vice*)
Attorneys for Defendants
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Phone:        (215) 569-5791

*Counsel for Defendants*