FINER WINN
2850 East Rockhurst Lane, Suite 356,
Spokane, WA 99223
(509) 981-8960


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

_____

ZAYN AL-ABIDIN MUHAMMAD HUSAYN
also known as ABU ZUBAYDAH

     Plaintiff,

       v.                              Case No. 2:23-cv-00270-TOR


JAMES MITCHELL and
JOHN "BRUCE" JESSEN

           Defendants.
_____


PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ..................................................................... iv

INTRODUCTION ......................................................................................1

FACTUAL BACKGROUND AND THE *SALIM* CASE ...............................2

LEGAL STANDARD.................................................................................5

ARGUMENT .............................................................................................6

I.   The Complaint Adequately Alleges That Defendants Violated Clearly Established Rights As Private Contractors, Not U.S. Agents, And Acted Outside the Scope of Authority ...............................................................6

   A. The MCA Does Not Apply Because Defendants Lacked the Authority to Bind the U.S. and were not U.S. Agents .......................................7

      1. Defendants fail to proffer any evidence to demonstrate an agency relationship, and their own contracts with the United States plainly rebut such a relationship ........................................................8

      2. The Complaint does not and need not allege that Defendants were agents of the U.S..........................................................................11

   B. Defendants' Roles and Conduct Defeat Their Immunity Arguments .........13

      1. Torture and similar abuses can never be validly authorized, and Defendants abused Plaintiff outside the scope of any authority that would entitle them to Yearsley immunity .......................................14

      2. Defendants violated clearly established rights and are not entitled to Filarsky immunity .............................................................16

   C. Defendants should be Collaterally Estopped from Relitigating This Court's Previous Denials of Their MCA and Immunity Arguments ......................18

      1. Defendants had a full and fair opportunity to litigate their MCA and immunity theories, and they lost ............................................18

      2. The Court's rejections of Defendants' arguments were "final judgments" for estoppel purposes...........................................................19

      3. Resolution of the MCA issue in Plaintiff's § 1782 Action lends further weight to the case for collateral estoppel ......................................21

II.  Defendants' Conduct as Private Actors Violated Substantive Laws Cognizable Under the ATS .................................................................................22

    A. An Agency Relationship Between Defendants and the State is Not Required to Support the Claims Plaintiff Asserts ........................................................23

       1. Plaintiff may prevail on a torture claim where private defendants act with the acquiescence of the state .................................................23

       2. Plaintiff may prevail on claims for arbitrary detention and non-consensual scientific experimentation where private defendants act with state acquiescence...............................................................................28

    B. Defendants Committed Nonconsensual Scientific Experimentation as Recognized at International Law.................................................30

    C. Defendants Are Responsible for Plaintiff's Arbitrary Detention................33

III. The Political Question Doctrine Has No Applicability Here Because the Complaint Implicates Unauthorized Conduct of CIA Contractors, Not Any Government Action..........................................................................37

CONCLUSION ........................................................................40

CERTIFICATE OF SERVICE ......................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullahi v. Pfizer,*
562 F.3d 163 (2d Cir. 2009) ................................................................. 30-31, 33

*Adickes v. S. H. Kress & Co.,*
398 U.S. 144 (1970)................................................................................12

*Al-Quraishi v. Nakhla,*
728 F.Supp.2d 702 (D. Md. 2010)........................................................12, 28

*Al Shimari v. CACI Premier Tech., Inc.,*
263 F.Supp.3d 595 (E.D.Va. 2017) .......................................................28, 40

*Aldana v. Del Monte,*
416 F.3d 1242 (11th Cir. 2005) .............................................................27

*ANA Int'l, Inc. v. Way,*
393 F.3d 886 (9th Cir. 2004) .................................................................7

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................6

*Baker v. Carr,*
369 U.S. 186 (1962)................................................................................38-39

*Barrett Bus. Servs., Inc. v. Colmenero,*
No. 1:22-CV-3122-TOR, 2022 WL 21320230 (E.D. Wash. Dec. 19, 2022).......6

*Behrens v. Pelletier,*
516 U.S. 299 (1996)................................................................................20

*Bell Atl. v. Twombly,*
550 U.S. 544 (2007)................................................................................6

*Berry v. King County,*
19 Wash.App.2d 583 (Wash. App. 2021).............................................35

*Brown v. DirecTV, LLC,*
    562 F.Supp.3d 590 (C.D. Cal. 2021) ........................................................ 11-12

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.,*
    797 F.3d 720 (9th Cir. 2015) ...................................................................16

*Campbell-Ewald Co. v. Gomez,*
    577 U.S. 153 (2016).......................................................................... 13-14

*Center for Bio. Diversity v. Mattis,*
    868 F.3d 803 (9th Cir. 2007) ...................................................................39

*Childs v. San Diego Fam. Hous. LLC,*
    22 F.4th 1092 (9th Cir. 2022) ...................................................................16

*Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*
    80 F.Supp.3d 1180 (E.D. Wash. 2015) .......................................................5

*Doe v. Qui,*
    349 F.Supp.2d 1258 (N.D. Cal. 2004) ......................................................35

*Doe I v. Nestle USA, Inc.,*
    766 F.3d 1013 (9th Cir. 2014) .................................................................35

*Eastman Kodak v. Kavlin,*
    978 F.Supp. 1078 (S.D.Fla.1997) ............................................................35

*Filarsky v. Delia,*
    566 U.S. 377 (2012).................................................................. 14, 16-18

*Fisher v. Le Vian Corp.,*
    815 F. App'x 170 (9th Cir. 2020) ..............................................................8

*Gomez v. Campbell-Ewald Co.,*
    768 F.3d 871 (9th Cir. 2014) ..............................................................14, 16

*Hamad v. Gates,*
    732 F.3d 990 (9th Cir. 2013) ...................................................................7

*Husayn v. Mitchell*,
    938 F.3d 1123 (9th Cir. 2019) .........................................................21

*In re Est. of Ferdinand Marcos Hum. Rts. Litig.*,
    25 F.3d 1467 (9th Cir. 1994) ...........................................................28

*In re Zayn Al-Abidin Muhammad Husayn*,
    No. 2:17-CV-0171, 2018 WL 11150135 (E.D. Wash. Feb. 21, 2018) .............21

*Jensen v. Lane Cty.*,
    222 F.3d 570 (9th Cir. 2000) ...........................................................17

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 2009) ...........................................................27

*Karki v. Holder*,
    715 F.3d 792 (10th Cir. 2013) .........................................................26

*Little v. Barreme*,
    6 U.S. (2 Cranch) 170 (1804) .........................................................15

*Lopez v. Stages of Beauty, LLC*,
    307 F.Supp.3d 1058, 1064 (S.D. Cal. 2018) .........................................9

*Luben Indus., Inc. v. United States*,
    707 F.2d 1037 (9th Cir.1983) .................................................... 19-20

*McAdory v. M.N.S. & Assocs., LLC*,
    No. 3:17-CV-00777-HZ, 2021 WL 2321634 (D. Or. June 7, 2021)...............11

*Mehinovic v. Vuckovic*,
    198 F.Supp.2d 1322 (N.D. Ga. 2002)......................................... 33-34

*MGIC Indem. Corp. v. Moore*,
    951 F.2d 361 (9th Cir. 1991) (unpublished) .......................................8

*Montana v. United States*,
    440 U.S. 147 (1979)......................................................................18

*Nicholes v. Jano,*
   No. 8:18-CV-774-T-60AEP, 2020 WL 2615529 (M.D. Fla. May 22, 2020) ....13

*NLRB v. Amax Coal Co.*,
   453 U.S. 322 (1981)................................................................................7

*Pacheco v. United States,*
   21 F.4th 1183 (9th Cir. 2022) ..............................................................35

*Perniciaro v. Lea,*
   901 F.3d 241 (5th Cir. 2018) ...............................................................17

*Peterson Builders, Inc. v. United States*,
   26 Cl. Ct. 1227 (Cl. Ct. 1992).................................................................8

*Posada v. Cultural Care, Inc.*,
   66 F.4th 348 (1st Cir. 2023)..................................................................16

*Resol. Tr. Corp. v. Keating,*
   186 F.3d 1110 (9th Cir. 1999) ..............................................................18

*Reyes-Reyes v. Ashcroft,*
   384 F.3d 782 (9th Cir. 2004) ................................................................26

*Richardson v. McKnight,*
   521 U.S. 399 (1997)........................................................................13, 17

*Saleh v. Titan Corp.*,
   580 F.3d 1, 15 (D.C. Cir. 2009)............................................................27

*Salim v. Mitchell,*
   183 F.Supp.3d 1121 (E.D. Wash. 2016) ("*Salim I*")................................*passim*

*Salim v. Mitchell,*
   No. CV-15-0286, 2017 WL 390270 (E.D. Wash. Jan. 27, 2017)
   ("*Salim II*").............................................................................*passim*

*Salim v. Mitchell,*
   268 F.Supp.3d 1132 (E.D. Wash. 2017) ("*Salim III*") ................................*passim*

*Sec. People, Inc. v. Medeco Sec. Locks, Inc.*,
   59 F.Supp.2d 1040 (N.D. Cal. 1999)................................................20

*Syverson v. International Business Machines Corp.*,
   472 F.3d 1072 (9th Cir. 2006) ......................................................20

*Taylor v. Kellogg Brown & Root Servs., Inc.*,
   658 F.3d 402 (4th Cir. 2011) ................................................... 38-40

*Terenkian v. Rep. of Iraq*,
   694 F.3d 1122 (9th Cir. 2012") ................................................. 20-21

*Thomas v. I.N.S.*,
   35 F.3d 1332 (9th Cir. 1994) .........................................................8

*United States v. Bonds*,
   608 F.3d 495 (9th Cir. 2010") ........................................................8

*United States v. Cox*,
   836 F.Supp.1189 (D. Md. 1993) ...................................................13

*United States v. Zubaydah*,
   595 U.S. 195 (2022)................................................................21, 39

