1

2

**EVANS, CRAVEN & LACKIE, P.S.**
James B. King, WSBA #8723
818 W. Riverside, Suite 250

3

Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

4

5

**BLANK ROME LLP**

6

James T. Smith (admitted *pro hac vice*)
Brian S. Paszamant (admitted *pro hac vice*)

7

Ann E. Querns (admitted *pro hac vice*)

8

One Logan Square, 130 N. 18th Street
Philadelphia, PA 19103

9

(215) 569-5500; fax (215) 832-5674

10

Attorneys for Defendants

11

James Mitchell and John "Bruce" Jessen

12

13

14

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

15

16

ZAYN AL-ABIDIN MUHAMMAD HUSAYN
also known as ABU ZUBAYDAH,

Case No.: 2:23-cv-00270

17

Plaintiff,

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FRCP 12(b)(1) AND 12(b)(6)**

18

v.

19

JAMES MITCHELL and JOHN "BRUCE"
JESSEN,

20

21

Defendants.

Hearing Date, February 15, 2024.

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page(s)**

I.  INTRODUCTION .................................................................. 1

II. THE MCA DIVESTS THE COURT OF JURISDICTION. .............................. 1

    A.  Plaintiff Misstates the Law of Agency ...................................... 1

    B.  Plaintiff Misstates the Facts He has Pled. ................................. 3

III. DEFENDANTS ARE ENTITLED TO IMMUNITY. ...................................... 5

    A.  Defendants are Entitled to *Yearsley* Immunity Because the
        Government's Authority to Interrogate "Enemy Combatants" was
        Validly Conferred to Defendants and Defendants Did Not Exceed
        the CIA's Instructions Regarding Plaintiff's Interrogation. ............... 5

    B.  Plaintiff Cannot Defeat Defendants' Right to *Filarsky* Immunity. ........... 8

IV. COLLATERAL ESTOPPEL CANNOT BE APPLIED HERE ........................ 10

    A.  Defendants Are Not Precluded From Arguing the MCA Applies. ........... 11

    B.  Defendants Are Not Precluded From Arguing Immunity Applies. ......... 13

V.  THE POLITICAL QUESTION DOCTRINE APPLIES TO CIA
    "CONTRACTORS." .............................................................. 14

VI. PLAINTIFF HAS NOT ALLEGED COGNIZABLE ATS CLAIMS .............. 17

    A.  State Acquiescence Is Insufficient Under the ATS .................................. 17

    B.  Finding Plaintiff Alleged Non-Consensual Medical
        Experimentation Would Greatly Expand Pfizer ...................................... 19

    C.  Defendants Are Not Liable For Plaintiff's Entire Detention ................... 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdullahi v. Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009) ................................................................... 19

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
  416 F.3d 1242 (11th Cir. 2005) .............................................................. 18

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) ............................................................ 7, 8

*Braswell v. Shoreline Fire Dep't*,
  No. C08-924-RSM, 2012 WL 1857858 (W.D. Wash. May 22, 2012) ............... 9

*Brosseau v. Haugen*,
  543 U.S. 194, (2004) ............................................................................. 6

*Brown v. DirecTV, LLC*,
  562 F. Supp. 3d 590 (C.D. Cal. 2021) ..................................................... 4

*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016) .......................................................................... 5, 7

*Chaser Shipping Corp. v. United States*,
  649 F. Supp. 736 (S.D.N.Y. 1986) ........................................................ 15

*Childs v. San Diego Family Hous. LLC*,
  22 F.4th 1092 (9th Cir. 2022) ......................................................... 7, 8, 13

*Cunningham v. Gen. Dynamics Info. Tech.*,
  888 F.3d 640 (4th Cir. 2018) .............................................................. 5, 6

*Doe I v. Unocal Corp.*,
  395 F.3d 932 (9th Cir. 2002) ................................................................ 18

*Filarsky v. Delia*,
  566 U.S. 377 (2012) ..................................................................... *passim*

*Ford v. Anderson Cty.*,
  No. 6:19-CV-384-JDK, 2022 WL 1424973 (E.D. Tex. May 5, 2022) ............. 10

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)................................................................................6

*Harbury v. Hayden*,
   522 F.3d 413 (D.C. Cir. 2008).............................................................15

*Hmong 2 v. United States*,
   799 Fed. App'x. 508 (9th Cir. 2020) ...................................................15

*Householder Grp., LLLP v. Van Mason*,
   No. CV 09-2370-PHX-MHM, 2010 WL 5093117 (D. Ariz. Dec. 8,
   2010) .....................................................................................................13

*In re: KBR, Inc.*,
   893 F. 3d 241 (4th Cir. 2018) ..............................................................16

*In re: KBR, Inc. Burn Pit Litigation*,
   744 F. 3d 326 (4th Cir. 2014) ...........................................................6, 7

*In re Oil Spill by the Oil Rig "Deepwater Horizon*
   No. MDL 2179, 2016 WL 614690 (E.D. La. Feb. 16, 2016)...........14

*In re Oil Spill by the Oil Rig "Deepwater Horizon,"*
   2016 U.S. Dist. LEXIS 101175 (E.D. La. Aug. 2, 2016)..................14

*Jensen v. Lane County*,
   222 F.3d 570 (9th Cir. 2000) .................................................................9

*Kadic v. Karadzic*,
   70 F.3d 232 (2d Cir. 1995) .............................................................17, 18

*Karki v. Holder*,
   715 F.3d 792 (10th Cir. 2013) .............................................................17

*Little v. Barreme*,
   6 U.S. (2 Cranch) 170 (1804) ................................................................7

*Littlejohn v. United States*,
   321 F.3d 915 (9th Cir. 2003) ...............................................................12

*Liu Bo Shan v. China Const. Bank Corp.*,
   421 Fed. App'x. 89 (2d Cir. 2011) ......................................................20

*Luben Indus., Inc. v. United States*,
   707 F.2d 1037 (9th Cir. 1983) .......................................................12, 13

*Ludwig v. Arizona by & through Brnovich*,
  790 Fed. App'x. 849 (9th Cir. 2019) ...................................................11

*Maciel v. Comm'r*,
  489 F.3d 1018 (9th Cir. 2007) .............................................................11

*Martinez v. City of Los Angeles*,
  141 F.3d 1373 (9th Cir. 1998) .............................................................20

*McAdory v. M.N.S. & Assocs., LLC*,
  No. 3:17-CV-00777-HZ, 2021 WL 2321634 (D. Or. June 7, 2021)....................4

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) (Stevens, J., concurring) ....................................10

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*,
  176 F.R.D. 329 (C.D. Cal. 1997)..........................................................18

*Padilla v. Yoo*,
  678 F.3d 748 (9th Cir. 2012) ..........................................................6, 16

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979)......................................................................11, 12

*Perniciaro v. Lea*,
  901 F.3d 241 (5th Cir. 2018) ............................................................8, 9

*Reyes-Reyes v. Ashcroft*,
  384 F.3d 782 (9th Cir. 2004) ..............................................................17

*Richardson v. McKnight*,
  521 U.S. 399 (1997).............................................................................9