*Williams v. PillPack LLC*,
   644 F.Supp.3d 845 (W.D. Wash. 2022) ........................................11

*Wolfe v. Strankman*,
   392 F.3d 358 (9th Cir. 2004) .........................................................6

*Yearsley v. W.A. Ross Const. Co.*,
   309 U.S. 18 (1940)................................................................. 14-16

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) .......................................................14

*Zheng v. Ashcroft*,
   332 F.3d 1186 (9th Cir. 2004") ....................................................26

1  *Zivotofsky v. Clinton*,
2      132 S.Ct. 1421(2012) ...............................................................38
3
4

5  **Statues & Regulations**

6  28 U.S.C. § 2241 ("MCA") ................................................................*passim*
7
8  30 U.S.C. § 1716 ...................................................................................7
9
10  8 C.F.R. § 208.18(a)(1), (7) ................................................................24
11
12  45 C.F.R. § 46.102(e) ..........................................................................33
13
14

15  **International Cases**

16  *Case of Husayn (Abu Zubaydah) v. Poland*, App. No. 7511/13 (July 24,
17      2014), *available at*
18      https://hudoc.echr.coe.int/#{%22itemid%22:[%22001-146047%22]} ..............25
19
20  *Commission nationale des droits de l'Homme et libertés v. Chad*,
21      Communication 74/92, Afr. Comm'n H.P.R., ¶¶ 5, 20-22 (1995),
22      *available at* http://hrlibrary.umn.edu/africa/comcases/74-92.html ....................29
23
24  *Hajrizi Dzemajl et al. v. Yugoslavia*, Communication No. 161/2000,
25      Committee Against Torture, U.N. Doc. CAT/C/29/D/161/2000 (2002),
26      *available at*
27      https://docstore.ohchr.org/SelfServices/FilesHandler.ashx?enc=6QkG1
28      d%2fPPRiCAqhKb7yhssh2tXWBbyLwahMw00Sn91WFLbogS4lNHI
29      Fmi9l4qQUu4yr8GaoCEvocLp34m5r6cVXtHIA4y9KELip8FEd%2be
30      ec0NRY5aGjGUiW7IVrCRFoVzQvkAkrdVd6CsJPe7UCihHJYfqh%
31      2bPGp70mnBSm4s%2f5E%3d .......................................................................25
32
33  *Medov v. Russia*, ECtHR, App. No. 25385/04 (2009), *available at*
34      https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-90645%22]} ..........29
35

*Mr. Ibn al-Shaykh al-Libi and 25 other persons v. United States of America*, WGAD Opinion No. 29/2006, U.N. Doc. A/HRC/4/40/Add.1 (2006), *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/G07/106/04/PDF/G0710604.pdf .......................34

*Osman v. United Kingdom*, ECtHR, App. No. 23452 (Oct. 28, 1998), *available at* https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-58257%22]} ...............................................................................29

*Riera Blume v. Spain*, ECtHR, App. No. 37680/97 (1999), *available at* https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-58321%22]} ..........29

*United States Diplomatic and Consular Staff in Tehran (U.S. v. Iran)*, Judgment, 1980 I.C.J. Rep. 3 (May 24, 1980), *available at* https://icj-cij.org/sites/default/files/case-related/64/064-19800524-JUD-01-00-EN.pdf ...................................................................................29

*United States v. Brandt (The Medical Case)*, International Military Tribunal, Judgment, Aug. 20, 1947, *available at* https://www.legal-tools.org/doc/c18557/pdf ...................................................................31

*United States v. Milch*, 2 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 (Apr. 16, 1947), *available at* https://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=1002&context=nmt2 ...................................................................31

*Velásquez Rodriguez v. Honduras*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 4 (July 29, 1988), *available at* https://www.corteidh.or.cr/docs/casos/articulos/seriec_04_ing.pdf ...................29

*Zayn al-Abidin Muhammad Husayn (Abu Zubaydah) v. United States of America, et al.*, WGAD Opinion No. 66/2022, U.N. Doc. A/HRC/2022/66 (2022), *available at* https://www.ohchr.org/sites/default/files/documents/issues/detention-wg/opinions/session95/A-HRC-WGAD-2022-66-Advance-Edited-Version.pdf...........................................................................33

**Other Authorities**

Comm. Against Torture and Other Cruel, Inhuman or Degrading Treatment
or Punishment, General Comment No. 2, U.N. Doc. CAT/C/GC/2 (Jan.
24, 2008), *available at* https://www.ohchr.org/en/documents/general-
comments-and-recommendations/catcgc2-general-comment-no-2-
2007-implementation .........................................................................25

Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"),
*available at*
https://treaties.un.org/doc/Publication/UNTS/Volume%201465/volume
-1465-I-24841-English.pdf .........................................................*passim*

Convention on the Rights of Persons with Disabilities, Dec. 12, 2006, 2515
U.N.T.S.                       3,               *available                  at*
https://treaties.un.org/doc/Publication/UNTS/Volume%202515/v2515.
pdf ....................................................................................................30

H. Comm. on the Judiciary, 111th Cong. 113-115 (May 26, 2010) (interview
with Jay Bybee, Fmr. Assistant Attorney General) ...........................15

*ICRC Commentary on Geneva Convention (III)*, Art. 130, ¶ 5257 (2020),
*available      at*      https://ihl-databases.icrc.org/en/ihl-treaties/gciii-
1949/article-130/commentary/2020...................................................31

*ICRC Commentary on Additional Protocol (I) to the Geneva Conventions*
(1987), *available at* https://ihl-databases.icrc.org/en/ihl-treaties/api-
1977/article-11/commentary/1987............................................... 31-32

PHYSICIANS FOR HUMAN RIGHTS, NUREMBERG BETRAYED: HUMAN
EXPERIMENTATION AND THE CIA TORTURE PROGRAM (June 2017),
*available at* https://phr.org/wp-
content/uploads/2017/06/phr_humanexperimentation_report.pdf ...................33

Press Conference by the President, Office of the Press Secretary, Aug. 1,
2014, *available at* https://obamawhitehouse.archives.gov/the-press-
office/2014/08/01/press-conference-president ..................................39

*Report of the Senate Select Committee on Intelligence Study of the Central Intelligence Agency's Detention and Interrogation Program*, S. Rep. No. 113-288 (Dec. 9, 2014) ...............................................................39

Restatement (Third) of Foreign Relations Law, § 702 (1987) ......................... 33-34

Restatement (Third) Of Agency § 1.01 (2006)..................................................... 7-8

Rule 12(b)...............................................................................................................5

Third Geneva Convention on Prisoners of War, Aug. 12, 1949, 75 U.N.T.S. 135, *available at* https://treaties.un.org/doc/Publication/UNTS/Volume%2075/volume-75-I-972-English.pdf...............................................................................30

U.N. Human Rights Committee, General Comment 31, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (2004), *available at* https://digitallibrary.un.org/record/533996 .......................................29

U.S. Instrument of Ratification to CAT, § II. (1)(d), Oct. 21, 1994, 1830 U.N.T.S. 321 ..........................................................................................24

U.S. Observations on U.N. Human Rights Committee General Comment 31 (Dec. 27, 2007)*, available at* https://2001-2009.state.gov/s/l/2007/112674.htm................................................24

1

**INTRODUCTION**

2      Plaintiff was the unfortunate "guinea pig" for an interrogation/torture program

3   devised and implemented by Defendants. Defendants designed this program to test

4   the bounds of human tolerance and resistance, and ultimately to win valuable follow-

5   on contracts that earned them tens of millions of dollars. Their tools—based on

6   recognized torture methods—included sleep deprivation, physical restraint, physical

7   abuse, isolation, and at least 83 applications of waterboarding. Plaintiff suffered

8   horrific abuses under Defendants' cruel, amateur hands as Defendants forced him

9   way beyond any lawful, authorized interrogation and into a netherworld of pain,

10  terror, and deliberate psychological destabilization. Defendants now seek to evade

11  accountability for their misconduct by hiding behind the government whose

12  authority and laws they flouted, and rewriting the facts surrounding their personal,

13  unlawful infliction of torture and other abuses. That they inflicted impermissible

14  torture has been recognized by everyone from U.S. Presidents to Supreme Court

15  justices to international adjudicative bodies, yet Defendants persist in a fantasy

16  world where they can ignore their monstrous deeds.

17      Defendants rely upon factual characterizations to support their motion and ask

18  the Court to determine whether they were U.S. agents (they were not), and whether

19  their tortious misconduct fell within the scope of any valid authorization (it did not).

20  A motion to dismiss is not the place to dispute facts, and the well-pleaded allegations

suffice to show that, as this Court has already found, Defendants were independent contractors, not agents, and their actions with respect to Plaintiff were clearly illegal and outside the scope of any authority they may have had. These facts are dispositive of their arguments under the Military Commissions Act and immunity doctrines. There are no new facts or law to justify revisiting this Court's prior, well-reasoned adjudications rejecting Defendants' arguments. Defendants are collaterally estopped from raising them in the hopes of a different result.

Nor must Plaintiff show an agency relationship to prevail on his standalone claims for torture and other violations of international human rights law. The Complaint plausibly alleges that Defendants acted with official acquiescence, and no more is required. These claims are properly pleaded, and causation is a fact-bound analysis that will be addressed at trial. The political question doctrine is also inapplicable: the Complaint is addressed to Defendants' unauthorized misconduct and the use of torture, which this Court and others have already addressed.

## FACTUAL BACKGROUND AND THE *SALIM* CASE

On March 28, 2002, Plaintiff was captured by the CIA, which mistakenly believed he was a high-ranking member of Al Qaeda. Plaintiff promptly provided useful information to the FBI interrogation team. Compl. ¶¶ 42-48.