*Saldana v. Occidental Petroleum Corp.*,
  774 F.3d 544 (9th Cir. 2014) ..............................................................17

*Salim v. Mitchell (Salim I or Salim)*
  183 F.Supp.3d 1121 (E.D. Wash. Apr. 28, 2016) ......................................*passim*

*Salim v. Mitchell (Salim II)*
  No. CV-15-0286-JLQ, 2017 WL 390270 (E.D. Wash. Jan. 27, 2017)........11, 12

*Salim v. Mitchell (Salim III)*
  268 F.Supp.3d 1132 (E.D. Wash. Aug. 7, 2017)................................14

*Schneider v. Cal. Dept. of Corrs.*,
  151 F.3d 1194 (9th Cir. 1998) ............................................................................20

*Sinaltrainal v. Coca-Cola Co.*,
  578 F.3d 1252 (11th Cir. 2009) .........................................................................17

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)............................................................................................19

*Syverson v. Int'l Bus. Machines Corp.*,
  472 F.3d 1072 (9th Cir. 2007) .....................................................................11, 12

*Thomas v. I.N.S.*,
  35 F.3d 1332 (9th Cir. 1994) ...............................................................................2

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)................................................................................................5

*Turkmen v. Hasty*,
  789 F.3d 218 (2d Cir. 2015) ..............................................................................10

*United States v. Zubaydah (1782 Litigation)*,
  595 U.S. 195 (2022)................................................................................4, 12, 13

*Williams v. PillPack LLC*,
  644 F. Supp. 3d 845 (W.D. Wash. 2022) .............................................................4

*Yearsley v. W.A. Ross Constr. Co.*,
  309 U.S. 18 (1940).......................................................................................*passim*

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017)............................................................................................10

**Statutes**

42 U.S.C. § 1983........................................................................................13, 18, 19

Alien Tort Act .............................................................................................................17

Clean Water Act..........................................................................................................14

Torture Victim Protection Act .................................................................................17

**Other Authorities**

152 Cong. Rec. H7 (Sept. 29, 2006) (statement of Rep. Sensenbrenner) .................5

RESTATEMENT (THIRD) OF AGENCY ...................................................................... 1, 2, 3

U.S. CONST. art II, § 2, cl. 1 ................................................................................. 16

## I.    INTRODUCTION

When the law is applied to the facts alleged, Plaintiff's claims fail for all the reasons detailed in Defendants' Motion to Dismiss. Seeking to avoid this outcome, Plaintiff goes to great lengths to mischaracterize both the facts and the applicable law. Plaintiff consistently misstates the law by relying on inapplicable authority—proclaiming definitive legal conclusions absent support, and distorting the governing authority cited by Defendants. He similarly misstates the facts pled—endeavoring to paint a false picture in which Plaintiff had no Al Qaeda involvement (despite his having detailed information about imminent attacks and identifying Mokhtar), and in which Defendants were rogue actors interrogating Plaintiff with little CIA involvement (despite the CIA observing and controlling the entire process from the next room, including when Defendants could stop interrogation).

Plaintiff deploys this deception because his Complaint fails. The ATS claims require Plaintiff to allege that Defendants acted under color of law, but the MCA divests the Court of jurisdiction if Defendants were agents of the U.S. Thus, Plaintiff tries to create a space between (i) ATS jurisdiction and (ii) MCA applicability, by misrepresenting ATS and agency law, as well as the relationship between Defendants and the CIA. No such space exists, and Plaintiff's claims should thus be dismissed under the MCA. Moreover, even if the MCA was found inapplicable, derivative sovereign immunity and the political question doctrine mandate the dismissal of this action nonetheless.

## II.   THE MCA DIVESTS THE COURT OF JURISDICTION.

Plaintiff admits if Defendants were "agents" of the Government, the MCA strips this Court of jurisdiction. Opp'n 7. Despite this concession, Plaintiff wrongly concludes that Defendants do not qualify as agents based on numerous legal/factual misstatements.

### A.    Plaintiff Misstates the Law of Agency.

For a principal-agency relationship to exist, an agent need *not* have the power to bind the principal in contracts. RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (2006)

1    ("Agents who lack authority to bind their principals to contracts nevertheless often have

2    authority to negotiate or to transmit or receive information on their behalf."). And the

3    lone case Plaintiff cites to claim Defendants could not be agents unless they could

4    "bind" the Government is off point. At issue in *Thomas v. I.N.S.*, was whether a U.S.

5    Attorney had actual authority to enter a contract that bound the Immigration and

6    Naturalization Services. 35 F.3d 1332, 1338 (9th Cir. 1994). But *Thomas* only analyzed

7    whether, as a government agent, there was actual authority to make a plea deal—*not*

8    whether an agency relationship existed. Defendants do not claim authority to offer plea

9    agreements or contract on behalf of the Government, thus rendering *Thomas* irrelevant.

10    Plaintiff also misstates the Restatement's guidance that an agent acts on "behalf

11    of another person with *power to affect the legal rights and duties of the other person*."

12    Opp'n 7 (emphasis in original). This does *not* mean an agent must be able to bind a

13    principal to create an agency relationship. Rather, it addresses only whether the person

14    can actually take the action at issue. RESTATEMENT § 3.05 cmt b ("An agent's power to

15    affect the principal's legal relations is usually limited only by the agent's ability to take

16    action."). For instance, representing a person as a lawyer requires the representative be

17    a lawyer. *Id.* It is then the scope of the agent's actual (or apparent) authority that defines

18    the extent the agent can impact the legal relations of another. *Id.* (explaining one who

19    acts with apparent authority has "power to affect the legal relations of another person

20    even though actual authority" is lacking). Thus, Plaintiff's purposeful confusion of the

21    elements of an agency relationship to suggest none exists here must be rejected. The

22    Restatement clearly explains, "[i]f the principal requests another to act on the principal's

23    behalf, indicating that the action should be taken without further communication and

24    the other consents so to act, an agency relationship exists." *Id.* § 1.01 cmt c.

25    Next, Plaintiff overstates the importance of the term "independent contractor"

26    used in Defendants' contracts. The Restatement and interpretive caselaw is unequivocal

27    that a party labeled "independent contractor" *can still be an agent*. Mot. 9. The existence

28    of an agency relationship is determined through an "assessment of the facts of the

1    relationship and not based on how the parties define their relationship." RESTATEMENT

2    § 1.02. Thus, Plaintiff's supposition notwithstanding, *see* Opp'n 7, the MCA need not

3    use the term "contractor" to apply to Defendants—agents as the Complaint establishes.[1]

4        **B.    Plaintiff Misstates the Facts He has Pled.**

5        Contrary to Plaintiff's assertion, his Complaint plainly alleges Defendants were

6    Government agents. Plaintiff claims after the CIA took over his interrogation,

7    Defendants interrogated him at a top-secret CIA black site, applying top-secret

8    interrogation techniques which were approved by the DOJ's highest levels, while the

9    CIA observed and provided direction. Compl. ¶¶57-58, 76-80, 82, 85. And Plaintiff

10   admits this occurred when the CIA was "under immense pressure to produce actionable

11   intelligence" after the September 11 intelligence failures and while the Vice President

12   urging the CIA to "use any means at our disposal." *Id.* ¶¶4, 30. Given these allegations,

13   how could Defendants not have been agents of the U.S.? Indeed, absent agency how

14   would Defendants have gained access to a top-secret CIA black site, the location of

15   which the Supreme Court ruled Defendants cannot disclose because it would harm

16   foreign relations? To distract from the facts pled, Plaintiff claims Defendants must be

17   "authorized representatives of the U.S.," or have "the power to bind the U.S."—but cites

18   *no* supportive authority (or even define his chosen phrases). Opp'n 11. In any event, as

19   explained above, no such finding is necessary to establish agency.