In April 2002, the CIA engaged Defendants as independent contractors to help interrogate Plaintiff. Defendants had no information-gathering experience or

1   anti-terrorism training. Rather, they had worked as interrogation *resistance* trainers

2   for the US Air Force's SERE school. This involved mock applications of torture,

3   including waterboarding, under limited circumstances, controlled to prevent a risk

4   of long-term harm. *Id*. at ¶¶ 17-27, 33-37. In early 2002, Jessen specifically

5   promoted the use of those methods for detainees outside the protections of the

6   Geneva Convention. *Id*. at ¶ 52.

7        When Defendants failed to elicit any additional information from Plaintiff,

8   they claimed that he was resisting interrogation. Having presented this "problem" to

9   the CIA, they also proposed a solution: the experimental use of interrogation

10  techniques, based on those at SERE, for which they would enjoy, as private

11  contractors, fees of $1800 per day, plus travel expenses. *Id*. at ¶¶ 49-66.

12       The CIA ultimately approved Defendants' proposal, including the use of ten

13  "enhanced" interrogation techniques. Approval was based on the close control of the

14  techniques as at SERE, and noted that techniques that could cause permanent mental

15  anguish or physical harm could violate the U.S. criminal prohibition against torture.

16  *Id*. at ¶¶ 70-78. The proposed safeguards proved meaningless.

17       After receiving limited approval for enhanced interrogation techniques,

18  Defendants "ignore[ed] CIA legal advice" and commenced on a repeated basis

19  activities "forbidden by U.S. law," engaging in torture, arbitrary detention, and

20  unconsented experimentation "well beyond the representations and limitations that

they had offered when seeking authority to implement their interrogation program." *Id*. ¶¶ 83, 87. Defendants did not disclose the actual severity of their interrogation plan, or that the safety protocols from the SERE program would not be implemented. *Id*. at ¶ 74. They were simultaneously the persons committing the acts of torture, those whose proposals were being tested, those who stood to benefit if their "experiment" proved a success, and also those responsible for avoiding permanent mental anguish. *Id*. at ¶¶ 28, 56, 90, 126. This squalid episode made a mockery of both the scientific method and the rule of law.

Waterboarding, in particular, departed from the safeguards provided in SERE. Defendants used substantially more water, for greater durations, and far more applications of waterboarding. *Id*. at ¶¶ 83-84. Mitchell justified the departure from the SERE program safeguards—and thus any legal approval—so that the waterboarding of Abu Zubaydah would be "for real." *Id*. at ¶ 84. Unlike in SERE, it was all too real. And Plaintiff suffers from Defendants' decisions to this day.

***The* Salim *Action*:** On October 13, 2015, other victims who had suffered psychological and physical torture at Defendants' hands filed an action here. *See Salim v. Mitchell*, No. CV-15-0286 (E.D. Wash) (the "*Salim* Action" or "*Salim*").

Defendants twice moved to dismiss the *Salim* Action, collectively asserting the principal arguments they advance here: the Court lacks jurisdiction under the political question doctrine and the Military Commissions Act, 28 U.S.C. § 2241 (the

1    "MCA"), and Defendants are entitled to derivative sovereign immunity. The Court

2    rejected each of these arguments. *See* 183 F.Supp.3d 1121, 1133 (E.D. Wash. 2016)

3    (Quackenbush, J.) ("*Salim I*"). In a second opinion, the Court found that for the

4    purposes of the MCA, Defendants were *not* agents of the U.S., and the MCA did not

5    bar the Court's exercise of jurisdiction. *See* No. CV-15-0286, 2017 WL 390270, at

6    *7 (E.D. Wash. Jan. 27, 2017) ("*Salim II*").

7         Defendants moved for summary judgment, relitigating the political question

8    doctrine and sovereign immunity issues. After considering the evidence, the Court

9    denied that motion for substantially the same reasons that it denied the motions to

10   dismiss. *See* 268 F.Supp.3d 1132, 1160-61 (E.D. Wash. 2017) ("*Salim III*"). The

11   parties then reached a settlement. *Salim*, No. CV-15-0286, ECF No. 259. The

12   opinions of the *Salim* Court have not been withdrawn and remain good law.

13                          **<u>LEGAL STANDARD</u>**

14        Defendants move to dismiss under Rules 12(b)(1) and 12(b)(6). A

15   jurisdictional challenge under Rule 12(b)(1) "may be either facial, where the court's

16   inquiry is limited to the allegations in the complaint; or factual, where the court may

17   look beyond the complaint to consider extrinsic evidence." *Cmty. Ass'n for*

18   *Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F.Supp.3d 1180, 1206 (E.D.

19   Wash. 2015) (Rice, J.). Except for Plaintiff's "enemy combatant" status (which is

20   undisputed), Defendants present a facial attack. Defendants' Motion to Dismiss,

1    ECF No. 27 ("MTD"), 7-8. In resolving the facial attack, all allegations in the

2    Complaint are presumed to be true and all reasonable inferences drawn in the

3    Plaintiff's favor. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The same

4    is true for resolving Defendants' 12(b)(6) motion. *Barrett Bus. Servs., Inc. v.*

5    *Colmenero*, No. 1:22-CV-3122-TOR, 2022 WL 21320230, at *3 (E.D. Wash. Dec.

6    19, 2022) (Rice, J.). The Court's review is limited to the Complaint, documents

7    incorporated therein by reference, and judicial notice. *Id.* A 12(b)(6) motion must be

8    denied if the Complaint alleges "sufficient factual matter, accepted as true, to 'state

9    a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

10   (2009), quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).

11                                  **ARGUMENT**

12   I.   **The Complaint Adequately Alleges That Defendants Violated Clearly**
13        **Established Rights As Private Contractors, Not U.S. Agents, And Acted**
14        **Outside the Scope of Authority**

15   As alleged in the Complaint, Defendants had no agency relationship to the U.S., and

16   this is dispositive of their arguments under the MCA. The Complaint plausibly

17   alleges that their conduct was clearly illegal and outside the scope of any authority

18   they enjoyed. As a result, they are unable to claim derivative sovereign immunity.

19   Defendants have fully litigated these issues in Article III courts, and they have been

20   fairly adjudicated to an appealable status against the Defendants. Defendants should

21   be estopped from re-litigating these issues again here.

Plaintiff's Opposition to Motion to Dismiss
Page 6

## A. The MCA Does Not Apply Because Defendants Lacked the Authority to Bind the U.S. and were not U.S. Agents

The MCA deprives the Court of jurisdiction only where a complaint asserts claims "against the United States or its agents." 28 U.S.C. § 2241(e); *Hamad v. Gates*, 732 F.3d 990, 995 (9th Cir. 2013). Because Congress did not define "agents" within the MCA, this Court must refer to the common law definition of the word. *NLRB v. Amax Coal Co*., 453 U.S. 322, 329 (1981). A jurisdiction-stripping statute is "not to be expanded beyond its precise language," because of the presumption of judicial review. *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004) (quotation and citation omitted)). Congress knows how to protect government contractors, and when it wants to, it does so explicitly. *See, e.g.*, 30 U.S.C. § 1716 (defining covered "person" as "any agent or employee of the United States and any independent contractor"). It did not do so here. This Court need not reverse its previous finding on the subject by expanding the MCA beyond its precise language.

"As defined by the common law, the concept of agency posits a consensual relationship in which one person … acts as a representative of or otherwise acts on behalf of another person with *power to affect the legal rights and duties of the other person*" vis-à-vis third parties. Restatement (Third) Of Agency § 1.01 (2006) (emphasis added). The person represented, in turn "has a right to control the actions of the agent." *Id*. This means that agency looks both inward—"between the agent and the principal"—and outward—among the "third-parties with whom the agent

interacts." *Id*. "[C]ontrol alone does not establish an agency relationship." *Fisher v. Le Vian Corp.*, 815 F. App'x 170, 171 (9th Cir. 2020). While Defendants also cite the Restatement, they omit and entirely ignore the requirement that to be an agent of the Government, they must *have the power to bind the Government*. *Cf. Thomas v. I.N.S.*, 35 F.3d 1332, 1339-40 (9th Cir. 1994), as amended on denial of reh'g (Nov. 23, 1994) (U.S. Attorneys' authority to enter into cooperation agreements binding the U.S. Government rendered them "agents" of the U.S.). Defendants never had any such power.

### 1. Defendants fail to proffer any evidence to demonstrate an agency relationship, and their own contracts with the United States plainly rebut such a relationship

"Unlike employees, independent contractors are not ordinarily agents." *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010). "The law presumes that a party acts for himself, and the party asserting an agency relationship bears the burden of proving the agency." *MGIC Indem. Corp. v. Moore*, 951 F.2d 361 (9th Cir. 1991) (unpublished). "A finding of an agency relationship between the government and contractor is unusual absent extraordinary contract provisions." *Peterson Builders, Inc. v. United States*, 26 Cl. Ct. 1227, 1230 (Cl. Ct. 1992).

Defendants submitted evidence relating to other parts of their MCA argument, *i.e.* MTD App. A, but, notably and dispositively, fail to proffer any evidence or argument to meet their burden of overcoming the presumption against agency for

1   contractors. Their failure to carry their burden was fatal to their MCA argument

2   when they moved to dismiss in *Salim*—a fact the Court remarked upon in denying

3   their motion—and they did not even advance the position in their motion for

4   summary judgment in that case.

5       Here, Defendants have not even submitted their own contracts to try and show

6   that they were agents of the U.S., and the Court may infer from that omission that

7   the contracts would show that they were independent contractors who were paid to

8   provide services for the U.S., not to act as agents.

9       The *Salim* docket makes it clear that the contracts reviewed by the *Salim* court

10  include those retaining Defendants as independent contractors for the enhanced

11  interrogation of Plaintiff. *Salim*, No. 2:15-cv-00286, ECF. Nos. 84-1, 84-2, and 84-

12  3 (collectively, the "Contracts"); *Lopez v. Stages of Beauty, LLC*, 307 F.Supp.3d

13  1058, 1064 (S.D. Cal. 2018) (this Court may take judicial notice that these

14  documents were filed in *Salim*). These include a December 2001 consulting services

15  agreement, which, on April 4, 2002, shortly after Plaintiff was captured, was

16  modified to pay Mitchell $1800 per day for work outside the U.S. and $17,000 in

17  travel expenses. Contracts at PgID 1592, 1602. This contract was extended through

18  October 2002, and therefore covers the period Plaintiff's torture at the hands of

19  Defendants as relevant here. *Id*. at PgID 1602-1605. Jessen entered into a similar

20  agreement in July 2002, with similar modifications. *Id*. at PgID 1641, 1647, 1649.