20       The Complaint also alleges far more than some "very limited and irrelevant [CIA]

21   direction over" Defendants. Opp'n 11; *see* Compl. ¶¶62, 79, 80, 82, 85. Deploying

22   revisionist history, Plaintiff now claims Defendants were rogue actors. This is displayed

23

24   [1] Plaintiff faults Defendants for not placing their contracts before the Court. Plaintiff

25   misunderstands Defendants' position. *The Complaint alone* establishes Defendant's

26   agency relationship. Thus, no further evidence—including Defendants' contracts—is

27   needed to show the MCA's applicability. Should the Court disagree, Defendants request

28   limited jurisdictional discovery so this threshold issue can be quickly resolved.

DEFENDANTS' MOTION TO DISMISS
Page 3

by his attempt to rebuff Justice Gorsuch's dissent as only "ascrib[ing] some level of responsibility to the CIA," Opp'n 21, even though Justice Gorsuch detailed how Defendants acted on the CIA's behalf, and at its direction, when Defendants sought to end Plaintiff's interrogation—but the CIA overrode them. *1782 Litigation*, 595 U.S. 195, 238 (2022) (Gorsuch, J., dissenting). The Complaint also alleges Defendants were acting with at least "apparent (though not bona fide) authority," Compl. ¶117, which cannot exist but-for an agency relationship. And this is consistent with Plaintiff's admission that Defendants' actions were ascribed to the Government. Opp'n 39 (quoting Press Conference by President Obama in which he stated "[W]e tortured some folks."); *1782 Litigation*, 595 U.S. 238 (Gorsuch, J, dissenting) (noting Plaintiff sought information about his interrogation "at the hands of the CIA"). The Complaint's allegations provide the very evidence Plaintiff claims is absent. *See* Opp'n 8-9.

Regardless of any superficial label, Defendants were acting as agents of the CIA when they interrogated Plaintiff. Defendants cited three cases identifying that finding an agency relationship here aligns with rulings across the Ninth Circuit—all of which post-date *Salim.* Mot. 10. Plaintiff attempts to distinguish this authority as involving non-governmental independent contractors, even though Plaintiff admits the common-law applied in those cases controls the agency analysis here. Opp'n 7. Plaintiff also claims the authority is distinguishable because it addresses vicarious liability and apparent authority, "not actual agency." Opp'n 11-12. This is illogical and wrong. Before apparent authority can be analyzed, an agency relationship must be found. This is why the cited cases address, in detail, how agency existed despite the parties being labeled independent contractors, then proceeded to address the grant of authority. *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 609-10 (C.D. Cal. 2021); *Williams v. PillPack LLC*, 644 F. Supp. 3d 845, 852-54 (W.D. Wash. 2022); *McAdory v. M.N.S. & Assocs., LLC*, No. 3:17-CV-00777-HZ, 2021 WL 2321634, at *8-9 (D. Or. June 7, 2021). Notably, in assessing whether an agency relationship existed, *none* of the cases use the term "bind," let alone analyze Plaintiff's other manufactured agency

1  requirements. In sum, Plaintiff fails to distinguish this authority and agency should be

2  found to exist here, just as it was found to exist in those cases. The MCA divests the

3  Court of jurisdiction.[2]

4  **III.  DEFENDANTS ARE ENTITLED TO IMMUNITY.**

5      The Opposition grossly mischaracterizes Defendants' immunity arguments and

6  fails to rebut the applicability of derivative sovereign immunity to this matter.

7          **A.    Defendants are Entitled to *Yearsley* Immunity Because the**
8              **Government's Authority to Interrogate "Enemy Combatants" was**
              **Validly Conferred to Defendants and Defendants Did Not Exceed the**
9              **CIA's Instructions Regarding Plaintiff's Interrogation.**

10      Plaintiff acknowledges, Opp'n 14, the first test for *Yearsley v. W.A. Ross Constr.*

11  *Co.*, 309 U.S. 18 (1940), immunity is whether the "authority" delegated to the contractor

12  was "validly conferred,"—*i.e.*, the government "acted within its constitutional power."

13  *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016); *see also Cunningham v.*

14  *Gen. Dynamics Info. Tech.*, 888 F.3d 640, 643 (4th Cir. 2018). But Plaintiff cannot show

15  any lack of validly delegated authority from the Government to Defendants here.

16      Plaintiff cannot impugn Congress's authority to delegate national security

17  matters to the executive branch. Nor can he challenge the executive branch's

18  prerogative to then assign contractors to complete tasks flowing therefrom. Mot. 25. So

19  he instead criticizes the OLC's supposed "circular logic" in approving the use of the

20

21  [2] Finally, it is worth noting the MCA's legislative history demonstrates it was intended

22  to be "a protection bill for the interrogators." 152 Cong. Rec. H7, 947-48 (Sept. 29,

23  2006) (statement of Rep. Sensenbrenner). Yet, Plaintiff argues the MCA cannot apply

24  because Defendants' contracts label them independent contractors. This argument

25  effectively reads the term "agent" out of the MCA's Section 2241(e)(2). Simply put, to

26  whom would that term apply if not Defendants, the individuals the CIA tasked with

27  interrogating Plaintiff? It is axiomatic that statutes, including the MCA, should not be

28  construed to render words superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

1  interrogation techniques on suspected terrorists and cites a former OLC lawyer's

2  testimony *from eight years later* to backstop his position. Opp'n 15. This, however,

3  does not alter that, *at the pertinent time (2001-03)*, there was "considerable debate" over

4  whether *applying these very techniques* constituted "torture." Mot. 34 (citing *Brosseau*

5  *v. Haugen*, 543 U.S. 194, 198 (2004) (immunity doctrines "judged against the backdrop

6  of the law at the time of the conduct")). And because Defendants' conduct was *not*

7  decidedly "torture" in mid-2002, it cannot be said that the government did not "act[]

8  within its constitutional power" when tasking Defendants with interrogating suspected

9  terrorists using these techniques. *Padilla v. Yoo*, 678 F.3d 748, 768 (9th Cir. 2012)

10  ("[A]lthough we hold that the unconstitutionality of torturing an American citizen was

11  beyond debate *in 2001-03*, *it was not clearly established at that time that the treatment*

12  *Padilla alleges he was subjected to amounted to <u>torture</u>*.") (emphasis added).[3] This is

13  especially true for "enemy combatants"—like Plaintiff. *Id.* at 761 ("Even [in 2004], it

14  remain[ed] murky whether an enemy combatant detainee may be subjected to …

15  methods of interrogation that would be unconstitutional if applied in the ordinary prison

16  and criminal settings.") (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 533-35 (2004)).