1    As this Court recognized in *Salim*, the contracts that Defendants entered into

2    with the CIA conclusively rebut the baseless assertion that Defendants were agents.

3    *Salim II* at *3. Defendants' contracts identify them as "Independent Contractor[s]"

4    who were retained for "consulting and research." Contracts at PgID 1592, 1597.

5    Mitchell's contract, for example, explicitly states that it should not "be construed as

6    requiring or authorizing the contractor to perform inherently Government functions"

7    and emphasizes that his "legal status is that of an independent contractor." *Id.* at

8    PgID 1593, ¶ 5. Jessen's contract contains identical language. *Id*. at PgID 1644, ¶ 13.

9    As alleged in the Complaint, the text of the Contracts at issue conclusively rebuts

10    the claim of agency. Defendants' motion does not challenge that inference.

11    In addition to these unequivocal expressions of Defendants' status as

12    contractors, not agents, the substantive rights and obligations established in the

13    contracts are alleged to confirm that there was no agency relationship. This includes

14    Defendants' obligations (consulting and research services), and absence of authority

15    to act as representatives of the U.S., both of which are inconsistent with an agency

16    relationship. The contracts do not grant—indeed they directly disclaim—any power

17    or authority of Defendants to act on behalf of or bind the U.S., or act as

18    representatives of the U.S., or to perform government functions. These key elements

19    of an agency relationship are absent from Defendants' contracts, and Defendants do

20    not argue otherwise.

### 2. The Complaint does not and need not allege that Defendants were agents of the U.S.

Nor does the Complaint support an argument that Defendants were somehow agents. Indeed, the Complaint's allegations support an inference to the contrary. The Complaint does not allege or imply that Defendants were authorized representatives of the U.S, or otherwise had the power to bind the U.S. in dealings with any third party. Defendants cite cherry-picked interactions that they had with U.S. personnel, as well as ways in which U.S. personnel exercised certain very limited and irrelevant direction over their services. Even if such interactions could somehow be construed to demonstrate control by the U.S., such control is insufficient to establish an agency relationship if Defendants lacked the authority unilaterally to affect the legal rights and duties of the U.S. Indeed, the fact that the CIA accepted some of Defendants' proposals (as emphasized by Defendants, *see* MTD 16) and rejected others itself shows that Defendants lacked this power.

Defendants cite three cases involving non-governmental independent contractors—but all three recognize this grant of authority as a requirement of actual agency. *See Williams v. PillPack LLC*, 644 F.Supp.3d 845, 854 (W.D. Wash. 2022); *Brown v. DirecTV, LLC*, 562 F.Supp.3d 590, 609 (C.D. Cal. 2021); *McAdory v. M.N.S. & Assocs., LLC*, No. 3:17-CV-00777-HZ, 2021 WL 2321634, at *5 (D. Or. June 7, 2021) (holding DNF authorized MNS "negotiate debts on its behalf" and "tell its debtors that MNS was settling their debts on DNF's behalf"). Furthermore,

two are vicarious liability cases against the principal that address apparent authority and ratification, not actual agency. *Williams*, 644 F.Supp.3d at 854; *Brown*, 562 F.Supp.3d at 609 (declining to determine whether agent was actually authorized to collect principal's debt, when principal ratified agent's actions).

Defendants also argue that the allegation that Defendants were "acting under color of law" is tantamount to an allegation that they were acting as agents of the U.S. This, too, is incorrect. The term "color of law" means that someone is acting under a ***pretense*** of law, even if the government did not authorize that person to take specific actions. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 211 (1970) (Brennan, J., concurring in part) ("[T]he word 'color,' as in 'color of authority,' 'color of law,' 'color of office,' 'color of title,' and 'colorable,' suggests a kind of holding out and means 'appearance, semblance, or simulacrum,' but not necessarily the reality."). "The Supreme Court long ago accepted that a person may act under color of law even when there is no legal basis or authority for his or her actions." *Al-Quraishi v. Nakhla*, 728 F.Supp.2d 702, 752 (D. Md. 2010) (holding that allegations that defendants acted under color of law did not make them agents for purpose of immunity analysis), *rev'd on other grounds then reinstated*. The Complaint alleges that Defendants tortured Plaintiff with the acquiescence—but not the legal approval—of the CIA in violating the law of nations, and that they used their position

as independent contractors to do so. Compl. ¶¶ 115-117. That does not make Defendants agents of the U.S.

In claiming that acting under "color of law" is tantamount to acting as an agent, Defendants cite two cases, MTD 11, but neither case involved the common-law definition of agency—those cases merely involved the term "agent" (in dictum) as shorthand for working for the government. *See Nicholes v. Jano*, No. 8:18-CV-774-T-60AEP, 2020 WL 2615529, at *5 (M.D. Fla. May 22, 2020) (citing a "government *employee* . . . performing a governmental duty" (emphasis added) as an example of an agent, but finding that the issue before it—whether defendant police officers acted in an "official capacity"—was distinct); *United States v. Cox*, 836 F.Supp.1189, 1197 n.9 (D. Md. 1993) (irrelevant whether defendant informant was a government agent because he consented to a recording).

## B. Defendants' Roles and Conduct Defeat Their Immunity Arguments

Federal contractors "do not" "share the Government's unqualified immunity from liability and litigation." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016). This is because contractors have different incentives and legal requirements than government employees. *See Richardson v. McKnight*, 521 U.S. 399, 411 (1997) (contractors can "offset any increased employee liability with higher pay").

"[I]mmunity must be extended with the utmost care" because it violates a key principle of justice: "that individuals be held accountable for their wrongful

1    conduct." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 882 (9th Cir. 2014), *aff'd*,

2    557 U.S. 153 (2016) (quotation marks omitted). The key, outcome determinative

3    inquiry, is "whether the contractor 'exceeded his authority.'" *Salim III* at 1148

4    (quoting *Campbell-Ewald*, 577 U.S. at 167). Defendants, who engaged in illegal

5    activity well beyond the scope of their authority, in a torture program of their own

6    bizarre design, and in a capacity that was not traditionally protected, are entitled to

7    neither *Filarsky* nor *Yearsley* immunity. *See Filarsky v. Delia*, 566 U.S. 377 (2012),

8    *Yearsley v. W.A. Ross Const. Co*., 309 U.S. 18 (1940).

9
10
11
       ***1. Torture and similar abuses can never be validly authorized,
       and Defendants abused Plaintiff outside the scope of any
       authority that would entitle them to* Yearsley *immunity***

12    As this Court has already decided, Defendants designed and implemented an

13    experimental torture program, and, as such, are not entitled to Yearsley immunity.

14    *Salim III* at 1148. To enjoy Yearsley immunity, a contractor (1) must be acting under

15    authority validly conferred by the government, and (2) those actions must be within

16    the scope of the contract. Defendants have not and cannot meet either requirement.

17    The allegations here relate to torture and other serious human rights violations

18    that can never be lawful. See *Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012).

19    Defendants argue that the authority to commit war crimes and torture was validly

20    conferred, because "using the interrogation techniques on suspected terrorists in

21    2001-03 was not unlawful at the time when done by the government." MTD 26. This

1    argument relies on a Department of Justice memo authored in August 2002 (the

2    "Yoo/Bybee Memo"), finding that certain enhanced interrogation techniques, if used

3    under controlled circumstances, and based on representations by Defendants that

4    they did not intend to torture, could not be charged as torture in a criminal case.

5        The Yoo/Bybee Memo does not support Defendants' position. As a

6    fundamental principle of separation of powers, this Court, not the executive branch,

7    determines the legality of an action. *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804)

8    (naval captain was liable for illegally seizing a ship despite Presidential order that

9    he could do so). The memo used indefensible circular logic to make the

10   unremarkable point that if an interrogator did not intend to commit torture when

11   applying enhanced interrogation techniques, they could not be ***criminally*** liable; it

12   says nothing about civil liability. Compl. ¶ 32. And one of its authors testified that

13   the enhanced interrogation techniques as applied to Plaintiff by Defendants,

14   exceeded the memo's approval in terms of both frequency and severity. H. Comm.

15   on the Judiciary, 111th Cong. 113-115, 220-222 (May 26, 2010) (interview with Jay

16   Bybee, Fmr. Assistant Attorney General). Because the Complaint alleges acts of

17   torture and abuse that would be illegal for government employees, the government

18   could not validly authorize Defendants to take these acts.

19       Defendants also fail to meet the second prong of *Yearsley*. Within the Ninth

20   Circuit, *Yearsley* immunity is "limited to cases in which a contractor had no

1   discretion in the design process and completely followed government

2   specifications." *Childs v. San Diego Fam. Hous. LLC*, 22 F.4th 1092, 1097 (9th Cir.

3   2022) (quoting *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732

4   (9th Cir. 2015)). As alleged in the Complaint, and recognized in the *Salim* Action,

5   Defendants designed the interrogation program, recklessly recommended

6   unauthorized techniques to the government, and implemented them on Defendant,

7   retaining full operational control over each day's interrogations, and doing so in a

8   manner that exceeded any authority. Compl. ¶¶ 1, 4, 8, 76, 84.

9       Defendants argue that *Salim*'s reliance on the "no discretion" language from

10  *Cabalace* confuses *Yearsley*'s requirements with *Boyle*. MTD 28-30. But the Ninth

11  Circuit has confirmed *Salim*'s application of the rule, *see Childs*, 22 F.4th at 1097,

12  and Defendants rely on authority from the other side of a circuit split. *See Posada v.*

13  *Cultural Care, Inc.*, 66 F.4th 348, 359 (1st Cir. 2023) (noting split). Defendants do

14  not deny their discretion in the operation of the interrogation program, only that this

15  discretion does not preclude *Yearsley* immunity. The Ninth Circuit has directly

16  rejected that argument.