17       Plaintiff also erroneously conflates the distinct concepts of a contractor's

18  "authority to act" under government instruction with an act's "legality." Opp'n 14; *see*

19  Mot. 26 & n.5 (citing *Cunningham*, 888 F.3d at 648 ("The question is not whether [the

20  conduct] violated the law, but rather whether Congress had the authority to assign [the

21  contractor] to complete that task.")). Appellate courts have rejected the claim that "the

22  government cannot 'validly confer' the authority to engage in conduct that violates the

23  law"—calling it a "misinterpretation" of *Yearsley*, and an "overinclusive interpretation

24  of what constitutes a 'valid conferral' of authority." *Cunningham*, 888 F.3d 648-49

25  (citing *Yearsley*, 309 U.S. at 20; *In re KBR Inc., Burn Pit Litigation*, 744 F.3d 326, 342,

---

[3] Plaintiff does not explain why Defendants could be liable for the same treatment for which Yoo was found to be immune. Mot. 19-20.

1    344 n.7 (4th Cir. 2014)). And if Plaintiff believes the alleged "acts of torture and abuse

2    … would be illegal for government employees," Opp'n 15, why has he not sued these

3    employees?

4        As to the second *Yearsley* test, Plaintiff does not plausibly allege Defendants took

5    any action that "exceeded" the CIA's instructions.[4] Mot. 27-28. At best, Plaintiff merely

6    asserts Defendants "misled" officials about the proposed "tactics," Opp'n 16, and that

7    his treatment "crossed legal limits." *Id.* Noticeably absent, however, is an allegation

8    *Defendants did anything other than what the CIA instructed*. This is fatal. *Campbell-*

9    *Ewald*, 577 U.S. at 166 (contractor loses "derivative immunity" only when it "violates

10   *both* federal law *and* the Government's explicit instructions") (emphasis added); *Ali v.*

11   *Rumsfeld*, 649 F.3d 762, 770, 774-78 (D.C. Cir. 2011) (affirming dismissal of ATS

12   claim for "arbitrary detention, torture, and cruel, inhuman or degrading treatment"

13   where government officials and employees were "acting within the scope of their

14   employment"). Nothing in the Complaint (or elsewhere) supports Plaintiff's bare

15   assertion that Defendants—contractors working alongside the CIA—somehow

16   "retain[ed] full operational control over each day's interrogation." Opp'n 16. In fact,

17   Plaintiff's allegations undercut any such notion. *See* Compl. ¶85 (Defendants were

18   required to send "CIA Headquarters a . . . summary of the day's interrogation, and

19   maintained data records concerning the techniques used"); *id.* ¶¶58, 95, 97 (CIA

20   unilaterally decided which black site(s) to send Plaintiff, including sites where

21   Defendants were not located).

22       Finally, Plaintiff's reliance on *Childs v. San Diego Family Hous. LLC*, 22 F.4th

23   1092 (9th Cir. 2022), as "confirm[ing]" the supposed "no discretion" limiter for

24

---

25   [4] The Ninth Circuit has recognized that the proper inquiry under *Yearsley* is whether a

26   contractor performed per its contractual terms. Mot. 24. Plaintiff's reliance on *Little v.*

27   *Barreme*, 6 U.S. (2 Cranch) 170, 179 (1804), Opp'n 15—decided 136 years *before*

28   *Yearsley*, and that did *not* involve a private contractor—is thus misplaced.

DEFENDANTS' MOTION TO DISMISS
Page 7

1  *Yearsley* immunity is unfounded. Opp'n at 16. For one, *Childs* only addressed whether

2  the court had appellate jurisdiction over the denial of a derivative sovereign immunity

3  defense. 22 F.4th at 1098 (holding it did not). Anything else is *dicta*. Regardless, *Childs*

4  noted the same distinction as Defendants, Mot. 28-30, between the "government

5  contractor defense" under *Boyle* (which considers discretion) and "derivative sovereign

6  immunity" under *Yearsley* (which, when properly interpreted, does not).[5] *Childs* further

7  opined how the "public interest" underlying *Yearsley* is to extend sovereign immunity

8  to agents "carrying out the . . . government's directions," as is the case here. *Id.* at 1097.

9      **B.    Plaintiff Cannot Defeat Defendants' Right to *Filarsky* Immunity.**

10     Immunity under *Filarsky v. Delia*, protects government contractors—like

11  Defendants—from "facing full liability for actions taken in conjunction with

12  government employees who enjoy immunity for the same activity." 566 U.S. 377, 391

13  (2012). It is undisputed that Defendants and particular CIA employees all engaged in

14  the "same activity" with respect to Plaintiff's treatment and interrogation. Mot. 30-31;

15  *Ali v. Rumsfeld*, 649 F.3d at 774-78. Plaintiff does not argue to the contrary.

16     Instead, Plaintiff argues two of *Filarsky*'s four elements are absent. Opp'n 16-17.

17  Specifically, Plaintiff claims *Filarsky* immunity is only available to contractors

18  "performing governmental functions that traditionally enjoyed qualified immunity, if

19  [they] did not violate clearly established rights in order to avoid unwarranted timidity."

20  *Id.* 17. Defendants easily satisfy both considerations, entitling them to immunity.

21     First, Defendants have explained how "general principles of immunity at

22  common law" in 1871 permitted private psychologists to assert qualified immunity

23  where, as here, they "work[ed] in a public institution … alongside government

24  employees [and] their public counterparts would be entitled to assert qualified

25  immunity." Mot. 32-33 (citing *Perniciaro v. Lea*, 901 F.3d 241, 252 (5th Cir. 2018)).

26

27  _____

   [5] *Childs*, 22 F.4th at 1097 n.3 (observing how both doctrines "derived from *Yearsley*"

28  before the Supreme Court "expanded" the government contractor defense in *Boyle*).

1    Plaintiff's retort is to claim *Perniciaro* represents a "split" from cases like *Jensen v.*
2    *Lane County*, 222 F.3d 570 (9th Cir. 2000). Opp'n 17. Not so. *Perniciaro* correctly
3    criticized *Jensen*: (i) for its overly narrow reading of the need for historical immunity
4    at common law; and (ii) because *Jensen* was decided *12 years* before *Filarsky*. Mot. 33
5    n.8. If *Jensen* had *Filarsky*'s guidance, the outcome would have been different. Indeed,
6    *Jensen* relied heavily on *Richardson v. McKnight*, 521 U.S. 399 (1997), which *Filarsky*
7    clarified "was not meant to foreclose all claims of immunity by private individuals,"
8    and that the "particular circumstances of [*Richardson*]—'a private firm, systematically
9    organized to assume a major lengthy administrative task (managing an institution) with
10   limited direct supervision by the government, undertak[ing] that task for profit and
11   potentially in competition with other firms'—combined sufficiently to mitigate the
12   concerns underlying recognition of governmental immunity[.]" 566 U.S. at 393. As in
13   *Filarsky*, and unlike *Richardson*, "[n]othing of the sort is involved here[.]" *Id.* Thus,
14   *Jensen*—which described *Richardson*'s rationale as "instructive," and opined "[*Jensen*]
15   is similar to *Richardson* in many respects"—is readily distinguishable. 222 F.3d at 578.