17      ### 2. *Defendants violated clearly established rights and are not*
18      *entitled to* **Filarsky** *immunity*

19      Whatever the merits of so-called "*Filarsky* immunity" as a distinct doctrine

20  outside of the § 1983 context in which it arose, *see Gomez*, 768 F.3d at 881,

21  Defendants fail to meet its requirements. This is because *Filrasky* provided qualified

1    immunity to contractors performing governmental functions that traditionally

2    enjoyed qualified immunity, if the contractors did not violate clearly established

3    rights in order to avoid unwarranted timidity. 566 U.S. at 390.

4    The basic elements of *Filarsky* are not present here. As noted by this Court,

5    the right not to be subjected to torture and war crimes is well-established. *Salim III*

6    at 1148. This, alone, renders *Filarsky* inapplicable.

7    And the Ninth Circuit, like almost every other circuit to have considered this

8    issue, has rejected the extension of immunity to private psychologists or psychiatrists

9    acting as government consultants. *See, e.g.*, *Jensen v. Lane Cty.*, 222 F.3d 570, 580

10    (9th Cir. 2000) (rejecting qualified immunity for contract psychiatrist in absence of

11    "'firmly rooted' tradition" of immunity) (quoting *Richardson*, 521 U.S. at 404).

12    In fact, Defendants' contracts explicitly state that they will ***not*** fulfil a

13    governmental function, nor is there any basis on which to conclude that they were

14    filling a traditionally protected function. The Complaint relates to torture and other

15    human rights abuses, which cannot comprise any lawful government function at all.

16    This is unchanged by the fact that Defendants were private contractors providing

17    research and consulting services relating to interrogation. Defendants cite cases from

18    the Fifth Circuit, which, again, has split from the Ninth Circuit on immunity.

19    *Perniciaro v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018) (noting circuit split).

20    Defendants' other cases, which involve expert opinions for courts, are inapposite.

1    Defendants charged the Government $1800 per day to design and implement an

2    experimental interrogation program, which served as a foundation for their receipt

3    of tens of millions in the following years. None of those things are consistent with

4    the types of customary government functions often outsourced to government

5    contractors that received *Filarsky* immunity.

6    **C. Defendants should be Collaterally Estopped from Relitigating**
7    **This Court's Previous Denials of Their MCA and Immunity**
8    **Arguments**

9    Nonmutual offensive collateral estoppel serves to conserve judicial resources,

10   prevent inconsistent decisions, and encourage reliance on adjudication by precluding

11   a party from relitigating issues that it previously lost. *See Montana v. United States*,

12   440 U.S. 147, 153 (1979). Its application is committed to the discretion of the trial

13   court and is warranted when "(1) [defendant] was afforded a full and fair opportunity

14   to litigate the issues in the prior actions; (2) the issues were actually litigated and

15   necessary to support the judgments; (3) the issues were decided against [defendant]

16   in final judgments; and (4) [defendant] was a party … in the prior proceedings."

17   *Resol. Tr. Corp. v. Keating*, 186 F.3d 1110, 1114 (9th Cir. 1999). These conditions

18   for application of estoppel are fully met in the instant case.

19   *1. Defendants had a full and fair opportunity to litigate their MCA*
20   *and immunity theories, and they lost*

21   Defendants moved to dismiss the *Salim* Action on immunity grounds,

22   devoting a total of 35 pages of briefing and almost 200 pages of exhibits across their

1    initial motion to dismiss and their summary judgment motion. *See Salim*, ECF Nos.

2    27, 29, 169, 200. They devoted a second full motion to their theory that the MCA

3    applies—another 199 pages of briefing and exhibits that were ultimately

4    unpersuasive. *See id.*, ECF Nos. 105, 106, 126.

5         The finding that Defendants were lead participants in what the court called

6    the "Program" was central to each of the well-reasoned opinions rejecting immunity.

7    *See Salim I* at 1133; *Salim III* at 1160. After reviewing the factual record extensively,

8    Judge Quackenbush concluded that Defendants "had a role in the design of the

9    Program, trained interrogators for the Program, and exercised some discretion in the

10   application of the Program." *Salim III* at 1150. The Court also rejected Defendants'

11   MCA arguments, because Defendants failed to meet the burden to prove that they

12   were "agents" of the U.S. *Salim II* at \*14. The Court found it "telling the Defendants,

13   who wish to establish the nature of the legal relationship between themselves and

14   the Government, did not cite to the contracts in their Motion." *Id.* Here too,

15   Defendants here have not cited or submitted their contracts with the Government, or

16   any other information to establish the agency relationship—they are simply asking

17   the Court to reach a different conclusion on the same facts.

18
19   ### 2. The Court's rejections of Defendants' arguments were "final judgments" for estoppel purposes

20        "A final judgment for purposes of collateral estoppel can be any prior

21   adjudication of an issue in another action that is determined to be sufficiently firm

1    to be accorded conclusive effect." *Luben Indus., Inc. v. United States*, 707 F.2d 1037,

2    1040 (9th Cir.1983) (citation omitted). The relevant (noncumulative) factors are that

3    "the parties were fully heard, that the court supported its decision with a reasoned

4    opinion, that the decision was subject to appeal or was in fact reviewed on appeal."

5    *Id.* (quotation and citation omitted). "To be 'final' for [issue preclusion] purposes, a

6    decision need not possess 'finality' in the sense of 28 U.S.C. § 1291." *Syverson v.*

7    *International Business Machines Corp.*, 472 F.3d 1072, 1079 (9th Cir. 2006); *see*

8    *also Sec. People, Inc. v. Medeco Sec. Locks, Inc*., 59 F.Supp.2d 1040, 1045 (N.D.

9    Cal. 1999) (16-page interlocutory order that preceded settlement was final judgment

10    because both parties were fully heard on the issues).

11        The court orders denying Defendants' MCA and immunity defenses met each

12    of these factors. The parties submitted briefs and exhibits and participated in oral

13    argument on these issues. *See Salim*, ECF Nos. 27-29, 105, 106, 120, 121, 169, 178,

14    190, 193, 194, 200, 203. This Court rejected the defenses in three well-reasoned

15    opinions, in a total of 71 pages. *See Salim I, II, III*. These opinions were subject to

16    appeal, because "[a]n order rejecting the defense of qualified immunity at *either* the

17    dismissal stage *or* the summary judgment stage is a 'final' judgment subject to

18    immediate appeal," *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996), as is a denial of

19    a motion to dismiss for lack of subject matter jurisdiction, *Terenkian v. Rep. of Iraq*,

694 F.3d 1122, 1131 (9th Cir. 2012). Thus, Judge Quackenbush's orders in the *Salim*

Action are "final" for purpose of preclusion**.**

### 3. *Resolution of the MCA issue in Plaintiff's § 1782 Action lends further weight to the case for collateral estoppel*

Beyond the *Salim* Action, in Plaintiff's § 1782 case filed against Defendants,

this Court again denied the applicability of the MCA, noting that Defendants'

contracts described them as independent contractors, and rejecting the attempt to

characterize themselves as agents of the U.S. *In re Zayn Al-Abidin Muhammad*

*Husayn*, No. 2:17-CV-0171, 2018 WL 11150135, at *3 (E.D. Wash. Feb. 21, 2018),

*rev'd and remanded sub nom*. *Husayn v. Mitchell*, 938 F.3d 1123 (9th Cir. 2019),

*rev'd and remanded sub nom*. *United States v. Zubaydah*, 595 U.S. 195 (2022), *aff'd*,

31 F.4th 1274 (9th Cir. 2022). While other aspects of that case were appealed

through the Supreme Court, Defendants **did not appeal the MCA** issue.

Defendants quote Justice Gorsuch's dissenting opinion in the Supreme

Court's resolution of Plaintiff's § 1782 case to support their position, MTD 11-12,

but no question of agency was before the Supreme Court, which was only evaluating

the Government's invocation of the State Secrets Privilege. Although Justice

Gorsuch ascribed some level of responsibility to the CIA (noting that Plaintiff was

subject to "torture at the hands of the CIA") his comments do not change the

substantive, fact-bound analysis the district court performed of whether Defendants

were agents under the common law of agency. *Zubaydah*, 595 U.S. at 238.

1    Defendants' citations to Justice Gorsuch's dissent are no more than cherry-

2  picking snippets of language that do not address the legal issue of agency. Although

3  Justice Gorsuch offhandedly refers to Defendants as agents, he does not say anything

4  regarding their ability to bind the CIA. His central point was something he

5  emphasized repeatedly: that Defendants tortured Plaintiff when they "waterboarded"

6  him and kept him "awake for 126 consecutive hours," and that Plaintiff had a right

7  to learn more about the circumstances under which they did so. *Id*. at 241. And the

8  other Justices also stated that Defendants' "treatment [of Plaintiff] constituted

9  torture," and "he was tortured" by "contractors" who used "enhanced interrogation

10  techniques" including "more than 80 waterboardings" *Id*. at 200-01 (Breyer, J.); *Id*.

11  at 236-237 (Kagan, J., concurring in part). There is no reasonable way to read the

12  various opinions by the Supreme Court as anything other than dismay and disgust

13  with respect to Defendants' treatment of Plaintiff. A dissenting opinion does not

14  somehow accord immunity *sub rosa* through a stray word on an unrelated issue.

15  **II. Defendants' Conduct as Private Actors Violated Substantive Laws**
16  **Cognizable Under the ATS**

17    Defendants do not challenge that the Complaint adequately states a claim for

18  war crimes based on the allegations of torture, non-consensual scientific

19  experimentation, and arbitrary detention that Defendants inflicted on Plaintiff. See

20  MTD 34-40. They argue only that their conduct cannot also amount to standalone

21  violations of international human rights law. Defendants are wrong.