16   Regardless, courts in the Ninth Circuit have also distinguished *Jensen* where, as
17   here, the "privatization and market forces arguments that the Ninth Circuit found
18   persuasive in *Jensen* and the Supreme Court relied upon in *Richardson* play little to no
19   role." *Braswell v. Shoreline Fire Dep't*, No. C08-924-RSM, 2012 WL 1857858, at *6
20   (W.D. Wash. May 22, 2012). Here, Plaintiff concedes the CIA recruited and retained
21   Defendants—who were the "only candidate[s] considered" that the CIA "thought to be
22   knowledgeable[.]" Compl. ¶¶ 49-50; *cf. Jensen*, 222 F.3d at 578 (observing "concerns
23   about [contractor] timidity are moderated by the likelihood [defendant's] failure to
24   adequately complete the … duties for which it has contracted will lead to its
25   replacement by competitors.").[6] Indeed, the case for immunity is actually heightened

26

27   ─────────────────
     [6] That Defendants were compensated for their specialized services—for which the CIA
28   sought them out, Compl. ¶¶ 49-53—does not change the immunity analysis. Mot. 33

1   where, as here, the "specialized" work concerns perilous matters of "national security."

2   *Mitchell v. Forsyth*, 472 U.S. 511, 541-42 (1985) (Stevens, J., concurring) ("Persons of

3   wisdom and honor will hesitate to answer the President's call to serve … if they fear

4   that vexatious and politically motivated litigation … will squander their time and

5   reputation[.]"); *Turkmen v. Hasty*, 789 F.3d 218, 281 (2d Cir. 2015) (Raggi, J.,

6   dissenting) ("It is difficult to imagine a public good more demanding of decisiveness or

7   more tolerant of reasonable, even if mistaken, judgments than the protection of this

8   nation and its people from further terrorist attacks in the immediate aftermath of the

9   horrific events of 9/11"), *reversed in part and vacated and remanded in part sub nom.*

10  *Ziglar v. Abbasi*, 582 U.S. 120, 152-56 (2017) (officials and wardens held immune to

11  civil conspiracy claims by alien detainees challenging confinement conditions imposed

12  after 9/11). Denying immunity here fosters the "timidity" *Filarsky* strived to prevent.

13          Second, as noted above, Defendants did not "violate well-established

14  prohibitions" against "torture" in 2001-03 by applying the DOJ-approved interrogation

15  techniques to Plaintiff—an "enemy combatant." *See* Sec. III.A. Finally, Plaintiff has no

16  response to Defendants' cited authority holding that contractors are entitled to immunity

17  where, as here, they "direct[ly]" contracted with the government and/or acted under its

18  "close official supervision." Mot. 34. This too is a sufficient basis to grant immunity.

19  **IV.    COLLATERAL ESTOPPEL CANNOT BE APPLIED HERE.**

20          Plaintiff, attempting to patch his arguments' fatal flaws, claims Defendants are

21  estopped from arguing the Court lacks jurisdiction under the MCA or that Defendants

22  are entitled to immunity, because the *Salim* court issued interim rulings when faced with

23  *Salim*'s facts. Opp'n 18-22. Not so. Offensive nonmutual issue preclusion is

24  discretionary, and "appropriate only if (1) there was a full and fair opportunity to litigate

25  the *identical* issue in the prior action; (2) the issue was actually litigated in the prior

26

27  ――――――――――――――

28  (citing *Ford v. Anderson Cty.*, No. 6:19-CV-384-JDK, 2022 WL 1424973, at *17 (E.D.
    Tex. May 5, 2022) (private physician paid $1,500/month held to be immune)).

action; (3) the issue was decided in a final judgment; and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action." *Syverson v. Int'l Bus. Machines Corp*., 472 F.3d 1072, 1078 (9th Cir. 2007) (internal citations omitted) (emphasis added). Plaintiff cannot establish these elements.

### A. Defendants Are Not Precluded From Arguing the MCA Applies.

*Salim* declined to apply the MCA because those detainee-plaintiffs were not properly determined to be "enemy combatants," and because Defendants had not established they were agents "based on the record submitted." *Salim II*, 2017 WL 390270, at *4-7. That ruling has no preclusive effect. First, Defendants did *not* have a "full and fair opportunity" to litigate the "identical issue." Specifically, while Plaintiff claims *Salim* engaged in a substantive analysis concerning Defendants' agent status, *see* Opp'n 20, *Salim denied* Defendants' request for an evidentiary hearing to address agency. 2017 WL 390270, at *7. This renders the *Salim II* ruling inappropriate for offensive nonmutual collateral estoppel: "If procedural opportunities unavailable in the first action could readily cause a different result in the second action, then the results of the first action generally should not be given preclusive effect." *Maciel v. Comm'r*, 489 F.3d 1018, 1023 (9th Cir. 2007) (internal quotations omitted); *cf. Ludwig v. Arizona by & through Brnovich*, 790 Fed. App'x. 849, 852 (9th Cir. 2019) (holding party had "full and fair opportunity" to litigate issue following a two-day evidentiary hearing).

The *Salim* court presumably refused to hold an evidentiary hearing because its ruling on agency was not outcome determinative: even if Defendants were found to be agents, the MCA was inapplicable because the *Salim* plaintiffs were not enemy combatants. Conversely, here, Plaintiff is an "enemy combatant"—rendering the present issue "not identical." *Syverson*, 472 F.3d at 1081 (issues not sufficiently identical where prior ruling did not end with the issue at hand, but also included facts specific to prior case). Further, for application of issue preclusion, "the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier

1   action." *Littlejohn v. United States*, 321 F.3d 915, 923 (9th Cir. 2003). Because agency
2   was unnecessary to the *Salim II* ruling, it cannot be used offensively.

3   Additionally, the *Salim II* ruling was not a "final judgment" on this issue. The
4   *Salim* court clarified its agency ruling was limited by "the record submitted," and did
5   not foreclose the possibility that a more fulsome record would establish agency (despite
6   stymying Defendants' ability to develop such a record). *Salim II*, 2017 WL 390270, at
7   *7. Such a tentative ruling is not "sufficiently firm" to be accorded conclusive effect.
8   *See Luben Indus., Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983). Thus,
9   Defendants are not estopped from invoking the MCA. And even if all four elements had
10  been met, courts should "take potential shortcomings or indices of unfairness into
11  account when considering whether to apply offensive nonmutual issue preclusion."
12  *Syverson*, 472 F.3d at 1078 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331
13  (1979)). It would be particularly unfair to apply collateral estoppel when Defendants
14  were previously denied the chance to develop such evidence.