### A. An Agency Relationship Between Defendants and the State is Not Required to Support the Claims Plaintiff Asserts

Defendants claim that Plaintiff must allege "state action" in order to prevail on his human rights law claims under the ATS, but they paint with too broad a brush when they further assert the requirement of an "agency relationship" between Defendants and the state (which would, in Defendants' manufactured "Catch-22," thereby preclude jurisdiction under the MCA). MTD 34-35. While it is true that private conduct without government involvement does not violate the substantive causes of action alleged here (other than war crimes), the type of government involvement required is far short of the agency relationship Defendants profess it to be. As described below, it suffices that the government acquiesced in the private party's conduct. The Complaint alleges sufficient facts to plausibly support that the government acquiesced in Defendants' misconduct, and no more is required.

### 1. Plaintiff may prevail on a torture claim where private defendants act with the acquiescence of the state

The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT")—to which the U.S. and 172 other countries are party—defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Art. 1(1), Dec. 10, 1984, 1465 U.N.T.S. 85 (emphasis added). When ratifying CAT, the U.S. expressed

1    its "understand[ing] that the term 'acquiescence' requires that the public official,

2    prior to the activity constituting torture, have awareness of such activity and

3    thereafter breach his legal responsibility to intervene to prevent such activity." U.S.

4    Instrument of Ratification to CAT, § II. (1)(d), Oct. 21, 1994, 1830 U.N.T.S. 321.

5    This is reflected in U.S. regulations implementing the Convention. See 8 CFR §

6    208.18(a)(1), (7).

7        Defendants do not dispute that the prohibition of torture constitutes a rule of

8    customary international law, and that, as such, a violation of the prohibition is

9    cognizable under the ATS. Thus, the plain terms of CAT—and the U.S.

10   understanding—reflect the international consensus that state action is not required

11   for conduct to constitute torture. It is enough that a state was aware of the conduct

12   and failed to prevent it.

13       The U.S. and other relevant authorities have reaffirmed this principle. For

14   example, the U.S. reiterated to the U.N. Human Rights Committee, "it is well-

15   *established in international law* that torture requires state action **or *affirmative***

16   ***acquiescence*.**" U.S. Observations on U.N. Human Rights Committee General

17   Comment 31 (Dec. 27, 2007), ¶ 16 (emphases added). It continued: "***Abuses***

18   ***committed by private individuals*** may constitute human rights violations in certain

19   instances, such as when an abuse is committed . . . with the acquiescence of the

20   state." Id. n.12 (citing Art1 of CAT) (emphasis added).

Plaintiff's Opposition to Motion to Dismiss
Page 24

1    In monitoring states' implementation of CAT, the U.N. Committee Against

2    Torture explains that a state "acquiesce[es]" in torture where state authorities "know

3    or have reasonable grounds to believe that acts of torture . . . are being committed

4    by non-State officials or private actors and they fail to exercise due diligence to

5    prevent [such conduct]." Comm. Against Torture, General Comment No. 2, U.N.

6    Doc. CAT/C/GC/2 (Jan. 24, 2008), ¶ 18. By acquiescing, the State "enables non-

7    State actors to **commit acts impermissible under the Convention**." *Id.* (emphasis

8    added). The Committee found that private actors committed "torture" in 1995 in

9    Yugoslavia by burning the victims' houses in the presence of police who failed to

10   intervene. *Hajrizi Dzemajl et al. v. Yugoslavia*, Communication No. 161/2000,

11   Comm. Against Torture, U.N. Doc. CAT/C/29/D/161/2000 (2002), ¶ 9.2. The

12   European Court of Human Rights ("ECtHR") applied this principle to the torture of

13   Plaintiff at a CIA black site in Poland from December 2002 to September 2003. It

14   found that Plaintiff was tortured by CIA contractors with Polish state acquiescence,

15   affirming that the prohibition of torture "requires States to take measures designed

16   to ensure that individuals within their jurisdiction are not subjected to torture or

17   inhuman or degrading treatment or punishment, **including such ill-treatment**

18   **administered by private individuals** . . . about which [state authorities] knew or

19   ought to have known." *Case of Husayn (Abu Zubaydah) v. Poland*, App. No.

20   7511/13, ¶ 502 (July 24, 2014) (citing three cases) (emphasis added).

Plaintiff's Opposition to Motion to Dismiss
Page 25

1   The Ninth Circuit has made clear when applying CAT: "acquiescence does

2   not require actual control or an agency relationship." *Reyes-Reyes v. Ashcroft*, 384

3   F.3d 782, 788 (9th Cir. 2004) (citing *Zheng v. Ashcroft*, 332 F.3d 1186, 1196 (9th

4   Cir. 2004)); *Morales v. Gonzales*, 478 F.3d 972, 983 (9th Cir. 2007) ("Government

5   acquiescence is not restricted to . . . an agency relationship; it includes 'willful

6   acceptance' or 'willful blindness' on the part of government officials toward abuse

7   inflicted exclusively by private individuals."), *abrogated in different part*. Judges err

8   by requiring a plaintiff to show that a state official or agent inflicted the violence.

9   *Reyes-Reyes*, 384 F.3d at 787-88; *Morales*, 478 F.3d at 984 ("focus[] on direct

10  government involvement . . . with Morales' attackers" is wrong given testimony that

11  prison officers heard her cries of rape and did nothing); *Karki v. Holder*, 715 F.3d

12  792, 806-07 (10th Cir. 2013) (acquiescence demonstrated by "evidence that the

13  government is aware of and does not prevent the Maoists' frequent acts of torture").

14      Defendants try to portray Plaintiff as facing a Catch-22; it is one that

15  Defendants have tried to construct against the mandates of the law. Defendants did

16  not need to be "agents" of the U.S. Government for their abuses of Plaintiff to

17  support a claim of torture. It is enough that, as private individuals, they committed

18  their acts with the acquiescence of the U.S. Government. And this is exactly what

19  occurred, and what the Complaint alleges: CIA officials knew or should have known

20  of Defendants' torture of Plaintiff, but did not try to stop it. Compl. ¶¶ 77-78, 85, 89.

1    Defendants support their Catch-22 argument by citing cases that did not

2    address acquiescence, or found it not established on the facts. MTD 36. Their

3    primary case **omitted the language concerning acquiescence** from its selective

4    quotation of CAT. *Saleh v. Titan Corp.*, 580 F.3d 1, 15 (D.C. Cir. 2009) (misquoting

5    CAT as applying only to "acts by 'a public official or other person acting in an

6    official capacity'"). Defendants also quote *Kadic v. Karadzic*'s statement that courts

7    should look to "principles of agency law and to jurisprudence under 42 U.S.C.

8    § 1983." MTD 35 (quoting 70 F.3d 232, 245 (2d Cir. 2009)). However, *Kadic* made

9    that statement when interpreting the Torture Victims Protection Act, *id.* at 245, a

10   narrower statute not at issue here that does "[not] diminish" the scope of the ATS.

11   *Id.* at 241. In any case, *Kadic* acknowledged the acquiescence language in CAT, *id.*

12   at 243-44, and interpreted the state action requirement consistently with this

13   language, to include private parties "act[ing] together with state officials or with

14   significant state aid," *id.* at 245. Finally, Defendants quote *Aldana v. Del Monte*'s

15   reliance on *Kadic*. MTD 35 (citing 416 F.3d 1242, 1247 (11th Cir. 2005)). However,

16   in *Aldana*, the court suggested that plaintiffs would have had a torture claim had they

17   "allege[d] sufficient facts to warrant the inference that the National Police knew of

18   and purposefully turned a blind eye to the events," *i.e.* acquiescence. *Id.* at 1248.

19       The Court should reject Defendants' attempt to impose an onerous "state

20   action" requirement that the law specifically disclaims. Defendants' manufactured

"state action" requirement is also inconsistent with case law establishing that torture can never be an official action but can only be taken under "color of law"—that is, a "veneer of perceived authority." *Al-Quraishi*, 728 F.Supp.2d at 752. These courts have ***allowed*** ATS torture claims to proceed, despite invocations of immunity. *See id.* at 751-53; *In re Est. of Ferdinand Marcos Hum. Rts. Litig.*, 25 F.3d 1467, 1472 n.8 (9th Cir. 1994); *Al Shimari v. CACI Premier Tech., Inc.*, 263 F.Supp.3d 595, 597, 600-02 (E.D.Va. 2017). The same analysis applies here and provides further support to reject the MCA and immunity arguments that Defendants advance. The U.S. Government could not lawfully enter into an agency relationship with Defendants that authorized their illegal conduct. To the extent that the specific conduct at issue has been alleged (and indeed found by courts) to constitute torture, it could not have been performed within the context of a protected agency relationship, and thus no immunity or jurisdiction stripping doctrine would apply, even under the MCA. Defendants at most acted under color of law—with the veneer of official approval but not bona fide legality—and this does not make them agents of the Government.

### 2. Plaintiff may prevail on claims for arbitrary detention and non-consensual scientific experimentation where private defendants act with state acquiescence.

The same is true for Plaintiff's remaining claims. As confirmed by the U.N. and every regional human rights court to have considered it, a violation of

1    international human rights law can arise from private conduct that occurs with the

2    acquiescence of the state, including failure by the state to act with due diligence to

3    prevent it. *See* U.N. Human Rights Committee, General Comment 31, U.N. Doc.

4    CCPR/C/21/Rev.1/Add.13 (2004), ¶ 8; *Commission nationale des droits de*

5    *l'Homme et libertés v. Chad*, Communication 74/92, Afr. Comm'n H.P.R., ¶¶ 5, 20-

6    22 (1995); *Velásquez Rodriguez v. Honduras*, Judgment, Inter-Am. Ct. H.R. (ser. C)

7    No. 4, ¶¶ 173, 182 (July 29, 1988); *Osman v. United Kingdom*, ECtHR, App. No.

8    23452, ¶ 116 (Oct. 28, 1998).

9         This principle has been applied in the arbitrary detention context. For

10    example, the International Court of Justice found that the wrongful detention of U.S.