15  Plaintiff, hoping to rehabilitate his infirm collateral estoppel argument, curiously
16  argues the *1782 Litigation* supports precluding Defendants from invoking the MCA
17  because Defendants appealed other issues in that litigation, but not the finding the MCA
18  was inapplicable. Opp'n 21. This argument is misdirected. *Defendants appealed no*
19  *issues* in the *1782 Litigation* and, critically, *were not even active participants*. 595 U.S.
20  at 197. The U.S. intervened early in *1782 Litigation* via a motion to quash—asserting
21  the MCA divested the court of jurisdiction, and that the states secret privilege applied
22  because if Defendants were to divulge the location of the CIA black sites, it would harm
23  national security interests. *Id.* at 203. The district court granted the U.S.' motion—so
24  there was no need to appeal—as the U.S. obtained the relief sought. *Id.* It was Plaintiff
25  who appealed to the Ninth Circuit, which reversed the application of the state secret
26  privilege. *Id.* In response, the U.S. appealed to the Supreme Court, where the privilege
27  was found to apply, and the subpoena remained quashed. *Id.* at 207.

28

1    Ironically, Plaintiff now faults Defendants for not appealing the district court's
2    ruling that *granted* the U.S.' motion because that ruling also made a superficial finding
3    that the MCA was inapplicable because no additional evidence had been presented on
4    the issue of agency. Plaintiff, petitioner in the *1782 Litigation*, knows Defendants
5    played no part in those appeals, and, therefore, do not afford him the desired preclusive
6    effect. The Court should address Defendants' argument that the MCA applies on the
7    Complaint before it and allow jurisdictional discovery to give Defendants the
8    opportunity to fully and fairly litigate the issue in the event the MCA's dispositive
9    impact is not clear on the Complaint's face—an opportunity they were denied in *Salim*.

10    **B.    Defendants Are Not Precluded From Arguing Immunity Applies.**

11    Plaintiff similarly claims Defendants are precluded from advancing their
12    entitlement to derivative sovereign immunity because *Salim* already ruled on this issue.
13    Opp'n 18-20. Plaintiff is again incorrect. The rulings addressing Defendants' claimed
14    immunity were *not* final judgments. "[A] district court order denying a claim of
15    derivative sovereign immunity is not immediately appealable under the collateral order
16    doctrine." *Childs*, 22 F.4th at 1094. Thus, had Defendants sought to appeal the *Salim*
17    rulings, their appeal would have been dismissed for lack of jurisdiction. *Id.* Plaintiff
18    instead tries to delude the Court, broadly claiming "*qualified* immunity" rulings are
19    immediately appealable. Opp'n 20 (emphasis added). But derivative sovereign
20    immunity under *Yearsley* (and even *Filarsky*) is a distinct legal doctrine from traditional
21    "qualified immunity" under 42 U.S.C. § 1983. That *Salim*'s rulings were not appealable
22    weighs heavily against their finality for preclusion purposes. *See Luben*, 707 F.2d at
23    1040; *Householder Grp., LLLP v. Van Mason*, No. CV 09-2370-PHX-MHM, 2010 WL
24    5093117, at *3 n.2 (D. Ariz. Dec. 8, 2010) (observing appealability is of "paramount
25    importance" for estoppel).

26    Collateral estoppel is also inapplicable because Defendants did *not* have a "full
27    and fair opportunity" to litigate an "identical issue" in *Salim*. While *Salim* mentions
28    Plaintiff's early treatment as a precursor to the three specific detainee-plaintiffs in that

1   case, the court did *not* decide Defendants' entitlement to immunity *as to Plaintiff*. At

2   both the motion to dismiss and summary judgment phases, the court observed an

3   "inquiry [was] required into whether the contractor 'exceeded his authority,' or whether

4   the government authority 'was not validly conferred'" in the context of the *Salim*

5   plaintiffs. *Salim I*, 183 F. Supp. 3d at 1130; *Salim III*, 268 F. Supp. 3d at 1148. And at

6   summary judgment, the focus was whether "Defendants, being on site, exercised

7   significant control *during individual interrogations*." *Salim III*, 268 F. Supp. 3d at 1150

8   (emphasis added). Thus, *Salim* recognized that the context of the *individual* detainee's

9   treatment properly determines whether a contractor "exceeded his authority." And no

10  such ruling occurred as to Plaintiff. To that end, courts have also made independent

11  immunity determinations with respect to *different contractors* working on the same

12  project, and under the same delegated authority. *See In re Oil Spill by the Oil Rig*

13  *"Deepwater Horizon* No. MDL 2179, 2016 WL 614690, at \*10 (E.D. La. Feb. 16, 2016)

14  (private contractors who operated under the valid conferral of government authority

15  from the Clean Water Act in connection with the Deepwater Horizon disaster, and who

16  followed government instructions, held immune); *In re Oil Spill by the Oil Rig*

17  *"Deepwater Horizon*,*"* 2016 U.S. Dist. LEXIS 101175, at \*36 (E.D. La. Aug. 2, 2016)

18  (additional contractors immune). Because *Salim* did not specifically assess Plaintiff's

19  interrogation, it is improper to apply issue preclusion with respect to immunity here.[7]

20  **V.    THE POLITICAL QUESTION DOCTRINE APPLIES TO CIA**
    **"CONTRACTORS."**

21          Contrary to Plaintiff's suggestion, Defendants do *not* "tacitly concede" their

22  political question doctrine argument falters under the *Baker* standard. Opp'n 37-38.

23  Moreover, Plaintiff misunderstands that the *Taylor* test does not supplant the *Baker*

24  factors; rather, it *focuses and distills* the *Baker* factors to apply to the modern world in

25  which contractors are increasingly used to support and accomplish executive branch

26

27  ───────────────

28  [7] Should this case proceed to discovery, discretion-based discovery would be different
    than in *Salim*, further establishing this is *not* an identical issue previously considered.

DEFENDANTS' MOTION TO DISMISS
Page 14

1  functions—the exact issue *Taylor* presents. Defendants suggest usage of the *Taylor* test

2  because it is most on point. But the outcome is the same under either test.

3        That Plaintiff insinuates the CIA is somehow outside the government because it

4  is a "civilian intelligence agency" defies logic and a basic understanding of our nation's

5  structure. Opp'n 39. And Plaintiff cites *nothing* to support his bare supposition the CIA

6  (or a CIA contractor) should be treated differently than the military (or a military

7  contractor). This manufactured distinction is especially baseless considering the CIA

8  was making decisions similar to its military counterparts in response to the 9/11 attacks.

9  Indeed, Plaintiff acknowledges the CIA was taking actions in defense of the country—

10  as instructed by the Vice President. Compl. ¶30.

11        Further, the CIA and its contractors do not fall outside of the scope of the political

12  question doctrine simply because the CIA is not part of the "military," as defined by

13  Plaintiff again without support. Opp'n 39-40. In fact, the political question doctrine has

14  been applied to CIA decisions innumerous times. *See e.g.*, *Hmong 2 v. United States*,

15  799 Fed. App'x. 508, 509 (9th Cir. 2020) (suit against CIA and U.S. nonjusticiable

16  because decision to grant aid to foreign military group was a political decision entangled

17  with conduct of foreign relations); *Harbury v. Hayden*, 522 F.3d 413, 420 (D.C. Cir.

18  2008) (common law tort claims arising from CIA's alleged torture and killing of the

19  plaintiff's husband in Guatemala in the early 1990's presented a political question);

20  *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736, 737 (S.D.N.Y. 1986) (suit

21  where plaintiff claimed CIA negligently placed land mines in Nicaraguan harbor that

22  damaged plaintiff's ships found nonjusticiable). Plaintiff's claimed distinction is

23  baseless.