11    diplomatic staff in Tehran violated customary international law, even when initially

12    the Government of Iran merely "encouraged" and "fail[ed] . . . to oppose" it, without

13    conducting the hostage-taking itself. *United States Diplomatic and Consular Staff in*

14    *Tehran (U.S. v. Iran)*, Judgment, 1980 I.C.J. Rep. 3 ¶¶ 57-60, 91 (May 24); *see also*

15    *Velásquez*, Inter-Am. Ct. H.R. (ser. C) No. 4, ¶ 186; *Riera Blume v. Spain*, ECtHR,

16    App. No. 37680/97, ¶ 35 (1999) ("national authorities at all times acquiesced in the

17    applicants' loss of liberty."); *Medov v. Russia*, ECtHR, App. No. 25385/04, ¶¶ 123-

18    25 (2009). The principles prohibiting Iranian private citizens' indefinite detention of

19    Americans with official Iranian acquiescence also apply to American private

20    citizens' arbitrary detention of a foreign national with U.S. acquiescence.

1      No more is required to state a claim for non-consensual experimentation. The

2      prohibition against non-consensual experimentation is a specific, universal, and

3      obligatory norm of international law. *Abdullahi v. Pfizer*, 562 F.3d 163, 174-88 (2d

4      Cir. 2009). It applies to "nonconsensual medical experimentation by any entity—

5      state actors, private actors, or state and private actors behaving in concert." *Pfizer*,

6      562 F.3d at 180. This prohibition is rarely tested in practice – unsurprising after the

7      unimaginable cruelties of the Nazi-era experimentation by Dr. Mengele and his ilk.

8      Nonetheless, Defendants have offered no moral justification or legal authority (and

9      there is none) to differ from the Second Circuit's cogent analysis and adopt a novel

10     'exception' here to the settled rule that private misconduct is actionable under

11     international human rights law when committed with the acquiescence of the state.

12     To contend for such a principle is itself morally abhorrent and legally baseless.

13     **B. Defendants Committed Nonconsensual Scientific**
14        **Experimentation as Recognized at International Law**

15     Defendants ask this Court to reject the Second Circuit's holding in *Pfizer* that

16     the prohibition against nonconsensual experimentation exists in customary

17     international law. MTD 37. The extremely comprehensive analysis in *Pfizer* speaks

18     for itself. 562 F.3d at 174-88. And there is even more evidence of the universality of

19     the prohibition that the Second Circuit did not consider. *See, e.g.*, Convention on the

20     Rights of Persons with Disabilities, Art. 15, Dec. 12, 2006, 2515 U.N.T.S. 3; Third

21     Geneva Convention on Prisoners of War, Art. 130, Aug. 12, 1949, 75 U.N.T.S. 135.

1    Defendants alternatively claim that nonconsensual scientific experimentation

2    does not violate international law unless it involves "pharmaceuticals and medical

3    experiments conducted for a separate purpose," as in *Pfizer*. MTD 37-38. The claim

4    is also morally repugnant and baseless. Defendants' argument would create an

5    exception for many of the Nazi-era experiments, which imposed horrific cruelty in

6    pseudoscientific settings and did not involve pharmaceuticals or applicable medical

7    research. *See, e.g.*, *United States v. Brandt (The Medical Case)*, International

8    Military Tribunal, Judgment, Aug. 20, 1947, pp. 175, 200-01, 211, 237 (indictment

9    for forcing detainees to endure high-altitudes and freezing temperatures); *United*

10   *States v. Milch*, 2 Trials of War Criminals Before the Nuernberg Military Tribunals

11   Under Control Council Law No. 10 (Apr. 16, 1947). The International Committee

12   of the Red Cross ("ICRC") explains that the prohibition includes "conduct the

13   primary purpose of which is to study the effects, at that time unknown, of a product

14   or situation (e.g. extreme cold or altitude) on the human body," *ICRC Commentary*

15   *on Geneva Convention (III)*, Art. 130, ¶ 5257 (2020), and "the practice of leaving a

16   person in complete isolation for a very long period of time." *ICRC Commentary on*

17   *Additional Protocol (I) to the Geneva Conventions*, p. 152, ¶ 463 (1987). The cruelty

18   of human experimentation, like the experimentation in this case, does not depend in

19   any way on whether pharmaceuticals are involved or is there some vague articulation

20   of a medical purpose and there is no factual or legal justification for such a limitation.

1    The Complaint plausibly alleges no less. Defendants subjected Plaintiff to a

2    psychological experiment to gain knowledge and practical experience regarding how

3    to "break" detainees, which they could then market to the U.S. to win valuable

4    government contracts to provide further custody and interrogation services. They

5    were psychologists and held themselves out to the CIA as such. Compl. ¶¶ 49, 53.

6    Their contracts with the CIA were purportedly for "applied research." Compl. ¶¶ 51,

7    54, 72, 108. The purpose of their experiment was to induce a state of "learned

8    helplessness" in Plaintiff through various interventions and test the effect of that

9    state on a human detainee's resistance to interrogation. Compl. ¶ 40. The

10   interventions included, *inter alia*, solitary confinement and cold temperatures, as in

11   the historical examples above. Compl. ¶¶ 5, 59. Defendants gathered information

12   from their interrogations of Plaintiff, which they used to contribute to generalizable

13   knowledge about interrogation methods, in order to "break" future detainees. Compl.

14   ¶ 93. This is not research to benefit the physical or mental health of anyone. Contrary

15   to Defendants' suggestion (MTD 38), this yielded information that the SERE

16   training program did not, since the latter taught how to *avoid* learned helplessness,

17   not how to *induce* it and observe its effects. Compl. ¶ 28. It is apt that the CIA

18   internally referred to Defendants' treatment of Plaintiff as "guinea pig research on

19   human beings." Compl. ¶ 85. Its use of a dehumanizing metaphor on Plaintiff and

20   others is no accident. Experts have also concluded that the broad definition of

1   "human subjects research" in U.S. law, 45 C.F.R. § 46.102(e), applies to

2   Defendants' treatment of Plaintiff. *See* Physicians for Human Rights,

3   Nuremberg Betrayed: Human Experimentation and the CIA Torture

4   Program 25 *et seq.* (June 2017).

5        The Court should reject Defendants' invitation to impose a novel limitation

6   based on the facts of *Pfizer* inconsistent with that case's reasoning. The prohibition

7   requires consent and bans experimentation on vulnerable populations such as

8   prisoners. Plaintiff gave no consent and was part of such a population. Plaintiff has

9   stated a claim for nonconsensual scientific experimentation.

10       **C. Defendants Are Responsible for Plaintiff's Arbitrary Detention**

11       The prohibition on arbitrary detention constitutes a norm of customary

12  international law. *See Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1349 (N.D. Ga.

13  2002) (citing Restatement (Third) of Foreign Relations Law, § 702 (1987)). It is

14  beyond dispute that aspects of Plaintiff's detention have been arbitrary as a matter

15  of customary international law, and Defendants do not argue otherwise. The U.N.

16  Working Group on Arbitrary Detention ("WGAD"), which reviews individual

17  complaints of arbitrary detention, has considered the circumstances of Plaintiff's

18  detention and concluded that he has been held arbitrarily. *Zayn al-Abidin*

19  *Muhammad Husayn (Abu Zubaydah) v. United States of America, et al.*, WGAD

20  Opinion No. 66/2022, U.N. Doc. A/HRC/2022/66, ¶¶ 101-18 (2022). WGAD made

1    a similar determination as early as 2006, the year Defendants last claim to have had

2    contact with Plaintiff (MTD 39). *Mr. Ibn al-Shaykh al-Libi and 25 other persons v.*

3    *United States of America*, WGAD Opinion No. 29/2006, U.N. Doc.

4    A/HRC/4/40/Add.1 at 103, ¶ 21 (2006). Defendants argue only that they were not

5    causally responsible for Plaintiff's arbitrary detention because they did not initially

6    detain him in 2002. MTD 39-40.

7        Any challenge to causation involves a fact-bound analysis best addressed at

8    trial, not on a dispositive motion where the Complaint plausibly alleges causation.

9    In any case, Defendants' lack of involvement in the initial capture of Plaintiff is

10    irrelevant—Plaintiff need not argue, and the Court need not find, that his initial

11    capture and detention was arbitrary. The Complaint alleges that Defendants were the

12    direct and proximate cause of ***subsequent*** arbitrary detentions, both short and long,

13    which states a claim under the ATS.

14        What makes a detention arbitrary is not only the circumstances of a detainee's

15    capture, but also the lack of legal basis for the continuation of the detention, as well

16    as the treatment of the detainee while in detention. *See Mehinovic*, 198 F.Supp.2d at

17    1349 (arbitrary detention is defined as detention "not pursuant to law," or otherwise

18    "incompatible with the principles of justice or with the dignity of the human person."

19    (citing Restatement (Third) of Foreign Relations Law, § 702 (1987)). Arbitrary

20    detention includes detention of a person "without notice of charges and failure to

1   bring that person to trial within a reasonable time." *Id.* Confinements of as little as

2   20 days to a month, in conjunction with torture, were considered prolonged and

3   arbitrary. *Doe v. Qui*, 349 F.Supp.2d 1258, 1325-26 (N.D. Cal. 2004). Significantly

4   shorter detention periods also have been deemed arbitrary. *See Eastman Kodak v.*

5   *Kavlin*, 978 F.Supp. 1078, 1094 (S.D.Fla.1997) (8-10 day detention). Plaintiff has

6   been detained for some ***twenty-two years*** without charge, the first four years of

7   which were used by Defendants to break him.

8          Domestic law determines questions of causality. *Doe I v. Nestle USA, Inc.*,

9   766 F.3d 1013, 1022 (9th Cir. 2014). In Washington State, proximate cause is a

10  "cause which, in a direct sequence, unbroken by any superseding cause, produces

11  the injury complained of and without which such injury would not have happened."