24        Plaintiff's analysis of the *Taylor* test is similarly flawed. Plaintiff relies

25  exclusively on conclusory statements that "there was no military control," and

26  "Defendants exceed their authority," to support his argument there could be no

27  "intertwinement between national defense decisions and Defendants conduct." Opp'n

28  39-40. But, the record does not support these statements and does not rebut Defendants'

1  detailed analysis. Mot. 14-18. Critically, Plaintiff alleges a "CIA takeover" of Plaintiff's
2  interrogation, with Defendants' use of enhanced interrogation techniques undertaken at
3  the request of, and pursuant to, the direct supervision of the CIA and only after DOJ
4  approval. Compl. ¶¶16, 32, 33, 41, 49, 57, 70, 73, 76, 77, 85, 140. The application of
5  those techniques was inextricably intertwined with the CIA's actions and judgements
6  in response to the Al Qaeda threat. *Id*. Plaintiff's newly-manufactured conclusory
7  statements cast no doubt on either prong of *Taylor*'s test. *In re: KBR, Inc*., 893 F. 3d
8  241, 259-60 (4th Cir. 2018); *Taylor*, 658 F.3d at 411.

9      Next, Plaintiff is incorrect that *Salim* and *Al-Shimari* control the outcome. Opp'n
10  37, 40. As Defendants' detailed, the *Taylor* test has garnered additional support since
11  *Salim* was decided, and the cases relied upon in *Salim* simply do not support that
12  Plaintiff's interrogation by Defendants is justiciable. Mot. 23. And the stark
13  dissimilarities between the conduct at issue in *Al-Shimari* and the instant conduct
14  renders inapt any unlawfulness conclusion sough to be derived therefrom. Mot. 21-22.

15      Finally, even if the Court is inclined to utilize the *Baker* factors in their raw form
16  to analyze the presence of a political question, such a question clearly exists. A textually
17  demonstrable commitment to the executive and legislative Branches over decisions
18  involving war and foreign policy is undeniable. *See* U.S. CONST. art II, § 2, cl. 1; art. I,
19  § 1, cls. 12-14; art. II, § 2. And because the Ninth Circuit has determined there was no
20  clearly recognized definition of "torture" during the period in which Defendants'
21  alleged conduct took place, neither can there be judicially manageable standards. *Yoo*,
22  678 F.3d at 764. It is also undebatable that the interrogation techniques' application was
23  inherently entangled with political decisions because those judgments were themselves
24  inextricably intertwined with the CIA's actions and determinations in response to the
25  Al Qaeda threat. Compl. ¶¶16, 32, 33, 41, 49, 57, 70, 73, 76, 77, 85, 140. Lastly, Plaintiff
26  tries to sidestep the political question doctrine's application because "every branch has
27  [after-the-fact] described Defendant's acts as torture." Opp'n 38-39. In light of the
28  uncertainty of the legality of the conduct in 2002, as discussed *supra*, the Court should

DEFENDANTS' MOTION TO DISMISS
Page 16

1    not be swayed by these post-hoc politically-motivated pronouncements, but perform the

2    "discriminating case-by-case analysis" into whether a political question is so

3    inextricably tied to the case. *Saldana v. Occidental Petroleum Corp*., 774 F.3d 544, 551

4    (9th Cir. 2014) (citations omitted). In sum, Plaintiff does not and cannot meaningfully

5    contest the application of the political question doctrine under either the *Taylor* test or

6    the *Baker* factors.

7    **VI.   PLAINTIFF HAS NOT ALLEGED COGNIZABLE ATS CLAIMS**

8        **A.   State Acquiescence Is Insufficient Under the ATS.**

9        Plaintiff admits "private conduct without government involvement" cannot

10   support Counts I, II, and IV, Opp'n 23, and concedes that if Defendants are U.S. agents,

11   the Court lacks jurisdiction. *Id.* at 7. Thus, Defendants do not divine a "catch-22"—the

12   law creates it. Plaintiff, desperate to escape this dilemma, misrepresents the law.

13   Plaintiff curiously claims Defendants somehow devised the (well-established) state

14   action requirement applicable to ATS torture claims. *Id.* at 23-24; *but see Sinaltrainal

15   v. Coca-Cola Co.*, 578 F.3d 1252, 1266 (11th Cir. 2009) (failure to allege state action

16   is fatal to an ATS claim); Mot. 35. Plaintiff also errantly claims he must show only that

17   the government "acquiesced" in Defendants' conduct—citing no authority addressing

18   an ATS claim. Rather, Plaintiff relies exclusively on the CAT to support this assertion.

19   Opp'n 23-26. But the CAT merely defines "torture;" it does not impact the ATS' state

20   action requirement—as evidenced by the fact that none of Plaintiff's cited cases concern

21   the ATS or state action requirement. *See Reyes-Reyes v. Ashcroft*, 384 F.3d 782, 787

22   (9th Cir. 2004) (discussing CAT's torture definition for an asylum claim); *Karki v.

23   Holder*, 715 F.3d 792, 806 (10th Cir. 2013) (assessing CAT's Art. 3 in asylum context).

24       Worse, in an attempt to distinguish the on-point ATS cases Defendants identify,

25   Plaintiff warps the law. For example, he argues *Kadic*'s § 1983 color of law language

26   only applies in the Torture Victim Protection Act ("TVPA") context, when that court

27   explicitly states, "the color of law jurisprudence … is a relevant guide to whether a

28   defendant has engaged in official action for purposes of jurisdiction under the Alien

1   Tort Act." *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995). Indeed, Plaintiff

2   misconstrues the court's distinction between the ATS and the TVPA. While the ATS is

3   broader, this is only because it dispenses with the state action requirement for certain of

4   its claims (none applicable here), while TVPA liability always requires such showing.

5   *Id.* at 241. In fact, *Kadic* highlights the distinction between the CAT and the ATS' state

6   action requirement in that it cites the CAT solely to "defin[e] torture." *Id.* at 244.

7   Torture's definition is not disputed in this action. Plaintiff also attempts to distinguish

8   *Aldana v. Del Monte Fresh Produce, N.A., Inc*., 416 F.3d 1242 (11th Cir. 2005). But

9   *Aldana* repudiates Plaintiff's acquiescence standard. *Id.* at 1248. ("Guatemala's

10  registration and toleration of private security forces does not transform those forces'

11  acts into state acts."). *Aldana* then adds, "[t]his lack of state action is *particularly*

12  *definite* where, as here, Plaintiffs do not allege sufficient facts to warrant the inference

13  that the National Police knew of and purposefully turned a blind eye to the events." *Id.*

14  (emphasis added). Plaintiff interprets this as saying that had the Police known, the state

15  action requirement would have been met. Wrong. This statement is merely explaining

16  that the state action requirement was completely out of reach, i.e. even had the police

17  known, the requirement would not have been met—the police's lack of knowledge

18  simply made that determination more definite.