12  *Berry v. King County*, 19 Wash.App.2d 583, 588 (Wash. App. 2021) (cleaned up);

13  *see also Pacheco v. United States*, 21 F.4th 1183, 1188 (9th Cir. 2022) (same).

14         The Complaint adequately alleges that Defendants were a direct and

15  proximate cause of Plaintiff's arbitrary detention in several respects. ***First***, they

16  physically and personally detained him in various stress positions, confinement

17  boxes, and on a waterboarding table over the course of 83 waterboarding sessions.

18  Compl. ¶¶ 16, 28, 90, 141. Could they really have thought that after forty, fifty, sixty,

19  seventy, eighty episodes of near-death torture there would suddenly be a

20  breakthrough in their "research;" or did it become sadistic frustration? The six to

Plaintiff's Opposition to Motion to Dismiss
Page 35

eight weeks that Defendants kept Plaintiff tied to a chair, and the 295 hours (more than 12 days) they confined him in a coffin-sized box also, constitute unlawful detention in violation of customary international law. Compl. ¶¶ 59, 90. Moreover, during the period following the FBI's interrogation of Plaintiff in April 2002, Defendants falsely overpromised on Plaintiff's continuing value as an intelligence source; this led to his continued, incommunicado captivity in a black site well after he could have been "regularized" at Guantanamo or elsewhere, with traditional prisoner of war rights of access and some limited legal process. Instead, Plaintiff remained in Defendants' custody after his initial capture and interrogation in order for Defendants to conduct their illegal, cruel experiments on him; this is not a sufficient legal basis for his continued detention.

*Second*, Defendants physically and personally subjected Plaintiff to torture and cruel, inhuman, and degrading treatment. Compl. ¶¶ 56-65, 78-90. This contributed to the unlawfulness and continuation of his detention. After 22 years detained, there is no case brought against him and likely never will be. Yet his torture has left the government apparently unwilling to release him for fear that somehow he may have been radicalized and poses a continuing threat these many years later, or—much more likely—that he would further publicize details of his treatment to the detriment of the CIA's bureaucratic interests in further revelations of human rights violations. Moreover, Defendants' roles in raising expectations concerning

1   Plaintiff's connections to terrorist groups, and the purported "confessions" they

2   extracted from him, have created political risk for any country to accept him out of

3   Guantanamo, further contributing to his continued arbitrary detention.

4          And if their intent is in question, Defendant Mitchell removed all doubt when,

5   on July 15, 2002, he urged that Plaintiff "remain in isolation and incommunicado for

6   the remainder of his life." Compl. ¶ 98. Defendants attempt to downplay this

7   recommendation of a life sentence, by misquoting the Complaint as conceding that

8   Plaintiff "would have been detained regardless" of this statement. MTD 40 (citing

9   Compl. ¶ 98). The Complaint actually alleges that while Plaintiff would have been

10  ***initially*** detained regardless of Defendants, "his ongoing, interminable detention

11  without charge is intentional and due, in significant part, to [Defendants]." Compl.

12  ¶ 98. The corollary to using torture as a purported experiment was burying its victim

13  alive and forever so the conduct could remain a secret.

14         These allegations state numerous unbroken chains of causation precipitated

15  by Defendants alone, and sufficiently state a claim for arbitrary detention.

16  **III.    The Political Question Doctrine Has No Applicability Here Because**
17          **the Complaint Implicates Unauthorized Conduct of CIA Contractors,**
18          **Not Any Government Action**

19         As this Court has found twice already, the facts and claims presented here are

20  readily justiciable under the test applied in this Circuit. *See Salim I* at 1129-30; *Salim*

21  *III* at 1146-47. Defendants tacitly concede this, asking the Court to rely instead on a

1    factually distinct out-of-circuit test from *Taylor v. Kellogg Brown & Root Servs.,*

2    *Inc.*, 658 F.3d 402, 411 (4th Cir. 2011). Even if it applied to this case, which it does

3    not, *Taylor* would not support dismissal.

4        In the Ninth Circuit courts weigh political question challenges through the six-

5    factor analytical framework provided by the Supreme Court in *Baker v. Carr*, 369

6    U.S. 186, 211 (1962). Supporting facts must be "prominent on the surface," *id.* at

7    217, to satisfy this "narrow exception" to justiciability, *Zivotofsky v. Clinton*, 132

8    S.Ct. 1421, 1427-28 (2012).

9        Here, analysis of these factors does not support Defendants' position. There

10   is no "textually demonstrable constitutional commitment of the issue to a coordinate

11   political department," *Baker*, 658 F.3d at 217, because, as observed by this Court,

12   there are a host of cases in which courts have heard torture claims. *Salim I* at 1129-

13   30 (collecting cases). There is no lack of a "judicially discoverable and manageable

14   standard for resolving" ATS claims, because the law of nations provides the

15   standard. *See id.* at 1128. This case does not ask the Court to make a policy

16   determination or rely on a political decision; the Complaint plainly alleges that

17   Defendants' individual conduct exceeded the scope of their authority; the allegations

18   do not directly implicate a decision of the U.S. or the conduct of its agents.

19       Deciding this case would not put in question the judiciary's respect for the

20   other branches of government. To date, every branch has described Defendants' acts

1    as torture. *See, e.g. Report of the Senate Select Committee on Intelligence Study of*

2    *the Central Intelligence Agency's Detention and Interrogation Program*, S. Rep. No.

3    113-288, at 19, 33 (Dec. 9, 2014); *Zubaydah*, 595 U.S. at 200; Press Conference by

4    the President, Office of the Press Secretary, Aug. 1, 2014 ("[W]e tortured some

5    folks."). Unlike Defendants' inapposite caselaw addressing the executive's decision

6    to deploy troops and mine harbors during war (MTD 14), here the Court is not asked

7    to question the wisdom of the executive's military decisions, but the legality of the

8    conduct of two independent contractors who devised a torture plan and exceeded

9    their authority in executing that plan on Plaintiff.

10      *Baker* remains good law, and courts in the Ninth Circuit have applied it for 60

11    years. *E.g.*, *Center for Bio. Diversity v. Mattis*, 868 F.3d 803, 821-26 (9th Cir. 2007).

12    There is no reason to reach out for a different test. Moreover, as exemplified by all

13    of Defendants' cases, *Taylor* is inapposite as it concerns claims against military

14    contractors closely controlled by the military, not CIA contractors off on a cruel

15    detour of their own devising. No court has ever ruled that a CIA contractor is akin

16    to a military contractor, because the CIA is a civilian intelligence agency.

17    Defendants' invitation to adopt an out-of-circuit test and extend it to novel facts

18    should be rejected.

19      Defendants would fare no better under *Taylor*. Here, there was no military

20    control, *Taylor*, 658 F.3d at 411, and the CIA is not a stand-in for the military on

1    questions of national defense. Too, the Complaint alleges that Defendants exceeded

2    their authority, acting ***outside*** any government control. *See* Compl. ¶¶ 1, 4, 27-28,

3    33, 40-41, 51, 55-62, 65-72, 74-75, 78-90. This removes the possibility of

4    intertwinement between national defense decisions and Defendants' conduct.

5         While asking this Court to adopt a Fourth Circuit test, Defendants seek to

6    dodge how the Fourth Circuit applied that test in the context of an analogous ATS-

7    torture case. In *Al Shimari*, detainees at the Abu Ghraib prison in Iraq filed ATS

8    claims against the military contractors who deployed unauthorized interrogation

9    techniques. 840 F.3d at 152. Applying *Taylor*, the Fourth Circuit held there was no

10   political question because the conduct was unlawful. *Id*. at 156-58. "[W]hen a

11   contractor has engaged in unlawful conduct, irrespective of the nature of control

12   exercised by the military, the contractor cannot claim protection under the political

13   question doctrine." *Id*. at 157. Mitchell and Jessen unlawfully tortured Abu

14   Zubaydah and cannot escape the consequences of their conduct under the political

15   question doctrine. The result would be the same in the Fourth Circuit.

16                                    **<u>CONCLUSION</u>**

17        For the above reasons, this Court should deny Defendants' motion to dismiss.

18

Dated:        January 5, 2024

Respectfully submitted,

FINER WINN
By: /s/ Jeffry K. Finer
Jeffry K. Finer, Esq.
2850 East Rockhurst Lane, Suite 356
Spokane, WA 99223
(509) 981-8960


LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
By: /s/ Solomon B. Shinerock
Solomon B. Shinerock (*pro hac vice*)
10 Grand Central, 155 East 44th Street, 25th Floor
New York, New York 10017
(212) 826-7001

Eric L. Lewis (*pro hac vice*)
David Short (*pro hac vice*)
Alexander S. Bedrosyan (*pro hac vice*)
1050 K Street, NW
Suite 400
Washington, DC 20001

*Counsel for Plaintiff*

Plaintiff's Opposition to Motion to Dismiss
Page 41

1

## <u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that on January 5, 2024, I electronically filed the foregoing

3    with the Clerk of the Court using the CM/ECF System which will send notification

4    of such filing to the following:

5    James B. King, WSBA #8723. (jking@ecl-law.com)
6    Evans, Craven & Lackie, P.S.
7    818 W. Riverside Ave., Ste. 250
8    Spokane, WA 99201
9    (509)455-5200
10    (509)455-3632 facsimile
11
12    James Smith (*Pro Hac Vice*)
13    Brian Paszamant (*Pro Hac Vice*)
14    Ann Querns (*Pro Hac Vice*)
15    Blank Rome LLP
16    One Logan Square
17    130 North 18th Street
18    Philadelphia, PA 19103
19    Phone: (215) 569-5791
20
21    *Counsel for Defendants*
22
23
24
25    **LEWIS BAACH**
26    **KAUFMANN MIDDLEMISS PLLC**
27
28    By: /s/ Solomon B. Shinerock
29    Solomon B. Shinerock
30    10 Grand Central
31    155 East 44th Street, 25th Floor
32    New York, New York 10017
33    (212) 826-7001
34
35

Plaintiff's Opposition to Motion to Dismiss
Page 42