19          Contrary to Plaintiff's representations, a "threshold question in any AT[S] case

20  against a private party … is whether the alleged tort requires the private party to engage

21  in state action for AT[S] liability to attach, and if so, whether the private party in fact

22  engaged in state action." *Doe I v. Unocal Corp.*, 395 F.3d 932, 945 (9th Cir. 2002). No

23  ATS case addressing torture, non-consensual medical experimentation, or arbitrary

24  detention has held that acquiescence alone satisfies this threshold issue. And while

25  Plaintiff attempts to deny it absent authority, "courts look to the standards developed

26  under 42 U.S.C. § 1983 to determine whether the [ATS] claim [against a private actor]

27  will stand." *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 345

28  (C.D. Cal. 1997). Specifically, courts look to whether "a private individual acts under

color of law within the meaning of section 1983" by acting together with state officials or with significant state aid. *Id.* The Complaint concedes this is the relevant standard; it alleges Defendants "acted under color of law … in that they acted with apparent (though not bona fide) authority." Compl. ¶117. Plaintiff attempts to lessen the standard required for state action only because he now recognizes that in alleging Defendants acted under color of law, he has pled an agency relationship resulting in MCA applicability.

**B.    Finding Plaintiff Alleged Non-Consensual Medical Experimentation Would Greatly Expand Pfizer**

In interpreting the ATS' bounds, the Supreme Court has stressed restraint and caution. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004); Mot. 37. Plaintiff asks this Court to extend the holding in *Abdullahi v. Pfizer, Inc.*, the sole case allowing non-consensual medical experimentation to support an ATS claim, beyond large-scale testing of drugs without informed consent, thereby stripping this already tenuous claim of the only shred of specificity it maintains. 562 F.3d 163,185 (2d Cir. 2009) ("[T]he prohibition in question applies to the testing of drugs without the consent of human subjects on the scale Pfizer allegedly conducted"). Plaintiff asserts confining the scope of *Pfizer* to the very parameters the Second Circuit defined would be a "novel limitation." Opp'n 33. But, specificity is a critical element in establishing new ATS claims, and, as such, expanding *Pfizer* is the novel approach. *Sosa*, 542 U.S. 692 at 738. Plaintiff's invitation should be declined.

**C.    Defendants Are Not Liable For Plaintiff's Entire Detention**

The Complaint advances a claim for arbitrary detention, seeking to hold Defendants liable for Plaintiff's decades-long detention at U.S. black sites and military bases, which plainly contradicts Plaintiff's claim Defendants were not agents. Compl. ¶¶137-44. Plaintiff recognizes he has overreached, so he now seeks to divide his claim into multiple "detentions, both short and long." Opp'n 34-37. But, Plaintiff is not entitled to replead his claim via motion practice; Plaintiff's claim as pled is not limited to the period of Defendants' interrogation—Plaintiff claims Defendants are the direct

cause of his *entire* detention. Pivoting, Plaintiff now introduces new allegations, such as "[Plaintiff's] torture has left the government apparently unwilling to release him for fear that somehow he may have been radicalized and poses a continuing threat … or— much more likely that he would further publicize details of his treatment to the detriment of the CIA's bureaucratic interests," Opp'n 36, and, that "the purported 'confessions' they extracted from him, have created political risk of any country to accept him out of Guantanamo." *Id.* at 37. These allegations cannot be considered. *Schneider v. Cal. Dept. of Corrs.*, 151 F.3d 1194, 1198 n.1 (9th Cir. 1998).

Moreover, Plaintiff presses his claim against the wrong party. Detention is arbitrary when it is "not accompanied by notice of charges; if the person detained is not given early opportunity to communicate with family or to consult counsel; or is not brought to trial within a reasonable time." *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1384 (9th Cir. 1998). But, Defendants are not alleged to have control over charging, prosecuting or making counsel available to Plaintiff.[8] Thus, Defendants cannot be liable for his alleged arbitrary detention. *See Liu Bo Shan v. China Const. Bank Corp.*, 421 Fed. App'x. 89, 92-93 (2d Cir. 2011). In *Liu Bo Shan*, the court held that a Chinese Bank could not be held liable for arbitrary detention claims even if it facilitated the plaintiff's arrest, manufactured false evidence against him and knew the manner in which he would be treated during his detention. *Id.* Notably, the Bank operated as an arm of the government and was not an entirely private entity. *Id.* at 92. Nevertheless, the Bank could not be held an instrumentality for all of the government's actions, just as Defendants cannot be held liable for 22 years of Plaintiff's detention at the hands of the executive branch or the military. Moreover, adopting Plaintiff's theory would extend Defendants' liability for his detention in perpetuity and extend liability for his detention to every individual and entity involved. Plaintiff's theory is absurd.

---

[8] As such, any UN decision concerning Plaintiff's detention is inapposite. Opp'n 33.

DATED this 5th day of February, 2024.

**EVANS, CRAVEN & LACKIE, P.S.**

By:    */s James B. King*

James B. King, WSBA #8723

Attorneys for Defendants

Evans, Craven & Lackie, P.S.

818 W. Riverside Ave., Ste. 250

Spokane, WA 99201

(509) 455-5200

(509) 455-3632 facsimile

jking@ecl-law.com

**BLANK ROME LLP**

By:    */s James Smith*

James Smith (*Pro Hac Vice*)

Brian Paszamant (*Pro Hac Vice*)

Ann Querns (*Pro Hac Vice*)

Attorney for Defendants

One Logan Square

130 North 18th Street

Philadelphia, PA 19103

Phone: (215) 569-5791

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 5, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Jeffry K. Finer, Esquire (Jeffry@FinerWinn.com)

Finer Winn

2850 East Rockhurst Lane, Suite 356

Spokane, WA 99223

(509) 981-8960

*Counsel for Plaintiff*


Solomon B. Shinerock, Esquire (Solomon.Shinerock@lbkmlaw.com)

Adam Kaufmann, Esquire (Adam.Kaufmann@lbkmlaw.com)

Elizabeth M. Velez, Esquire (Elizabeth.Velez@lbkmlaw.com)

Anika Conrad, Esquire (Annika.Conrad@lbkmlaw.com)

Lewis Baach Kaufmann Middlemiss PLLC

The Chrysler Bldg, 405 Lexington Avenue, 64th Floor

New York, NY 10174

(212) 826-7001

Eric L. Lewis, Esquire (Eric.Lewis@lbkmlaw.com)

David Short, Esquire (David.Short@lbkmlaw.com)

Alexander Bedrosyan (**alexander.bedrosyan@ibkmlaw.com)**
Lewis Baach Kaufmann Middlemiss PLLC

1101 New York Avenue NW, Suite 1000

Washington, DC 20005

*Counsel for Plaintiff*

1

                            **EVANS, CRAVEN & LACKIE, P.S.**

2

               By <u>s/ James B. King, WSBA #8723_</u>

3

                        James B. King, WSBA #8723

4

                        Attorneys for Defendants

5

                        Evans, Craven & Lackie, P.S.

6

                        818 W. Riverside Ave., Ste. 250

7

                        Spokane, WA 99201

8

                        (509) 455-5200

9

                        (509) 455-3632 facsimile

10

                        jking@ecl-law.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28